IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHON ROBERT HOPWOOD,           §
                               §
            Plaintiff,         §
                               §
vs.                            §        Case No. 1:25-cv-4214 -SLS
                               §
                               §
JILL COCKSON,                  §        **JURY TRIAL DEMANDED**
                               §
            Defendant.         §

## FIRST AMENDED COMPLAINT IN A CIVIL ACTION

**INTRODUCTION**

1. "Vendetta" is defined as "a series of acts done by someone over a long period of time to cause harm to a disliked person." Vendetta, Merriam-Webster Dictionary (2025). Shon Hopwood ("Hopwood") and Jill Cockson had a high school romance in 1991 to 1992 that ended with Hopwood initiating a breakup. Cockson never forgot it. Starting around 2011, Cockson embarked on a personal vendetta to harm, inconsiderately besmirch, and defame Hopwood's name by contacting schools that he attended, employers that he worked for, bar associations that granted him law licenses, and ultimately Hopwood's wife and children. Cockson defamed Hopwood, portrayed him in a false light, and intentionally harassed and caused him emotional distress. Through this lawsuit, Hopwood seeks to end this unnecessary juvenile vendetta against him.

RECEIVED

DEC 1 9 2025

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

1

**THE PARTIES**

2. Shon Hopwood is the Plaintiff and is domiciled in the District of Columbia (hereinafter "District").

3. Jill Cockson is the Defendant and is domiciled in Kansas City, Missouri.

**BACKGROUND ON THE PARTIES**

4. Hopwood attended David City Public High School in David City, Nebraska, from 1989 to 1993. He graduated in 1993, and then attended Midland Lutheran College in Fremont, Nebraska, before enlisting in the U.S. Navy. He was honorably discharged from the Navy in 1996.

5. Hopwood committed a series of crimes in 1994, and in 1998, he pled guilty to five counts of bank robbery and one count of using a firearm during a crime of violence. Hopwood was sentenced to twelve years and three months of imprisonment.

6. Hopwood served around a decade of imprisonment at FCI Pekin in Pekin, Illinois. While incarcerated, he worked at the prison law library, and he began researching legal issues, even though he had no bachelor's degree or any formal legal training.

7. Hopwood began researching other prisoners' legal claims and writing legal briefs that prisoners would file pro se, meaning without a lawyer and representing themselves. Hopwood prepared two petitions for writs of certiorari that the Supreme

Court of the United States granted. He also prepared and litigated successful appeals, post-conviction motions, and sentence reduction motions.

8. Hopwood was released from federal prison in 2007 and was released from federal custody in 2008.

9. Hopwood married his wife, Ann Marie Hopwood, on August 7, 2009. The Hopwoods have a son and daughter together.

10. Hopwood attended law school as a Gates Scholar at the University of Washington School of Law, and he graduated in 2014.

11. Hopwood became a member of the Washington State Bar Association and later of the District of Columbia Bar.

12. After law school, Hopwood clerked for the Honorable Janice Rogers Brown of the U.S. Court of Appeals for the District of Columbia.

13. After clerking, Hopwood served as a Teaching Fellow at the Georgetown University Law Center's Appellate Litigation Clinic.

14. Hopwood was next appointed as a tenure-track law professor at Georgetown University Law Center.

15. Hopwood also opened a law firm in the District (Hopwood & Singhal PLLC). He litigated private and pro bono cases through his law firm.

16. Hopwood spent considerable energy advocating for criminal justice reform, including sentencing and prison reform.

17. Hopwood's accomplishments and career were featured in a segment on 60 Minutes on CBS.

18. In 2023, Hopwood was charged with two counts of misdemeanor assault of his wife in the DC Superior Court.

19. In 2023, Hopwood's indictment was later superseded and included four counts of assault, five counts of contempt of court, and two counts of obstruction of justice. His trial began on June 11, 2025.

20. Hopwood was acquitted of one count of assault and convicted of the remaining counts. The DC Superior Court is currently considering a motion for a new trial based on right to counsel violations and judicial errors.

21. Cockson is a bartender and the owner and operator of bars in Kansas City, Missouri.

22. Upon information and belief Cockson resides in either Kansas City, Missouri or Lincoln, Nebraska.

**THE HIGH SCHOOL RELATIONSHIP**

23. Cockson and Hopwood began dating in 1991 or 1992. In 1991 or 1992, Cockson suffered a devastating car crash in which she was left partially paralyzed.

24. When Hopwood learned about the car crash, he and his father, Mark Hopwood, drove from David City to Lincoln, Nebraska to visit Cockson in a hospital emergency room.

25. For months, Hopwood drove from David City to Lincoln, Nebraska to visit and stay with Cockson at her hospital room and at the rehabilitation center where she also stayed for months.

26. After Cockson's release from the rehabilitation center, she became very bitter due to her being unable to walk or run as she did prior to the car crash.

27. At some point, Cockson rode in Hopwood's car, and, according to Cockson, he drove too fast, causing Cockson to be upset. Cockson would later claim that she was "traumatized" from these incidents. According to Cockson, Hopwood also drove near a ravine and slammed on the brakes.

28. Sometime in 1992, Hopwood ended the relationship with Cockson, and she was angry about their relationship ending.

29. When the relationship ended, Hopwood was sixteen years old.

30. After the relationship ended, Hopwood briefly dated Cockson's best friend, which caused Cockson to become more bitter, angry, and resentful of Hopwood.

31. Hopwood did not see, nor communicate with Cockson from 1993 to 2025.

**COCKSON'S PERSONAL VENDETTA AGAINST HOPWOOD**

32. Starting in or around 2011, when Hopwood attended law school at the University of Washington School of Law in Seattle, Washington, Cockson embarked on a personal vendetta against Hopwood. Cockson contacted schools, employers,

bar associations, and even Hopwood's family. In doing so, Cockson made vile and false allegations against Hopwood, and encouraged others to contact entities and persons connected to Hopwood within the District.

33. Cockson's goals in her vendetta against Hopwood was that he would be fired from his employer and take away his law license.

34. Beginning in 2011 through 2025, Cockson contacted the University of Washington School of Law, and 60 Minutes (a television program on CBS). These contacts were made outside the District.

35. From 2014 to 2025, Cockson contacted, via email, letter, or phone calls, the following: (1) Judge Janice Rogers Brown; (2) the U.S. Court of Appeals for the District of Columbia Circuit; (3) the District of Columbia Bar Association; (4) the Washington Post; and (5) Georgetown University Law Center. Cockson's communications originated in Missouri (or Nebraska), but the recipients of those communications were *all* within the District.

36. Upon information and belief, from 2014 to 2025, Cockson contacted, via email, letter, or phone calls, the following: (1) Judge Janice Rogers Brown; (2) the U.S. Court of Appeals for the District of Columbia Circuit; (3) the District of Columbia Bar Association; and (4) Georgetown University Law Center. Cockson claimed that Hopwood was a "certifiable psychopath and sociopath" who was "cruel to animals," and, based on her personal interactions and observations, a "monster"

that should not be employed, nor have the privilege of practicing law. She asked the above persons and entities to terminate Hopwood's employment, and the District Bar to discipline or disbar Hopwood.

37. In 2023, Cockson posted several comments about Hopwood and his criminal case on her publicly accessible Facebook page. She wrote: "Based on my personal encounters with him, it is my opinion that Shon Hopwood is a textbook sociopath. He endangered my life more than once and laughed maniacally as he did so. I told everyone that I feared for Annie and the kids. I hope they are safe from him now. Shon Hopwood is a monster. I hope he finally goes back to prison, where he belongs. I am sad that Annie has had to endure his sociopathic terrorism. Shame to every publication that has given this monster positive press: DO BETTER. To the Bill and Melinda Gates Foundation (which bought his sob story and paid for his law degree): Next time, find a worthy recipient who hasn't even had one chance, versus someone who pissed away several, whilst ruining lives and permanently traumatizing others."

38. Cockson posted on Facebook: "he is facing both criminal and civil proceedings. there's also an embezzlement charge against him, as I understand. Nothing would shock me. It's just that Washington DC is full of lawyers who are paid to make this stuff go away for people like him."

39. In July of 2024, Cockson posted a video about Hopwood on her Instagram account, which was posted to all 50 states and the District. She alleged that during their high school relationship, Hopwood exhibited signs of "sociopath slash psychopathy." She further alleged that Hopwood was "cruel to animals, cruel to his siblings, cruel to friends." She encouraged a podcaster of "true crime" to feature Hopwood as a "monster" because institutions and people had "escalated Hopwood's evolution as a narcissist and a sociopath." Cockson later deleted the video in or around April of 2025, after Hopwood had threatened civil litigation against her.

40. Cockson posted that she had been contacting Hopwood's employers and the law school that he attended in order to let them know he was a "sociopath" and a "psychopath."

41. On or around 2024, Cockson left a comment on an American Bar Association website. The ABA had posted an article about Hopwood, and Cockson left a comment that Hopwood was a "psychopath," who was "cruel to animals," and a "monster."

42. On or around December 2024, Hopwood learned about Cockson's vendetta against him.

43. Through social media (Facebook messenger), an acquaintance of Hopwood told Hopwood that Cockson had left a comment on the ABA article and that she had written Facebook posts about Hopwood. Hopwood learned this

information sometime between December 26, 2024, to January 1, 2025. He took a screenshot of one of Cockson's Facebook posts on January 1, 2025. At the same time, Hopwood learned that Cockson had contacted Judge Brown, the DC Circuit, Georgetown University, and the DC Bar Association.

44. On March 11, 2025, Hopwood posted an article on Substack.

45. On March 12, 2025, Cockson responded that Hopwood was a "psychopath and a liar." She wrote: "I remember how you used to terrorize people, including myself. How you got off on seeing people afraid. How you put people in danger to get a reaction that gave you a jolt or thrill. You are a pathetic monster. That's a hard-wiring defect."

46. On March 12, 2025, Hopwood responded: "Jill, you also said on Facebook that I was being investigated and charged with embezzlement. That was false and there is a legal term for it: defamation. I decided not to file a lawsuit against you even though I would have won. You can keep repeating delusional lies about me, especially since you know nothing about me because we have not seen each other in 30 years. But if you keep spreading lies, you will hear from my attorney."

47. On March 12, 2025, Cockson responded: "You don't need any help defaming yourself. You've done that all on your own. I believe I got the embezzlement information from the online portal documenting your case. I can rephrase. I believe you are being investigated for embezzlement. Now it's a statement

about my beliefs. Fun trick, huh? That degree in formal logic comes in handy. Your pattern of behavior is stereotypical of a narcissist and sociopath. The courts have seen you 1000 times. You can hide behind words like defamation, when I would gladly take the stand in a court of law any day to describe the very vivid memories I still have of your terror. You can surround yourself with idiots who believe what you say, but there are those of us who know. And I'll do everything I can to get that version of you out there..."

48. On March 12, 2025, Hopwood responded: "The public docket never said a word about embezzlement. That is something you made up to defame me. I've got the screenshots of what you wrote and now I will deal with you in court. You've held some sort of grudge against me ever since I broke up with you at the age of 16. You just sound like a lunatic, who is guilty of defamation per se. And now I have proof that it is malicious."

49. A few weeks after Cockson's comments on Substack, she deleted her Facebook posts regarding Hopwood, and then deleted or deactivated her Facebook account.

50. In June of 2025, Cockson traveled to the District and attended Hopwood's criminal trial. Cockson also spoke to Mrs. Hopwood in the District.

51. While Cockson was in the District, she saw Mrs. Hopwood and their children.

52. Friends of Hopwood viewed Cockson's Facebook posts, which were publicly available, her internet comment on the ABA website, and her Substack comments, while they were in the District.

53. Hopwood's colleagues at Georgetown University Law Center, fellow lawyers, former law school students, and friends viewed Cockson's Substack and ABA comments while they resided in the District.

54. Hopwood's mother, brother, and sisters viewed Cockson's Facebook posts about Hopwood from their residences in Nebraska.

55. Hopwood was convicted of obstruction of justice, contempt of court, and three counts of assault. He filed a motion for a new trial that is pending before the DC Superior Court.

## SUBJECT MATTER JURISDICTION

56. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) & (a)(4)(b)—"diversity" jurisdiction.

57. Plaintiff Hopwood is a citizen of the District, whereas Cockson is a citizen of Missouri.

58. The amount in controversy greatly exceeds $75,000.00. Hopwood seeks $250,000.00 in compensatory damages and $500,000.00 in punitive damages, in addition to costs and nominal damages. Hopwood seeks such damages for the mental, emotional, and physical distress caused by Cockson's actions. He also seeks

redress for reputational harm caused by Cockson's defamatory comments, portrayal of Hopwood in a false light, and Cockson's intentional infliction of emotional distress. Hopwood operates a law firm and was employed by Georgetown University Law Center and was distressed and concerned about reputational harm caused to his clients, potential clients, and employer. Hopwood also seeks damages for the harm caused by Cockson's false comments to his wife and children, and Cockson's goal of alienating Hopwood from them.

**PERSONAL JURISDICTION**

59. The Court has personal jurisdiction over Cockson for her acts and injuries that she caused occurred in the District. Cockson traveled to the District and spoke to Hopwood's wife while in the District. Cockson made defamatory and false light statements about Hopwood that she began in Missouri (or Nebraska) but that were published in the District via phone calls, texts, social media messenger applications, emails, and internet comments, all of which caused Hopwood harm within the District. Cockson also intentionally inflicted emotional distress on Hopwood by contacting his employers, wife, the DC Bar Association, and telling them vile, false, and misleading statements about Hopwood in an effort to alienate Hopwood from family, friends, colleagues, and employers. She caused substantial harm to Hopwood within the District.

60. The Court has personal jurisdiction over Cockson due to her persistent course of conduct within the District. Cockson's false and vile comments largely concerned Hopwood residing and taking action in the District, and District was her focus. Cockson intended to affect Hopwood in the District via his family, friends, and employers in the District. She tried to influence Hopwood's employers, and the DC Bar in the District through her personal vendetta against Hopwood. She knew that her intentional actions would cause the most harm in the District. And she published vile and false statements against Hopwood in the District. Cockson further tried to impact Hopwood's criminal case in the District.

## COUNT 1 DEFAMATION PER SE

61. Upon information and belief, continuing through at least December 2024, Cockson contacted via email, text, phone call, or social media application, Judge Janice Rogers Brown, the DC Circuit, Georgetown University Law Center, and the DC Bar Association, and claimed that Hopwood was a "certifiable psychopath and sociopath" who was "cruel to animals," and a "monster." She originated those claims in Missouri (or Nebraska) but published them in the District. She did so in an attempt to get Hopwood terminated from employment and disciplined or disbarred. Cockson further tried to impact Hopwood's criminal case in the District.

62. Cockson knew the comments were false and defamatory. The comments constitute defamation per se because they were highly likely to damage Hopwood's reputation as a lawyer and law professor.

63. Cockson made the false and defamatory claims in bad faith and with ill will. Cockson knew these comments were false. Cockson is not a licensed psychiatrist and does not know if Hopwood is a certifiable psychopath or sociopath, and she also does not know that he is cruel to animals, as she had not seen, nor communicated with Hopwood from 1993 to 2025. Cockson made up those claims. But even if she heard or learned those claims from others, such claims were unsupported by any facts and Cockson made no investigation into whether the claims were true. Cockson committed defamation per se with actual malice.

64. Hopwood discovered that Cockson made these statements at the earliest of December 26, 2024, via an acquaintance that told Hopwood about Cockson's posts. He was previously unaware of Cockson's vendetta against him because Cockson deliberately hid her actions from Hopwood.

65. As will be listed below, and expressly incorporated into this count (see paragraphs 116-120), Hopwood suffered several types of harm, including physical, mental, and emotional distress, as well as reputational harms.

**COUNT 2 FALSE LIGHT (In the Alternative to Count 1)**

66. Hopwood incorporates paragraphs 61 in support of this count. Cockson's comments portrayed Hopwood in a false light that is highly offensive.

67. Hopwood incorporates paragraphs 62 and 63 in support of this count. Cockson had knowledge these comments were false or acted with reckless disregard as to the falsity.

68. Hopwood incorporates paragraphs 64-65 in support of this count.

**COUNT 3 DEFAMATION PER SE**

69. Sometime in 2023 or 2024, Cockson made a statement on her Facebook page that Hopwood was being "investigated and charged with embezzlement." The statement was published to all 50 states and the District. Her statement was false—as Hopwood was never investigated, nor charged with embezzlement--and constitutes defamation per se because she alleged that Hopwood committed a crime.

70. Cockson made this statement in bad faith and with ill will against Hopwood. She fabricated the statement and thus knew it was false. She later claimed that she saw Hopwood was charged with embezzlement on the DC Superior Court website. That claim was also false. But even if she learned or heard the statement from others, it was unsupported and she made no attempt to investigate whether the statement was false. Cockson committed defamation per se with actual malice, and she did so maliciously.

71. Hopwood discovered that Cockson made this statement at the earliest on December 26, 2024. He took a screenshot of Cockson's Facebook post on January 1, 2025. Hopwood was previously unaware of Cockson's vendetta against him, as Cockson deliberately hid her actions from Hopwood.

72. As will be listed below, and is expressly incorporated into this count (see paragraphs 116-120), Hopwood suffered several types of harms, including physical, mental, and emotional distress, as well as reputational harms.

**COUNT 4 FALSE LIGHT (In the Alternative to Count 3)**

73. Hopwood incorporates paragraph 69 in support of this count. Cockson's false comment portrayed Hopwood as an embezzler. She later claimed that she saw Hopwood was charged with embezzlement on the DC Superior Court website. That claim was also false. Hopwood was never investigated or charged with embezzlement. He was previously unaware of Cockson's vendetta against him because Cockson deliberately hid her actions from Hopwood up until her comments on Hopwood's Substack article on March 12, 2025.

74. Hopwood incorporates paragraphs 70 and 71 in support of this count.

75. Hopwood incorporates paragraph 72 in support of this count. Hopwood suffered physical, mental, and emotional harms, in addition to reputational harms.

**COUNT 5 DEFAMATION PER SE**

76. Sometime in 2023 or 2024, Cockson made a statement on her Facebook page that Hopwood was a "psychopath" and "sociopath." These statements were published to all 50 states and the District. Her statement was false and constituted defamation per se because the statements were highly likely to damage Hopwood's reputation as a lawyer and law professor.

77. Cockson made these statements in bad faith and with ill will towards Hopwood. She fabricated the statements and was well aware that she is not a trained psychiatrist, that Hopwood has never been diagnosed as a psychopath or sociopath, and that her statement was false. Cockson had not seen nor communicated with Hopwood from 1993 to 2025. But even if she learned or heard that false statement from others, she knew it was unsupported, and she made no attempt to investigate whether the statement was false. Cockson committed defamation per se with actual malice.

78. Hopwood discovered that Cockson made this statement at the earliest on December 26, 2024. He took a screenshot of Cockson's Facebook post on January 1, 2025. He was previously unaware of Cockson's vendetta against him because Cockson deliberately hid her actions from Hopwood up until December 2024.

79. As will be listed below and is incorporated into this count, (see paragraphs 116-120), Hopwood suffered physical, mental, and emotional distress, as well as reputational harms.

**COUNT 6 FALSE LIGHT (In the Alternative to Count 5)**

80. Hopwood incorporates paragraphs 37 and 76 in support of this count. Cockson's statement portrayed Hopwood in a false light.

81. Hopwood incorporates paragraphs 77 and 78 in support of this count.

82. Hopwood incorporates paragraph 79 in support of this count. As a result of Cockson's statements, he suffered physical, mental, and emotional distress, as well as reputational harm.

**COUNT 7 DEFAMATION PER SE**

83. On or around 2023 or 2024, Cockson made a comment on the ABA website at the end of an article about Hopwood's criminal case in which she called him a "psychopath" and stated that he was "cruel to animals." She originated those statements in Missouri (or Nebraska), but they were published in all 50 states and the District. Her statements were false and constitute defamation per se because they are highly likely to damage Hopwood's reputation as a lawyer and law professor.

84. Cockson made this statement in bad faith and with ill will towards Hopwood. Cockson is not a licensed psychiatrist and has not diagnosed, nor known of a diagnosis, that Hopwood is a psychopath. She also has no information to draw

upon that Hopwood is cruel to animals. She has not seen, nor communicated with Hopwood from 1993 to 2025. She fabricated these claims. But even if she learned or heard these statements from others, she knew they were unsupported and she made no attempt to investigate the statements before publishing them. This constitutes actual malice.

85. Hopwood discovered that Cockson made this statement on December 26, 2024. He was previously unaware of Cockson's vendetta against him because Cockson deliberately hid her actions from Hopwood up until Hopwood discovered her Facebook comments on December 26, 2024.

86. As will be listed below, and is incorporated into this count, (see paragraphs 116-120), Hopwood suffered physical, mental, and emotional distress as well as reputational harm.

**COUNT 8 FALSE LIGHT (In the Alternative to Count 7)**

87. Hopwood incorporates paragraph 83 in support of this count. Cockson's statements portrayed Hopwood in a false light.

88. Hopwood incorporates paragraphs 84 and 85 in support of this count.

89. Hopwood incorporates paragraph 86. As a result of Cockson's statements, Hopwood suffered physical, mental, and emotional distress, as well as reputational harms.

**COUNT 9 DEFAMATION PER SE**

90. On or around March 12, 2025, Cockson made a statement that Hopwood was being "investigated" for "embezzlement," and that she learned he was being investigated for embezzlement "from the online portal documenting [Hopwood's] case." Hopwood incorporates paragraphs 44 to 48 in support of this count. Cockson made these statements in the comment section of an article Hopwood wrote on Substack. Cockson wrote this false and defamatory statement from Missouri (or Nebraska), but the statement was published in all 50 states and in the District. Her statement constitutes defamation per se because it accused Hopwood of a crime that he did not commit, and was never investigated or charged for.

91. Cockson made the statement in bad faith and with ill will against Hopwood. She fabricated the statement and thus knew it was false. But even if she learned or heard this statement from others, she knew it was unsupported, and she conducted no investigation to determine its falsity. At no point did the public portal to Hopwood's criminal case state that he was being investigated or charged with embezzlement. Cockson committed defamation per se with actual malice, and she did so maliciously.

92. Hopwood discovered that Cockson made this statement on or around March 12, 2025.

93. As will be listed below, and expressly incorporated into this count (see paragraphs 116-120), Hopwood suffered physical, mental, and emotional distress, as well as reputational harm.

**COUNT 10 DEFAMATION PER SE**

94. On March 12, 2025, Cockson made statements that Hopwood was a "psychopath and a liar," a "sad, pathetic, monster" with a "hard-wiring defect," and that his behavior was "stereotypical of a narcissist and sociopath." Cockson made these statements in the comment section of an article Hopwood wrote on Substack. Hopwood incorporates paragraphs 44 to 48 in support of this count. Cockson wrote these false and defamatory statements from Missouri (or Nebraska), but the statements were published in all 50 states and the District. Her statements constitute defamation per se because they harm Hopwood's reputation as a lawyer and law professor.

95. Cockson made these statements in bad faith and with ill will against Hopwood. She fabricated these claims and knew they were false. Cockson is not a licensed psychiatrist and was unaware whether Hopwood was diagnosed as a psychopath, sociopath, or narcissist (which he was not). Cockson had not seen, nor communicated with Hopwood between 1993 to 2025. Even if she had learned or heard from others that Hopwood had been diagnosed as a psychopath, sociopath, or narcissist (which he was not), Cockson knew such a claim was unsupported and she

made no attempt to investigate whether the statement was false. Cockson committed defamation per se with actual malice, and did so maliciously.

96. Hopwood discovered that Cockson made these statements on or around March 12, 2025.

97. As will be listed below, and expressly incorporated into this count (see paragraphs 116-120), Hopwood suffered physical, mental, and emotional distress, as well as reputational harms.

**COUNT 11 DEFAMATION PER SE**

98. On or around June or July of 2024, Cockson published a video on her Instagram account to all 50 states and the District. She alleged that Hopwood exhibited signs of "sociopath slash psychopathy," and that Hopwood was "cruel to animals, his siblings, and his friends." These statements were false and are highly likely to damage Hopwood's reputation as a professional lawyer and law professor.

99. Cockson made those statements in bad faith and with ill will towards Hopwood. Cockson is not a licensed mental health provider and has not diagnosed, nor known of Hopwood to receive any diagnosis, of sociopathy or psychopathy. She had no information to draw upon that Hopwood was cruel to animals, siblings, or friends. She fabricated these statements because she held a grudge against Hopwood for breaking up with Cockson and dating her best friend. This constitutes actual malice.

100. Hopwood learned of this video on November 3, 2025, after he was sent a transcript of the video from his friend Joshua Boyer.

101. As will be listed below, and is incorporated into this count (see paragraphs 116-120), Hopwood suffered physical, mental, emotional, and reputational harms.

## COUNT 12 INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

102. From 2014 to 2025, Cockson contacted, via email or phone calls, Hopwood's employers, and the DC Bar Association, in a smear campaign designed to discredit, defame, and undermine Hopwood's career. Hopwood incorporates paragraphs 34 through 36 in support of this count. Cockson contacted Judge Janice Rogers Brown, the DC Circuit, and Georgetown University Law Center and stated lies designed to make Hopwood look like a monster, and she requested that those persons or entities terminate Hopwood's employment. Cockson also encouraged others to contact Hopwood's employer.

103. Cockson also contacted the DC Bar and stated lies designed to encourage the DC Bar to discipline or disbar Hopwood.

104. Cockson contacted persons and entities connected to Hopwood and made knowingly false and vile statements against Hopwood. She did so intentionally and recklessly and expressly to harm Hopwood. As she stated in a comment on Substack,

she would do "everything" she could to get a false, vile, and negative "version" of Hopwood "out there."

105. Cockson also encouraged others to make false or vile statements to persons and entities connected to Hopwood.

106. Cockson committed the actions above and incorporated in this complaint during 2023 to 2025 when she knew Hopwood was particularly susceptible to emotional distress, as he was alienated from his family and from colleagues at Georgetown University as he fought the criminal charges against him. She callously ignored his known weakness and continued her personal vendetta and smear campaign knowing it would cause Hopwood the most harm in the District.

107. Hopwood discovered Cockson's personal vendetta against him on December 26, 2024. Cockson had previously hidden her actions against Hopwood, and they had not been in contact from 1993 to 2025.

108. When Hopwood discovered Cockson's personal vendetta against him and the length and depth she had gone to besmirch his name with employers, and the DC Bar, he suffered from extreme emotional distress. He was concerned that Georgetown University would terminate him, that current and potential clients would drop his representation, or not hire him. This concern was particularly acute from December of 2024 to July of 2025, when Hopwood was worried how he would support his wife and children financially. By December of 2024, several of

Hopwood's clients had terminated his representation of them and his family was incredibly vulnerable financially.

109. Hopwood's severe emotional distress manifested in physical symptoms. He lost approximately 10 pounds, his blood sugar levels spiked (as he has type 2 diabetes), and he suffered from anxiety attacks, insomnia, excessive sweating, body aches, lethargy, and low testosterone.

110. Hopwood's severe emotional distress manifested mentally and emotionally. He was depressed, unable to work more than a few hours a day, withdrew from family and friends, was alienated from them, spent large periods of time in his bedroom, exercised infrequently, and alienated himself from the outside world.

111. Cockson committed these actions against Hopwood with ill will, spite, glee, recklessness, and malice aforethought. As evidenced from her Substack comments and Facebook posts (Hopwood incorporates paragraphs 37-54 in support of this count), Cockson was aware of her intentional and outrageous conduct and did so intentionally with malicious intent.

**COUNT 13 DEFAMATION PER SE**

112. On December 12, 2025, Cockson sent an email through a "Justice for Jill" email address to the DC Superior Court Judge assigned to Hopwood's criminal case, two Assistant U.S. Attorneys, the U.S. Attorney, the American Bar Association,

and several other lawyers. In the email, Cockson accused Hopwood of "witness intimidation" and "conspiracy" and asked the DC Superior Court to impose some "controls" on Hopwood. Cockson originated these statements in Missouri but they were published in the District, and these statements constitute defamation per se because they are highly likely to damage Hopwood's reputation as a lawyer and law professor.

113. Cockson made these statements in bad faith and with ill will towards Hopwood. Cockson fabricated these false claims and thus they were false. She had no information to draw upon that Hopwood was being investigated for, nor committed witness intimidation or conspiracy.

114. Cockson made these statements intentionally to defame Hopwood because she was upset that Hopwood previously sued her for defamation per se, false light, and intentional infliction of emotional distress. Cockson cited the Bill of Rights.

115. Cockson intentionally argued with ill will towards Hopwood and made these false and defamatory claims to influence the American Bar Association to interrogate Hopwood in both this civil case and this criminal case in DC Superior Court. As will be listed below, and is incorporated into this count (see paragraphs 116-120), Hopwood suffered physical, mental, emotional, and reputational harms.

## DAMAGES AND RELIEF

116. As a result of Cockson's statements and actions, Hopwood suffered several types of harm: (1) physical symptoms; (2) mental and emotional distress; (3) reputational harms; (4) familial harms; and (5) legal harms. The harms are listed below.

117. Physical harms: loss of weight (10 pounds), high blood sugar levels, pancreatic attacks, anxiety attacks, insomnia, excessive sweating, body aches, fever, stiffness of joints, low testosterone levels, and lethargy.

118. Mental and emotional harm: depression, unable to work more than a few hours a day, withdrawn from family and friends, spent large periods of time in house and bedroom fearing that people would see Hopwood out and about in the District, unable to exercise frequently, and miserable and defeated disposition.

119. Reputational harms: colleagues, law partner, former and current law school students, current clients, future clients, friends, potential jurors in the District, family, employers, and bar associations read false and vile statements from Cockson, which lowered their opinion of Hopwood both professionally and personally. Cockson also encouraged others to make false, vile, and defamatory statements to persons and entities connected to Hopwood.

120. Familial harms: Hopwood's mother, brothers, and sisters read Cockson's false and vile statements against Hopwood, causing them emotional distress, for which Hopwood ultimately felt responsible for, even though he had no control over Cockson's unhinged actions and statements.

121. As a result of Cockson's actions and statements and the subsequent harms to Hopwood, he seeks $350,000.00 in compensatory damages, which could increase based on information gleaned from any forthcoming discovery requests.

122. Because Cockson carried out her personal vendetta against Hopwood intentionally, recklessly, maliciously, and with ill will and in bad faith against Hopwood, he seeks $650,000.00 in punitive damages. Hopwood incorporates paragraphs 61-115, in support of punitive damages. Again, this amount may increase upon discovery.

123. Hopwood seeks costs, including attorneys' and paralegal fees, filing fees, and other litigation-related costs.

124. Hopwood seeks a permanent injunction barring Cockson from making defamatory comments against Hopwood, such as calling him a psychopath, sociopath, or narcissist, or accusing him of committing, being investigated for, charged with, or convicted of embezzlement, or disparaging Hopwood before his wife or children.

125. To the extent they are necessary, Hopwood requests nominal damages and declaratory relief.

126. Plaintiff requests a jury trial to decide these claims.

WHEREFORE, Plaintiff respectfully requests that this Court: A. Award Plaintiff compensatory damages in the amount of $350,000.00, or such greater amount as may be proven at trial; B. Award Plaintiff punitive damages in the amount of $650,000.00, or such greater amount as may be proven at trial; C. Grant a permanent injunction prohibiting Defendant from making further defamatory statements about Plaintiff; D. Award Plaintiff his costs of suit, including reasonable attorneys' fees and paralegal fees; E. Award Plaintiff nominal damages and declaratory relief as appropriate; and F. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Shon Robert Hopwood  12/18/25
137 East Reed Avenue
Alexandria, VA 22305