## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHON ROBERT HOPWOOD
DCDC#: 374088
Central Detention Facility
1901 D Street, S.E.
Washington, DC  20003,

     Plaintiff,

  v.

JILL COCKSON
1519 Cherry Street
Kansas City, MO  64108,

     Defendant.

Civil Action No. 1:25-cv-04214-SLS

## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

  Defendant Jill Cockson respectfully moves this Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiff's Amended Complaint, ECF No. 2.[1] The statements upon which Mr. Hopwood bases his defamation and intentional infliction of emotional distress claims are that Ms. Cockson called Mr. Hopwood—a convicted bank robber, domestic abuser, contemnor, and obstructor of justice—epithets like "psychopath," "sociopath," and "monster." These epithets are classic non-actionable statements of opinion. Mr. Hopwood's extensive and varied criminal record, moreover, means that even if there were any factual implications, they are substantially true. It also means that Ms. Cockson's statements could not possibly have diminished a reputation already consigned to the gutter by Mr. Hopwood's criminal convictions. Additionally, Mr. Hopwood—by his own admission, a published author

---

[1] Although such relief appears foreclosed by binding precedent, *see Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 238 (D.C. Cir. 2021), Ms. Cockson preserves for possible future proceedings the argument that the District of Columbia's anti-SLAPP statute applies. *See* D.C. Code §§ 16-5501–5505 (D.C. Anti-SLAPP Act of 2010).

featured in *60 Minutes* for his proclaimed rehabilitation, witness before Congress, law professor, and prominent criminal justice reform advocate—is a public figure, and saying that Ms. Cockson dislikes him is not enough to plead actual malice. His complaint is also untimely on its face as to all but the March 12, 2025, comment under D.C.'s one-year statute of limitations for defamation. Finally, the complaint should also be dismissed because Mr. Hopwood is *pro se* and was required to sign his complaint "personally," Fed. R. Civ. P. 11(a), but, as the non-jail address on the complaint reflects, it appears to have been signed by a non-lawyer purporting to be Mr. Hopwood's attorney-in-fact.

 A supporting memorandum of law is attached hereto.

Dated: February 26, 2026     Respectfully submitted,


            */s/ Joseph M. Sanderson*
           Michelle S. Kallen (Bar No. 1030497)
           STEPTOE LLP
           1330 Connecticut Avenue, NW
           Washington, D.C.  20036-1795
           Telephone:  202 429 3000
           Facsimile:  202 429 3902
           mkallen@steptoe.com

           Joseph M. Sanderson (Bar No. NY0560)
           STEPTOE LLP
           1114 Avenue of the Americas
           New York, NY  10036-7703
           Telephone:  212 506 3900
           Facsimile:  212 506 3950
           josanderson@steptoe.com


           *Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHON ROBERT HOPWOOD
DCDC#: 374088
Central Detention Facility
1901 D Street, S.E.
Washington, DC  20003,

             Plaintiff,

     v.

JILL COCKSON
1519 Cherry Street
Kansas City, MO  64108,

             Defendant.

Civil Action No. 1:25-cv-04214-SLS

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

# TABLE OF CONTENTS

I.     Preliminary Statement ........................................................................................... 1

II.    Background. ......................................................................................................... 4

   A.    Mr. Hopwood Robs Five Banks, Gets Caught, And Spends More Than A Decade In Prison. ................................................................................................................. 4

   B.    Mr. Hopwood Spins His Work as a Jailhouse Lawyer Into Celebrity, Appearing on *60 Minutes*, Testifying Before Congress, Attending Bill Signings at the White House, and Clerking at the D.C. Circuit. ..................................................................................... 4

   C.    Mr. Hopwood Violently Assaults His Wife and Tries to Coerce Her Not to Testify Against Him. ........................................................................................................... 5

   D.    Mr. Hopwood Sues His High School Ex-Girlfriend for Calling Him a Psychopath and a Monster. ............................................................................................................... 8

III.   Argument ............................................................................................................ 9

   A.    Standard of Review. ........................................................................................... 10

   B.    The Defamation and False Light Counts Should Be Dismissed for Numerous Independent Reasons. ............................................................................................................. 11

     1.    Ms. Cockson's Statements Could Not Harm Mr. Hopwood's Reputation More Than The Judicially-Established or Admitted Truth. ............................................................... 12

       a.    As a Violent Criminal, Mr. Hopwood Cannot Demonstrate That Ms. Cockson's Statements Brought His Reputation Any Lower Than The Truth Does. ........................... 12

       b.    Because The Truth—As Established by Mr. Hopwood's Convictions and Admissions—Is Devastating to His Reputation, The Gist of the Statements Is Substantially True. ...................................................................................................... 14

     2.    Ms. Cockson's Vague Statements Do Not Convey Any Verifiable Facts About Mr. Hopwood. ............................................................................................................. 16

     3.    Mr. Hopwood Is, At Minimum, A Limited-Purpose Public Figure. ............................ 20

     4.    Vague Allegations of a "Vendetta" Do Not Equal Knowledge of Falsity. .................... 22

     5.    Mr. Hopwood's Claims are Untimely. ................................................................... 25

     6.    Mr. Hopwood's Allegations "On Information and Belief" of Unspecified Communications on Unspecified Dates to a Long List of Possible Recipients Do Not State A Claim. ........................................................................................................... 26

     7.    Reports to Bar Disciplinary Authorities Are Absolutely Privileged. .......................... 27

     8.    The False Light Claims Fail for the Same Reasons. ................................................. 27

   C.    The Intentional Infliction of Emotional Distress Claim Fails Both For The Same Reasons and the High Bar for Outrageousness. .......................................................................... 28

   D.    The Complaint Must Be Dismissed Under Rule 11(a) Because There Is Strong Evidence That Mr. Hopwood Did Not Sign It "Personally." ........................................................... 29

IV.    Conclusion ......................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*5-Star Mgmt., Inc. v. Rogers*,
    940 F. Supp. 512 (E.D.N.Y. 1996) ........................................................................16

*Asare v. LM-DC Hotel, LLC*,
    62 F. Supp. 3d 30 (D.D.C. 2014) .........................................................................28

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................10

*Barrett v. Atl. Monthly Grp. LLC*,
    No. CV 22-49 (LLA), 2024 WL 4119400 (D.D.C. Sept. 9, 2024) .........................10

*Bauman v. Butowsky*,
    377 F. Supp. 3d 1 (D.D.C. 2019) ........................................................................27

*Biro v. Conde Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013).................................................................24

*Blodgett v. Univ. Club*,
    930 A.2d 210 (D.C. 2007) ............................................................................23, 28

*Booth v. Fletcher*,
    101 F.2d 676 (D.C. Cir. 1938) ............................................................................10

*Braxton v. First Transit*,
    322 F. Supp. 3d 110 (D.D.C. 2018) ....................................................................10

*Brown v. Shimabukuro*,
    118 F.2d 17 (D.C. Cir. 1941) ..............................................................................16

*BYD Co. Ltd. v. All. for Am. Mfg.*,
    554 F. Supp. 3d 1 (D.D.C. 2021), *aff'd*, 2022 WL 1463866 (D.C. Cir. May 10,
    2022) .................................................................................................................11

*Cannon v. Peck*,
    36 F.4th 547 (4th Cir. 2022) ...............................................................................25

*Cardillo v. Doubleday & Co.*,
    518 F.2d 638 (2d Cir. 1975).................................................................................13

*Carpenter v. King*,
    792 F. Supp. 2d 29 (D.D.C. 2011) ......................................................................13

*Caudle v. Thomason*,
    942 F. Supp. 635 (D.D.C. 1996) ...................................................................................25

*Davalos v. Bay Watch, Inc*,
    494 Mass. 548 (2024) ...................................................................................................26

*Deripaska v. Associated Press*,
    282 F. Supp. 3d 133 (D.D.C. 2017) ..............................................................................10

*Dragulescu v. Virginia Union Univ.*,
    223 F. Supp. 3d 499 (E.D. Va. 2016) ............................................................................25

*Farah v. Esquire Mag.*,
    736 F.3d 528 (D.C. Cir. 2013) ................................................................................17, 28

*In re FedEx Ground Package Sys., Inc., Emp. Pracs. Litig.*,
    No. 305-MD-527 RM, 2010 WL 1253891 (N.D. Ind. Mar. 29, 2010)..................................16

*Flint v. Beneficial Fin. I Inc.*,
    No. 2:12-CV-01675-GEB, 2012 WL 3277109 (E.D. Cal. Aug. 9, 2012) .............................16

*Goldwater v. Ginzburg*,
    414 F.2d 324 (2d Cir. 1969)...........................................................................................19

*Gomez v. Wilson*,
    477 F.2d 411 (D.C. Cir. 1973) .......................................................................................10

*Guilford Transp. Indus., Inc. v. Wilner*,
    760 A.2d 580 (D.C. 2000) .............................................................................................17

*Holder v. Bobb*,
    797 F. Supp. 3d 134 (E.D.N.Y. 2025) ...........................................................................24

*Howard Univ. v. Best*,
    484 A.2d 958 (D.C. 1984) .............................................................................................12

*Hustler Mag., Inc. v. Falwell*,
    485 U.S. 46 (1988)........................................................................................................28

*In re Indian Palms Assocs., Ltd.*,
    61 F.3d 197 (3d Cir. 1995).............................................................................................16

*Jankovic v. Int'l Crisis Grp.*,
    72 F. Supp. 3d 284 (D.D.C. 2014), *aff'd*, 822 F.3d 576 (D.C. Cir. 2016)........................20, 23

*Johnson v. Paragon Sys., Inc.*,
    195 F. Supp. 3d 96 (D.D.C. 2016) ................................................................................28

*Jones v. Globe Int'l Inc.*,
No. 3:94:CV01468 (AVC), 1995 WL 819177 (D. Conn. Sept. 26, 1995) ............................15

*Joseph v. Xerox Corp.*,
594 F. Supp. 330 (D.D.C. 1984) ........................................................................................21

*Kamdem-Ouaffo v. Pepsico, Inc.*,
160 F. Supp. 3d 553 (S.D.N.Y.), *aff'd*, 657 F. App'x 949 (Fed. Cir. 2016) .........................25

*Kruise v. Jorgensen*,
No. 19-CV-49 (DLF), 2022 WL 4379036 (D.D.C. Sept. 22, 2022), *aff'd*, No.
22-7143, 2023 WL 3476628 (D.C. Cir. May 16, 2023) .....................................................27

*Lamb v. Rizzo*,
391 F.3d 1133 (10th Cir. 2004) ........................................................................................13

*Langer v. George Washington Univ.*,
498 F. Supp. 2d 196 (D.D.C. 2007) ..................................................................................28

*Logan v. D.C.*,
447 F. Supp. 1328 (D.D.C. 1978) ................................................................................12, 13

*Lyles v. Micenko*,
404 F. Supp. 2d 182 (D.D.C. 2005) ..................................................................................19

*Mar-Jac Poultry, Inc. v. Katz*,
773 F. Supp. 2d 103 (D.D.C. 2011) ..................................................................................17

*Mason v. Am. Prospect, Inc.*,
2024 WL 4345855 (D.D.C. Sept. 30, 2024) ......................................................................22

*Mattiaccio v. DHA Grp., Inc.*,
908 F. Supp. 2d 136 (D.D.C. 2012) ..................................................................................27

*Moldea v. New York Times Co.*,
22 F.3d 310 (D.C. Cir. 1994) ...........................................................................14, 15, 17, 18

*Montgomery v. Risen*,
197 F. Supp. 3d 219 (D.D.C. 2016), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017) ..........................19

*Moss v. Stockard*,
580 A.2d 1011 (D.C. 1990) ..............................................................................................14

*Mullin v. Washington Free Wkly., Inc.*,
785 A.2d 296 (D.C. 2001) ................................................................................................25

*Nader v. Democratic Nat. Comm.*,
555 F. Supp. 2d 137 (D.D.C. 2008) ..................................................................................16

*Obsidian Fin. Grp., LLC v. Cox*,
  740 F.3d 1284 (9th Cir. 2014) ............................................................18

*Pelkowski v. Hovermann*,
  No. 20CV1845ENVRLM, 2021 WL 9032222 (E.D.N.Y. Sept. 9, 2021) ..............18

*Ramos v. ADR Vantage, Inc.*,
  No. 18-CV-1690 (APM), 2021 WL 4462611 (D.D.C. Sept. 29, 2021), *aff'd*,
  No. 21-7124, 2022 WL 17726704 (D.C. Cir. Dec. 16, 2022) ..................26

*Ray v. U.S. Dep't of Just.*,
  508 F. Supp. 724 (E.D. Mo. 1981), *aff'd*, 658 F.2d 608 (8th Cir. 1981) ................12

*Reading v. N. Hanover Twp., New Jersey*,
  No. 1:23-CV-1469, 2026 WL 102849 (D.N.J. Jan. 13, 2026) ..................24

*Safex Found., Inc. v. Safeth, Ltd.*,
  531 F. Supp. 3d 285 (D.D.C. 2021) ....................................................22

*Sandals Resorts Int'l Ltd. v. Google, Inc.*,
  86 A.D.3d 32 (2011) ..........................................................................18

*Smith v. Humane Soc'y of United States*,
  519 S.W.3d 789 (Mo. 2017) ..............................................................17

*Solomon v. Supreme Ct. of Fla.*,
  816 A.2d 788 (D.C. 2002) ..................................................................27

*In re Spikes*,
  881 A.2d 1118 (D.C. 2005) ..............................................................3, 27

*Stein v. City of Philadelphia*,
  No. CIV.A. 13-4644, 2013 WL 6408384 (E.D. Pa. Dec. 5, 2013) ..........26

*Stovell v. James*,
  810 F. Supp. 2d 237 (D.D.C. 2011) ...................................................27

*Tah v. Glob. Witness Publ'g, Inc.*,
  991 F.3d 231 (D.C. Cir. 2021) ..........................................................11

*Tavoulareas v. Piro*,
  817 F.2d 762 (D.C. Cir. 1987) .....................................................20, 21

*Thomas v. News World Commc'ns*,
  681 F. Supp. 55 (D.D.C. 1988) ..........................................................19

*Tu Nguyen v. Duy Tu Hoang*,
  318 F. Supp. 3d 983 (S.D. Tex. 2018) ...............................................26

*Valiant-Bey v. Morris*,
620 F. Supp. 903 (E.D. Mo. 1985)........................................................................29

*Vindman v. Trump*,
2022 WL 16758575 (D.D.C. Nov. 8, 2022) ....................................................22, 23

*Waldbaum v. Fairchild Publications, Inc.*,
627 F.2d 1287 (D.C. Cir. 1980)..........................................................................22

*Weyrich v. New Republic, Inc.*,
235 F.3d 617 (D.C. Cir. 2001) .............................................................17, 18, 19, 20

*Wiggins v. Philip Morris, Inc.*,
853 F. Supp. 458 (D.D.C. 1994)...........................................................................26

*Williams v. Frame*,
145 F.R.D. 65 (E.D. Pa. 1992)..............................................................................29

*Wood v. American Federation of Government Employees*,
316 F. Supp. 3d 475 (D.D.C. 2018) ...............................................................23, 24

**Statutes**

D.C. Code § 12-301(4)................................................................................................25

D.C. Code §§ 16-5501-5505.................................................................................1, 11

Fed. R. Civ. P. 11(a) .....................................................................................2, 3, 29, 30

Fed. R. Civ. P. 12(b)(6)........................................................................................1, 10, 11

**Other Authorities**

D.C. Bar Rule XI § 19(a) ..........................................................................................27

5A Fed. Prac. & Proc. Civ. § 1309 (4th ed.)............................................................27

## I.     PRELIMINARY STATEMENT

Mr. Hopwood has been convicted of five counts of armed bank robbery. Last year, he was convicted of three counts of assault, five counts of contempt, and two counts of obstructing justice for a brutal attack on his wife and trying to coerce her not to testify against him. He is currently incarcerated pending sentencing.

In the years between his initial bank-robbery convictions and his recent convictions for assault, contempt, and obstruction, Mr. Hopwood became famous in the legal community. He clerked on the D.C. Circuit, became a Georgetown professor, served as a frequent panelist on criminal justice reform at universities and before Congress and courts, and published a book—all for the extraordinary sinner-turned-saint story he told of his crimes and purported redemption. That façade came tumbling down after Mr. Hopwood assaulted his wife and tried to prevent her testimony.

Now, rather than reflect on the choices that led him once again to a jail cell, Mr. Hopwood sues his high school girlfriend Jill Cockson (who, perhaps not coincidentally, knows Mr. Hopwood's assault victim and soon-to-be-ex-wife) for defamation. He claims Ms. Cockson called him epithets like a "psychopath and a liar," "sociopath," "monster," and "narcissist," damaging his reputation and causing emotional distress.

Even setting aside the strong indication that this suit is tied to Mr. Hopwood's efforts to influence witnesses in his criminal case, the complaint is utterly meritless for numerous independent reasons.

***First***, Mr. Hopwood's extensive, violent, and well-publicized criminal history means none of the purported statements Mr. Hopwood attributes to Ms. Cockson could possibly diminish Mr. Hopwood's reputation beyond the gutter in which it already lies. Mr. Hopwood's reputation, even limited to the judicially-noticeable parts, is as (i) a convicted armed robber, (ii) a

wife-beater, (iii) a contemnor, and (iv) an obstructor of justice. Witnesses' testimony divulged far more specific and damaging facts about Mr. Hopwood in open court, and a jury convicted him of serious crimes. Mr. Hopwood is suspended as an attorney based on conviction of a crime of moral turpitude. Even if Ms. Cockson's words were statements of fact—they were not—they could not possibly do harm Mr. Hopwood's discredited reputation as a serial violent felon.

*Second*, all the statements Mr. Hopwood challenges are vague epithets, which are classic statements of opinion. None reasonably state or imply any specific incident capable of being proven true or false. Courts have consistently held similar epithets are loose, rhetorical, and subjective, and that reasonable readers would understand them as such. The statements thus cannot be the basis of defamation claims.

*Third*, for similar reasons, even if a reader were to infer any facts about Mr. Hopwood at all from Ms. Cockson's epithets, the judicially-noticeable facts from Mr. Hopwood's convictions show that they are substantially true. "Psychopath," "sociopath," "monster," and the like are, after all, not unusual terms for someone to apply to a violent criminal.

*Fourth*, Mr. Hopwood is, by his own description, a prominent public figure, but pleads nothing beyond conclusory labels to allege that Ms. Cockson knew her statements were false (or that she consciously did not care if they were true or false). Mr. Hopwood's tale of his purported rehabilitation made him a household name in the legal community and beyond; he was featured on a *60 Minutes* segment, was a witness before Congress, and more. So, he must plead and prove that Ms. Cockson acted with constitutional malice to sue her for defamation. But all he does is loosely assert that Ms. Cockson has a "vendetta" against him because of a relationship decades ago—dislike is not enough to prove a speaker knew that what she was saying was false.

***Fifth***, all but one of the statements Mr. Hopwood alleges were made more than a year before this suit was commenced on December 3, 2025, and are thus untimely under the District of Columbia's one-year statute of limitations for defamation. While Mr. Hopwood attempts to claim that a discovery rule applies, the D.C. Court of Appeals has repeatedly declined to state whether it applies to defamation cases, and the better reading is that it does not. It has, moreover, expressly rejected it for widely-disseminated statements in the media, a rule it would likely extend to publicly-accessible social media posts too. These statements were, at any rate, discoverable with reasonable diligence.

***Sixth***, Count I, which alleges on information and belief statements made by unspecified means on unspecified dates, is inadequately pleaded. This Court has consistently held that these sorts of vague allegations are insufficient to plead a defamation claim.

***Seventh***, Mr. Hopwood's allegation of defamation by contacting bar disciplinary authorities to seek his discipline or disbarment is frivolous. The D.C. Court of Appeals has *suspended* an attorney for filing a similar defamation suit in light of unequivocal authority that communication with disciplinary authorities is absolutely privileged. *In re Spikes*, 881 A.2d 1118 (D.C. 2005).

***Eighth***, the intentional infliction of emotional distress (IIED) claims fail too, both because they are repackaged defamation claims that do not meet the constitutional standards for defamation liability, and because expressing negative opinions about someone simply is not the extreme and outrageous conduct required for IIED liability. These claims too must be dismissed.

***Finally***, the complaint is also deficient because it appears to have been signed by a non-lawyer calling himself Mr. Hopwood's attorney-in-fact. Rule 11(a) requires that *pro se* parties sign complaints "personally." Mr. Hopwood was incarcerated when the complaint was filed, yet

the complaint lists a non-jail address and this non-attorney appears to have been handling the litigation of this case, including sending demands to Mr. Hopwood's soon-to-be-ex-wife that she preserve her communications with Ms. Cockson. A *pro se* party cannot use a non-lawyer to sign his complaint and handle the litigation; a *pro se* complaint that is not signed personally is insufficient and should be dismissed unless the defect is promptly cured.

⁑

This complaint is an attempt at vengeance and coercion. Unable to harass his wife further (because of restraining orders and his prosecution), Mr. Hopwood misuses the judicial process to lash out at another former romantic partner. This case is utterly meritless and should be dismissed with prejudice.

## II.    BACKGROUND.

### A.    Mr. Hopwood Robs Five Banks, Gets Caught, And Spends More Than A Decade In Prison.

The Amended Complaint alleges that Mr. Hopwood and Ms. Cockson had a relationship as teenagers. ECF No. 2 ¶ 23. Around the same time, Mr. Hopwood engaged in a series of armed bank robberies across rural Nebraska, robbing $48,000 from Petersburg State Bank, $9,980 from Saline State Bank, $16,000 from York State Bank, $25,650 from the Bank of Peru, and $115,116 from Farmer's National Bank. *Id.* ¶ 5; Sanderson Decl. Ex. A at 5-6 (Transcript of Change of Plea Hearing). Caught, he pleaded guilty to five counts of bank robbery and one count of using a firearm during a crime of violence. ECF No. 2 ¶ 5; Sanderson Decl. Ex. A at 5-6; Sanderson Decl. Ex. B (6/30/25 Tr. at 148:16-151:6). Mr. Hopwood was sentenced to twelve years and three months in prison, serving more than a decade behind bars. ECF No. 2 ¶ 6.

### B.    Mr. Hopwood Spins His Work as a Jailhouse Lawyer Into Celebrity, Appearing on *60 Minutes*, Testifying Before Congress, Attending Bill Signings at the White House, and Clerking at the D.C. Circuit.

By his own account, Mr. Hopwood spent his time in prison working in the prison law library, eventually becoming a jailhouse lawyer who helped other inmates prepare *pro se* post-conviction motions and petitions. *Id.* ¶¶ 6-7. Among other successes, two petitions for certiorari he ghostwrote were granted. *Id.*

After release, Mr. Hopwood attended law school, became an attorney, clerked for the D.C. Circuit, taught at Georgetown University Law Center, operated a law firm, and advocated for criminal justice reform. *Id.* ¶¶ 10-16. Plaintiff attained such fame that his "accomplishments and career were featured in a segment on 60 Minutes." *Id.* ¶ 17. He made himself a household name in the legal community. He testified before Congress and state legislatures. Sanderson Decl. Exs. C, D. He attended bill signings at the White House with the President, Sanderson Decl. Ex. E; *see also* Sanderson Decl. Ex. B (6/30/25 Tr. at 19:25-27:3, 142:7-13), and received "a lot of publicity for working on criminal justice reform, especially," in Mr. Hopwood's words, "after one of the meetings [he] attended at the White House with the famous Kim Kardashian." Sanderson Decl. Ex. B (6/30/25 Tr. at 35:13-16). Mr. Hopwood was perhaps the most prominent formerly-incarcerated spokesperson for criminal justice reform; to the world and the media, he seemed a real-life Jean Valjean, rehabilitation personified.

## C.    Mr. Hopwood Violently Assaults His Wife and Tries to Coerce Her Not to Testify Against Him.

Sadly, Mr. Hopwood's rehabilitation was a façade. Last year, Mr. Hopwood was convicted of three counts of assault, five counts of contempt, and two counts of obstructing justice, arising out of his abuse of his wife. Sanderson Decl. Ex. F (Transcript of Verdict). He currently sits in the D.C. jail awaiting disposition of post-verdict motions and sentencing. Sanderson Decl. Ex. G (Docket Sheet).

Mr. Hopwood's wife testified at that trial about the intensive, violent abuse and coercive control he perpetrated against her. She explained that he repeatedly called her "a stupid dumb b—h and a worthless piece of s—t." Sanderson Decl. Ex. H (Tr. 6/18/25 at 12:8-9). He pushed her with two hands into the bedroom door frame, injuring her head. *Id.* at 14:1-23. He threw her phone, destroying it (along with an air conditioner and light fixture) after realizing that she was audio recording a fight. *Id.* at 19:13-25, 20:15-21:11. He shoved her down the stairs during an argument, breaking her finger and hurting her back. *Id.* at 23:9-24:19. He physically broke through a door into a locked room where she was hiding and threw her onto a bed, causing bruising all over her body. *Id.* at 25:21-27:4. He moved almost $100,000 from their law firm's account to which she had access to an LLC account that only he could access, causing them to be unable to make tax payments, and when she confronted him, he threatened to "slap the s—t out of [her] again" and then punched and slapped her. *Id.* at 45:5-21, 47:1-9, 47:16-48:3, 52:14-20, 54:14-55:19.

Mr. Hopwood's wife testified that Mr. Hopwood threw her phone out of the car, and then drove off with their children when she exited to retrieve it. *Id.* at 87:11-88:1. He would make video recordings interviewing the children about whose "fault" arguments were. *Id.* at 90:22-24. He shoved her onto the kitchen floor as he tried to block her from escaping a room and threw her when she tried again; he threw her at least half a dozen times as she tried to escape again and again, breaking her finger. *Id.* at 91:11-95:2. Mr. Hopwood's wife showed text messages in which Mr. Hopwood admitted slapping her. *Id.* at 104:14-20.

After a stayaway order was entered against Mr. Hopwood, Mr. Hopwood's wife testified that he telephoned her to say he knew he would get acquitted, he would publicly humiliate her and destroy her, and that their children would never forgive her. *Id.* at 126:23-127:14. He texted

her that she would have to answer to their kids when they were all poor because of her and they would be homeless because of her. *Id.* at 131:19-132:24. Later, Mr. Hopwood started texting his wife on their son's phone to avoid being tracked, again telling her that her cooperation would make them homeless. Sanderson Decl. Ex. I (6/23/25 A.M. Transcript at 8:20-12:6). He badgered her repeatedly about trying to get the prosecution dismissed and stated she would be to blame if their kids were forced to testify against him. *Id.* at 16:23-18:10. He sent her a draft separation agreement purporting to require her not to cooperate with prosecutors. *Id.* at 22:6-19. He blamed her for complying with a grand jury subpoena. *Id.* at 25:25-26:1. Mr. Hopwood pressured his wife to obtain burner phones to coordinate complying with his instructions to not appear at the original trial date in violation of a subpoena. *Id.* at 31:19-35:25. Mr. Hopwood's daughter corroborated multiple incidents of violence that she had witnessed. Sanderson Decl. Ex. J (6/25/25 Tr. at 16:10-24:15, 27:6-13).

Mr. Hopwood testified in his own defense, broadly contending that actually, Ms. Hopwood hit him, but that she did not remember it because he claimed she was delusional or paranoid or psychotic. Sanderson Decl. Ex. B (6/30/25 Tr. at 40:4-5, 41:18-42:9, 46:3, 46:25-47:1, 92:25). He claimed that Ms. Hopwood was engaged in "performance art." *Id.* at 73:9. He admitted, however, that he had smacked his wife in the back of the head during an argument and again during the argument about tax payments. *Id.* at 98:24-25, 101:14-22. He admitted battering the door down, claiming that he did it to see if Ms. Hopwood was harming herself inside. *Id.* at 115:23-116:23. He admitted contacting Ms. Hopwood in violation of the restraining order, but claimed that the idea to defy the subpoena was hers. *Id.* at 136:18-141:16. He admitted breaking Ms. Hopwood's iPhone deliberately. *Id.* at 157:25-158:16. He admitted that he had offered to get brain scans because there was a voice in his head saying that Ms. Hopwood was the enemy and

he was worried that it was something demonic. *Id.* at 161:22-163:14. He admitted to taking Ms. Hopwood's phone. *Id.* at 168:19-170:7. He admitted to moving $80-90,000 to an account to which he had sole access. *Id.* at 174:15-175:5.

Mr. Hopwood admitted to saying "Shut up or I'll slap the s—t out of you again." *Id.* at 177:10-178:1. He tried to explain it away by saying that he could "never imagine actually slapping" her, before admitting that he went on to slap her later that same day. Sanderson Decl. Ex. K (7/1/25 Tr. 10:25-12:17). He admitted to throwing Ms. Hopwood's phone out of the car and driving off. *Id.* at 18:10-20:9. He admitted to telling his children to lie to Child Services and say nothing happened. *Id.* at 37:16-38:5. He admitted to lying to police. *Id.* at 41:1-7, 43:2-7, 44:10-21. He admitted he knew about the order of protection, knew what it prohibited, and knowingly violated it by communicating with her and had suggested she leave town for the original trial date. *Id.* at 58:21-82:22.

After all this, a jury convicted him. Sanderson Decl. Ex. F (Transcript of Verdict). Mr. Hopwood has also been suspended from the D.C. Bar. Sanderson Decl. Ex. L (Suspension Order). Given Mr. Hopwood's fame, the trial attracted widespread media attention. *See, e.g.*, Sanderson Decl. Exs. M, N, O.

> **D.    Mr. Hopwood Sues His High School Ex-Girlfriend for Calling Him a Psychopath and a Monster.**

Mr. Hopwood's complaint alleges that he and Ms. Cockson had a brief high school relationship in the early 1990s, and because that ended on poor terms, Ms. Cockson maintains a "vendetta" against him. ECF No. 2 ¶¶ 1, 32-55. Mr. Hopwood alleges that on various occasions between 2014 and 2025, Ms. Cockson contacted Judge Janice Rogers Brown, the U.S. Court of Appeals for the D.C. Circuit, the D.C. Bar Association, Georgetown University Law Center, and the Washington Post, asserting that Mr. Hopwood was a "certifiable psychopath," "sociopath,"

"cruel to animals," and a "monster," and urging termination or bar discipline. ECF No. 2 ¶¶ 35-36, 61. He asserts that Ms. Cockson publicly posted on Facebook in 2023 and 2024 calling him a "textbook sociopath," a "monster," and stating he endangered her life. *Id.* ¶¶ 37-38. She allegedly also wrote that Mr. Hopwood was facing "criminal and civil proceedings." *Id.* He further alleges Ms. Cockson posted a July 2024 Instagram video asserting Mr. Hopwood exhibited signs of "sociopath slash psychopathy," was "cruel to animals, his siblings, [and] his friends," and urging a "true crime" podcaster to feature him. *Id.* ¶¶ 39, 100. Mr. Hopwood also alleges Ms. Cockson left an ABA website comment calling him a "psychopath," and a "monster." *Id.* ¶¶ 41, 83. He claims that Ms. Cockson posted comments on Substack calling him a "psychopath," "liar," "sad, pathetic monster," and stating, in reference to Mr. Hopwood's admitted transfers of funds to an account only he had access to, that she believed he had embezzled from Ms. Hopwood. *Id.* ¶¶ 44-48, 94-96. And he claims that after he threatened to sue her, Ms. Cockson reported it as "witness intimidation" to the judge and prosecutors in his criminal case. *Id.* ¶¶ 112-15.

Mr. Hopwood, the convicted bank robber who admitted to slapping his wife and intentionally (and repeatedly) violating a restraining order, claims that Ms. Cockson using unfavorable epithets to describe him hurt him emotionally and damaged his reputation. *Id.* ¶¶ 109-110, 117-18. He claims that he has suffered at least $350,000 in harm, not because he has been convicted of abusing his wife, but rather because Ms. Cockson used unfavorable epithets to describe him, and seeks $650,000 and an injunction against Ms. Cockson describing him unfavorably in the future, too. *Id.* ¶¶ 121-26.

## III.    ARGUMENT

This suit should be dismissed because, among other things, (i) it targets vague, unfalsifiable statements; (ii) Mr. Hopwood's reputation was already thoroughly tarnished by his

array of criminal convictions and other confessed misconduct; (iii) Mr. Hopwood is, by his own admission, a public figure; and (iv) the complaint pleads nothing more than that Ms. Cockson dislikes Mr. Hopwood and does not plead facts supporting a reasonable inference that Ms. Cockson knew any statement was false.

### A.    Standard of Review.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  In other words, a complaint must "raise 'more than a sheer possibility that a defendant has acted unlawfully.'" *Braxton v. First Transit*, 322 F. Supp. 3d 110, 115 (D.D.C. 2018) (quoting *Iqbal*, 556 U.S. at 678)).  While the Court accepts a complaint's allegations as true, it need not "accept the truth of legal conclusions or 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Id*.

On a motion to dismiss, a court can also consider materials incorporated into the complaint by reference or that are subject to judicial notice. In assessing whether a plaintiff is a public figure, courts may take judicial notice of readily-available media articles for the fact of their publication. *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140-42 (D.D.C. 2017); *Barrett v. Atl. Monthly Grp. LLC*, No. CV 22-49 (LLA), 2024 WL 4119400, at *7 (D.D.C. Sept. 9, 2024). They may also take judicial notice of "records in another but interrelated proceeding," at least for the fact that they exist in the public record and the legal effect of those records. *Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938); *accord Gomez v. Wilson*, 477 F.2d 411, 416 (D.C. Cir. 1973).[2]

---

[2] The District of Columbia has enacted strong statutory protections for individuals facing meritless lawsuits targeting speech on matters of public interest. *See* D.C. Code §§ 16-5501–

### B.     The Defamation and False Light Counts Should Be Dismissed for Numerous Independent Reasons.

"The Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *BYD Co. Ltd. v. All. for Am. Mfg.*, 554 F. Supp. 3d 1, 6 (D.D.C. 2021), *aff'd*, 2022 WL 1463866 (D.C. Cir. May 10, 2022) (quoting *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017)). "Early resolution of defamation cases under Federal Rule of Civil Procedure 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Id.* (quoting *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 89 (D.D.C. 2018)).

If ever there were a defamation case that is unmeritorious, it is this one. Even limiting discussions to Mr. Hopwood's admissions under oath in his prior criminal proceedings, it is impossible for the sort of statements he alleges Ms. Cockson made to lower his reputation any further—far worse and more specific statements have been made about him in a widely-publicized trial under absolute privilege by his victim. What is more, Mr. Hopwood challenges vague statements that principally convey that Ms. Cockson holds a low opinion of Mr. Hopwood—these statements do not offer any specific facts that could be proven true or false. Mr. Hopwood, moreover, admits that he was a household name in the legal world, but alleges no

---

5505 (D.C. Anti-SLAPP Act). These protections were designed to shield speakers like Ms. Cockson from precisely the kind of retaliatory litigation at issue here. Ms. Cockson recognizes, however, that the D.C. Circuit has held that these statutory safeguards do not apply in federal court when a plaintiff, like Mr. Hopwood, elects to file a SLAPP suit in the U.S. District Court for the District of Columbia. *See Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 238 (D.C. Cir. 2021) (holding that the D.C. Anti-SLAPP Act's special procedure cannot be invoked in federal court). Nevertheless, Ms. Cockson respectfully preserves this issue for potential review in future proceedings.

facts other than Ms. Cockson's dislike for him as a basis to infer she knew her statements were false.

<blockquote>1.    <b>Ms. Cockson's Statements Could Not Harm Mr. Hopwood's Reputation More Than The Judicially-Established or Admitted Truth.</b></blockquote>

To start, Mr. Hopwood's claims fail categorically because his convictions and admissions under oath establish that Ms. Cockson's statements could not possibly have lowered Mr. Hopwood's reputation more than the truth. Where, as here, the truth and unchallenged statements utterly devastate a plaintiff's reputation, he cannot show that additional statements caused him harm. Either he is defamation-proof, or the gist or sting of the statements is no more damaging than the truth; either way, he cannot sue for trivial inaccuracies that cannot possibly hurt his reputation more than judicially-established facts and his own sworn admissions.

<blockquote>a.    <b>As a Violent Criminal, Mr. Hopwood Cannot Demonstrate That Ms. Cockson's Statements Brought His Reputation Any Lower Than The Truth Does.</b></blockquote>

To be actionable, a statement must "injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Howard Univ. v. Best*, 484 A.2d 958, 988 (D.C. 1984). Thus, where "the plaintiff cannot demonstrate that the [statements] caused any injury to his reputation," the claim fails. *Logan v. D.C.*, 447 F. Supp. 1328, 1332 (D.D.C. 1978). Where a plaintiff has an "extensive past criminal record," then, he "will be found 'libel-proof' as a matter of law." *Id.*; *see also Ray v. U.S. Dep't of Just.*, 508 F. Supp. 724, 726 (E.D. Mo. 1981), *aff'd*, 658 F.2d 608 (8th Cir. 1981) (applying similar doctrine under Missouri law).[3] As the case that this Court quoted in *Logan* explains, this doctrine applies where a plaintiff is "so unlikely by virtue of his life as a habitual criminal to be able to recover anything other than

---

[3] The complaint appears to contend that most of Ms. Cockson's alleged statements were made from her Missouri home but alleges that they were principally directed at the District.

nominal damages as to warrant dismissal of the case, involving as it does First Amendment considerations." *Cardillo v. Doubleday & Co.*, 518 F.2d 638, 639 (2d Cir. 1975). In those circumstances, even if a plaintiff "denies participation in" the "specific crimes" he is suing over, his reputation is so deep in the gutter that he could not recover anything even if he prevailed. *Id.*

In applying this doctrine, courts have held that when "[w]hen . . . an individual engages in conspicuously anti-social or even criminal behavior, which is widely reported to the public, his reputation diminishes proportionately." *Lamb v. Rizzo*, 391 F.3d 1133, 1137–38 (10th Cir. 2004). "Depending upon the nature of the conduct, the number of offenses, and the degree and range of publicity received, there comes a time when the individual's reputation for specific conduct, or his general reputation for honesty and fair dealing is sufficiently low in the public's estimation that he can recover only nominal damages for subsequent defamatory statements." *Id.*; *accord Carpenter v. King*, 792 F. Supp. 2d 29, 34 n.2 (D.D.C. 2011) (quoting *Lamb* in case under D.C. law), *aff'd*, 473 F. App'x 4 (D.C. Cir. 2012).

Thus, in *Logan*, a man with numerous drug convictions and fencing who had bragged (he claimed, falsely) that he had killed someone could not sue for falsely being identified as a *current* drug user. 447 F. Supp. at 1332. And in *Cardillo*, a mafioso convicted of multiple federal crimes involving stolen property and bail-jumping, who had publicly admitted involvement in other "minor crimes" and bookmaking, and who had been publicly implicated by a witness under absolute privilege in Congressional testimony with fixing races could not possibly have a legitimate reputation left to salvage, even if he did not commit the specific crimes that a book claimed. 518 F.2d at 639.

Here, Mr. Hopwood has a similarly illustrious criminal career and thus no legally cognizable reputation to protect, at least from allegations such as these. It is established as a

matter of law that he has committed five armed bank robberies, persistently hit his wife, repeatedly violated a restraining order, and obstructed justice. Sanderson Decl. Exs. H, I, J, K. Mr. Hopwood has admitted numerous crimes under oath—indeed, he admitted some with which he was never charged, such as stealing and destroying his wife's phone and deliberately lying to Child Services and the police. The only reputation he is legally entitled to is that of a serial criminal. Nothing Ms. Cockson is accused of saying could bring Mr. Hopwood's reputation lower than what his own established or admitted actions have done.

Moreover, this case does not involve accusations of wholly unrelated wrongdoing. *Cf. Moldea v. New York Times Co.*, 22 F.3d 310, 319 (D.C. Cir. 1994) (discussing possibility that a person who committed one sort of crime might suffer damages if accused of a different sort of crime). Ms. Cockson stated her view that Mr. Hopwood was a psychopath, a sociopath, a monster, cruel—all epithets fairly within the realm of what Mr. Hopwood has been convicted of doing. Likewise, Mr. Hopwood admitted under oath to transferring money from a joint business account to an account his wife could not access, amply justifying Ms. Cockson's description of that behavior as embezzlement; he also admitted under oath to stealing his wife's phone. Ms. Cockson expressed her view that Mr. Hopwood is what his convictions and sworn admissions establish him to be.

> b.  **Because The Truth—As Established by Mr. Hopwood's Convictions and Admissions—Is Devastating to His Reputation, The Gist of the Statements Is Substantially True.**

Moreover, alleged inaccuracies that are no more damaging than the true facts established by convictions and admissions cannot support a defamation claim. Courts have characterized this doctrine as a particular application of the substantial truth doctrine—that what matters for defamation liability is whether the "'gist' or 'sting'" of the charge is false, not every minutia that does not materially alter the reader's estimation of the plaintiff. *Moss v. Stockard*, 580 A.2d

-14-

1011, 1023 (D.C. 1990) (discussing Standardized Jury Instruction for defamation). For example, accusing a burglar of one burglary more than the literal truth does not cause legally cognizable harm "since the essentially derogatory implication of the statement ('he is an habitual burglar') is correct, he has not been libeled." *Moldea*, 22 F.3d at 319.

Criminal convictions and sworn admissions of related misconduct can therefore establish the substantial truth of the gist or sting of the statements. Thus, for example, a man subsequently convicted of stealing shoes to satisfy a sexual fetish was unable to sue for defamation based on additional, purportedly false, allegations of a similar sort in a previously-published article from after the arrest. *Jones v. Globe Int'l Inc.*, No. 3:94:CV01468 (AVC), 1995 WL 819177, at *11 (D. Conn. Sept. 26, 1995). "The true facts surrounding the plaintiff's criminal conviction along with the unchallenged statements in the articles at issue," the court held, "had a devastating impact upon the plaintiff's reputation." *Id.* Thus, even if the additional allegations were inaccurate, he could not "prove that the remaining statements caused him to suffer any further injury." *Id.*

The same is true here. If any facts at all can be divined from the vague epithets that Ms. Cockson is alleged to have used to describe Mr. Hopwood, they are well within the scope of the conduct for which Mr. Hopwood has been convicted or has admitted under oath. Even if there were enough to convey to the reader that Mr. Hopwood is violent, *that is judicially established to be true*; he has been convicted of domestic violence and armed bank robbery. If a statement were to convey that Mr. Hopwood disrespects the law, *that is judicially established to be true*; he has been convicted of contempt and obstruction of justice and suspended as an attorney. That Mr. Hopwood disrespects others' property? Even leaving aside the *five armed bank robberies*, he has admitted under oath transferring joint funds to an account in his sole name and destroying his

-15-

wife's phone.[4] As in *Jones*, the judicially-established or admitted truth devastates Mr. Hopwood's reputation.

Indeed, to the extent Mr. Hopwood claims that accusing him of "witness intimidation" in an email to the judge in his criminal case and copying prosecutors was defamatory, ECF No. 2 ¶ 112, *he has been convicted of contempt and obstruction of justice*. The statement, moreover, was in an email to the D.C. Superior Court judge presiding over Mr. Hopwood's criminal trial and relevant to the issues before that court and thus absolutely privileged. *Brown v. Shimabukuro*, 118 F.2d 17, 18 (D.C. Cir. 1941) (Statements filed with court "are absolutely privileged if they have enough appearance of connection with the case in which they are filed so that a reasonable man might think them relevant. They need not be relevant in any strict sense.").[5]

    2.    **Ms. Cockson's Vague Statements Do Not Convey Any Verifiable Facts About Mr. Hopwood.**

At any rate, none of Ms. Cockson's statements convey any actionable *fact* about Mr. Hopwood. Certainly, the alleged statements convey a low *opinion* of Mr. Hopwood. But defamation law does not police opinions, only underlying objectively verifiable facts.

---

[4] While judicial notice of disputed facts in the other litigation is generally not permitted, courts can take judicial notice of a party's own sworn admissions absent a satisfactory explanation why a previously-admitted fact should now be deemed subject to dispute. *5-Star Mgmt., Inc. v. Rogers*, 940 F. Supp. 512, 519 (E.D.N.Y. 1996) (taking notice of "a critical admission in another judicial proceeding"); *In re FedEx Ground Package Sys., Inc., Emp. Pracs. Litig.*, No. 305-MD-527 RM, 2010 WL 1253891, at *4 (N.D. Ind. Mar. 29, 2010) ("Court documents from another case may be used to show that . . . admissions were made."); *Flint v. Beneficial Fin. I Inc.*, No. 2:12-CV-01675-GEB, 2012 WL 3277109, at *3 (E.D. Cal. Aug. 9, 2012) (taking judicial notice of admission in prior proceeding); *see also In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 205 (3d Cir. 1995) ("[I]t is not seriously questioned that the filing of documents in the case record provides competent evidence of certain facts—that a specific document was filed, that a party took a certain position, that certain judicial findings, allegations, or admissions were made.").

[5] "[P]etitioning the Government for redress of grievances," including "seeking redress in court" is also immune from liability under the Petition Clause of the First Amendment and the *Noerr-Pennington* doctrine. *Nader v. Democratic Nat. Comm.*, 555 F. Supp. 2d 137, 156 (D.D.C. 2008).

Defamation claims "arise[] only if, at a minimum, a defendant's statement 'reasonably implies false and defamatory facts.'" *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990)). "Where a defendant's statement 'cannot be construed as representations of fact,' there can be no defamation." *Id.* (internal citation omitted) (quoting *Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers v. Austin*, 418 U.S. 264, 284 (1974)). Thus, where "a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000). And "[t]o ensure space for 'imaginative expression' and 'rhetorical hyperbole,' a statement of opinion is actionable only if it implies an explicit or implicit factual foundation and therefore is 'objectively verifiable.'" *Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 121 (D.D.C. 2011) (quoting *Milkovich*, 497 U.S. at 20-22); *see also Smith v. Humane Soc'y of United States*, 519 S.W.3d 789, 800 (Mo. 2017) ("[T]he test to be applied to an ostensible 'opinion' is whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact.").

To determine whether a reasonable reader would interpret a statement as conveying facts, context is key. *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001) ("In deciding whether a reasonable factfinder could conclude that a statement expressed or implied a verifiably false fact about appellant, the court must consider the statement in context."); *Mar-Jac*, 773 F. Supp. 2d at 122-23 (analyzing "general tenor" of broadcast and finding that "speculative" and "hyperbolic" statements "did not imply a verifiably false fact"); *Guilford*, 760 A.2d at 603 (D.C. 2000) (context as op-ed suggested subjective opinion). Thus, in *Moldea*, that the statements were in a book review would affect whether a reader would understand them as factual assertions

rather than the reviewer's evaluations. 22 F.3d at 315. Here, many of the statements were made in the context of comments or posts on social media, a context where courts have repeatedly recognized that vituperative statements are likely to be expressions of subjective opinion rather than literal fact. "Use of epithets, fiery rhetoric or hyperbole on social media have been held to warrant an understanding that these statements are vigorous expressions of personal opinion, rather than the rigorous and comprehensive presentation of factual matter." *Pelkowski v. Hovermann*, No. 20CV1845ENVRLM, 2021 WL 9032222, at *5 (E.D.N.Y. Sept. 9, 2021) (cleaned up); *see also Obsidian Fin. Grp., LLC v. Cox*, 740 F.3d 1284, 1294 (9th Cir. 2014) (blog post); *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.3d 32, 43, 925 N.Y.S.2d 407, 415 (2011) (online speech is "often the repository of a wide range of casual, emotive, and imprecise speech" and readers may give "less credence" to statements in that context).

At any rate, statements like those attributed to Ms. Cockson that a person is, in essence, crazy, have consistently been held non-actionable, subjective statements.  In *Weyrich v. New Republic, Inc.*, for example, the D.C. Circuit upheld the dismissal a defamation claim stemming from an article that depicted the plaintiff, a political activist, as "emotionally volatile[,] short-tempered . . . a zealoted political extremist and an easily-enraged tyrant." 235 F.3d 617, 620 (D.C. Cir. 2001). The article further described the plaintiff as suffering from "bouts of pessimism and paranoia." *Id*. at 623. The *Weyrich* court, however, rejected the plaintiff's contention that "a reasonable reader might . . . regard the article as actually asserting that [plaintiff] suffers from, or has been diagnosed with, a psychological ailment." *Id*. at 625. Rather, the D.C. Circuit held that in context, these were clearly statements of opinion: at the time the article was published, "the definitive, clinical term 'paranoia' ha[d] taken on a less-than-definitive popular meaning, as ha[d] 'crazy' and 'nutty.'"  *Id*. at 624. "Presented in such a loose manner, in such a well-

understood context," the court recognized, "the article's reference to 'bouts of paranoia' is neither verifiable nor does it imply specific defamatory facts about appellant." *Id*. at 625 (internal ellipses omitted). That, the D.C. Circuit held, was quite unlike *Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969), where a statement specifically alleging *clinically diagnosable* paranoia that "purported to be a well-researched psychiatric diagnosis." *Weyrich*, 235 F.3d at 624.

So too in *Thomas v. News World Commc'ns*, 681 F. Supp. 55 (D.D.C. 1988). There, the plaintiffs—antinuclear demonstrators who had maintained continuous protests outside the White House—brought a defamation action against a newspaper that had published various editorials describing the protestors as "pitiable lunatics," "deluded," and "insane," among other choice epithets. *Id*. at 63 (cleaned up). But in light of "the immediate, linguistic context" in which the statements appeared, "the newspaper's description of plaintiffs as 'insane' persons and as 'pitiable lunatics' reflects opinion and not fact—exaggerated epithet, not factual allegation." *Id*. at 64. Many other decisions in D.C. alone similarly recognize that calling people one dislikes various creative synonyms for "crazy" does not imply verifiable facts but rather are "loose, rhetorical turn[s] of phrase, and [] statement[s] of . . . subjective opinion." *Montgomery v. Risen*, 197 F. Supp. 3d 219, 248 (D.D.C. 2016), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017); *Lyles v. Micenko*, 404 F. Supp. 2d 182, 187–88 (D.D.C. 2005).

So too here. Ms. Cockson, like so many others, is alleged to have expressed in colorful terms distaste for her ex. While, as noted above, Mr. Hopwood's public convictions for armed bank robbery and domestic violence and other admissions under oath certainly might lead others to reach a similar opinion, the statements themselves do not assert any facts that can be proven verifiably true or false. Mr. Hopwood does not allege that Ms. Cockson claimed to be a psychiatrist or to be delivering a formal diagnosis. "Psychopath," "sociopath," "cruel," "liar,"

"sad, pathetic monster," "hard-wiring defect," "narcissist"—all of these terms are precisely the sort of epithets that *Weyrich* holds a reasonable reader would not regard as stating provable, objective facts, but rather a very low subjective opinion of the object of the statements. And, as discussed above, to the extent any residual factual implications are discernible, Mr. Hopwood's convictions and admissions under oath in open court amply justify them.

3.      **Mr. Hopwood Is, At Minimum, A Limited-Purpose Public Figure.**

When the plaintiff in a defamation case is a public figure, he must demonstrate by clear and convincing evidence that the defendant knew that the facts she was stating were false or consciously did not care whether they were true or false in the face of information suggesting that they were. *Jankovic v. Int'l Crisis Grp.*, 72 F. Supp. 3d 284, 309 (D.D.C. 2014), *aff'd*, 822 F.3d 576 (D.C. Cir. 2016) (citing *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991)). As the D.C. Circuit has noted, "[t]he Supreme Court has identified two classes of public figures in addition to government officials: general purpose and limited purpose public figures." *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987). "In some instances, an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Id.* Alternatively, when "an individual voluntarily injects himself or is drawn into a particular public controversy," he "thereby becomes a public figure for a limited range of issues." *Id.* "The extent of the individual's participation in public affairs and assumption of the risk of adverse publicity determines the weight of the government's interest in protecting his or her reputation." *Id.*

To determine whether a plaintiff is a public figure for the purposes of the statements against them, a court conducts a three-step analysis. "First, we isolate the controversy at issue, because the scope of the controversy in which the plaintiff involves himself defines the scope of the public personality." *Tavoulareas*, 817 F.2d at 772 (cleaned up). It "must be public both in the

-20-

sense that persons actually were discussing it and that persons beyond the immediate participants in the dispute are likely to feel the impact of its resolution." *Id.* at 772-73 (cleaned up). "Second, we examine the plaintiff's role in the controversy, to be sure that it is more than trivial or tangential." *Id.* at 773. "Finally, we determine if the alleged defamation was germane to the plaintiff's participation in the controversy." *Id.*

This case is not a close call. Criminal justice, including the extent to which sentencing laws are unduly harsh and fail to recognize the possibility of rehabilitation and redemption, is an obvious and legitimate subject of public debate. Mr. Hopwood injected himself firmly into that debate by touting himself extraordinarily publicly as a shining beacon of rehabilitation, speaking in a *60 Minutes* segment, authoring and publicizing a book, testifying before Congress and state legislatures, appearing in the media in the debate over criminal justice reform, attending White House bill signings as an invited guest, and much more before his very public downfall. *See* ECF No. 2 ¶¶ 5-17. That is remarkably similar to what the D.C. Circuit held made the plaintiff a public figure in *Tavoulareas*. 817 F.2d at 774 ("He made speeches, testified before Congress . . . published articles . . . and through Mobil's publicity apparatus enjoyed continuing access to the media."). Plaintiff's noteworthy background, combined with his concededly "considerable" efforts to "inject[]" himself into the public discourse on topics related to criminal justice reform, mean that Plaintiff has inescapably played a significant role in the relevant controversy here. *Joseph v. Xerox Corp.*, 594 F. Supp. 330, 334 n.4 (D.D.C. 1984) ("Courts commonly find that writers have injected themselves into public controversies and thus have become limited-purpose public figures.") (collecting cases).[6]

---

[6] Ms. Cockson's view that the media and the Gates Foundation acted irresponsibly in providing a platform to Mr. Hopwood's sinner-to-saint tale and funding him, rather than worthier causes, is similarly a matter of legitimate public controversy. ECF No. 2 ¶ 37.

Ms. Cockson's alleged statements are related to this controversy—the common theme is that Ms. Cockson expressed her belief that Mr. Hopwood's public persona built on his purported rehabilitation was a façade. "[S]tatements, including those highlighting a plaintiff's talents, education, experience, and motives, can be germane." *Safex Found., Inc. v. Safeth, Ltd.*, 531 F. Supp. 3d 285, 305 (D.D.C. 2021) (internal quotations omitted); *see also Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287,1298-99 (D.C. Cir. 1980) (Plaintiff's "talents, education, experience, and motives could have been relevant to the public's decision whether to listen to him" as a "leading advocate of certain precedent-breaking policies."). Fundamentally, Ms. Cockson expressed the view that none of Mr. Hopwood's public persona as the personification of rehabilitation was real, that Mr. Hopwood was more skilled at convincing others of his claimed redemption than actually introspecting and addressing his issues, and that he remained more or less the same man who committed five armed bank robberies. This is certainly relevant to Mr. Hopwood's "experience and ability to effectively advocate" on the relevant controversies. *Mason v. Am. Prospect, Inc.*, 2024 WL 4345855, at *15 (D.D.C. Sept. 30, 2024). It is precisely Mr. Hopwood's claimed rehabilitation that made him worth listening to. Ms. Cockson's statements went precisely to whether Mr. Hopwood was the changed man he claimed to be when testifying before Congress, attending bill-signings related to rehabilitation, and being feted by judges and the media; the statements are therefore germane to Mr. Hopwood's role in the debate on punishment and rehabilitation.

### 4.    Vague Allegations of a "Vendetta" Do Not Equal Knowledge of Falsity.

It is not enough for Mr. Hopwood to allege that each challenged statement was false; he must also "allege that the statement was published with actual malice." *Vindman v. Trump*, 2022 WL 16758575, at *10 (D.D.C. Nov. 8, 2022) (citing *New York Times v. Sullivan*, 376 U.S. 254

-22-

(1964)). "The actual-malice standard . . . 'is a daunting one.'" *Id.* (quoting *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996)). "[I]t is not enough to show that defendant should have known better; instead, the plaintiff must offer evidence that the defendant in fact harbored subjective doubt" about the veracity of the challenged statements. *Jankovic*, 822 F.3d at 589. Nor are allegations of a defendant's "ill will . . . sufficient to demonstrate actual malice." *Vindman*, 2022 WL 16758575, at *10 (citing *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 90 (D.D.C. 2012); *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 92 (D.D.C. 2019)). Instead, "a plaintiff must plead 'nonconclusory facts alleging the defendant knew its statement was false or questioned its truth.'" *Id.* (cleaned up) (quoting *BYD Co. Ltd. v. All. for Am. Mfg.*, 554 F. Supp. 3d 1, 9 (D.D.C. 2021)), aff'd, 2022 WL 1463866 (D.C. Cir. May 10, 2022).

Mr. Hopwood's allegations never venture beyond the conclusory to any factual allegations supporting a reasonable inference that—to the extent that they had any factual content at all (which they did not)—Ms. Cockson *knew* that any of her statements were false. For the most part, Mr. Hopwood simply asserts that Ms. Cockson "knew" her comments were false without elaboration. *See*, *e.g.*, ECF No. 2. ¶¶ 62, 63, 70, 77, 84, 91, 95. All he really says beyond this is alleging that Ms. Cockson dislikes him due to their teenage relationship, which he repeatedly dubs a "vendetta." *See*, *e.g.*, *id*. ¶¶ 32, 33, 42, 60, 64, 71, 73, 78, 85.

But courts have consistently held that allegations of a "vendetta" are "inadequate to establish actual malice." *Wood v. American Federation of Government Employees*, 316 F. Supp. 3d 475, 484 (D.D.C. 2018) (citing *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 290 (D.C. 1977) ("[S]peculation and innuendo" are not sufficient to show malice.)); *Blodgett v. Univ. Club*, 930 A.2d 210, 224 (D.C. 2007) (holding that actual malice was not demonstrated where plaintiff merely "assert[ed] in conclusory fashion" that defendants acted in

bad faith)); *see also Holder v. Bobb*, 797 F. Supp. 3d 134, 150 (E.D.N.Y. 2025) ("vendetta"

insufficient, because constitutional malice turns on knowledge of falsity, not "animosity" or "ill-

will").

So, even if Ms. Cockson did hold this purported grudge, it would not be sufficient to

adequately plead actual malice, as the mere "fact that [Defendant] harbored ill will toward

Plaintiff generally is insufficient as a matter of law to demonstrate that he acted with actual

malice" in making the challenged statements. *Wood*, 316 F. Supp. 3d at 484. *See also Reading v.*

*N. Hanover Twp., New Jersey*, No. 1:23-CV-1469 (KMW-SAK), 2026 WL 102849, at *42

(D.N.J. Jan. 13, 2026) ("Plaintiff's theory of actual malice relies on allegations of hostility,

escalation, persistence, and an alleged vendetta. But New Jersey courts have repeatedly held that

such allegations, even if accepted as true, do not satisfy the subjective actual malice standard.").

The Amended Complaint is simply devoid of any factual allegations that could show that Ms.

Cockson knew that anything she was saying was wrong, rather than her honest beliefs based on

her past knowledge of Mr. Hopwood and, more recently, his highly-publicized arrest, trial, and

conviction.

Nor do Mr. Hopwood's denials of the criminal charges against him—unconvincing as

they were to the Superior Court jury—matter. "[A] plaintiff's denial as to the veracity of a story

only 'serves to buttress a case for actual malice when there is something in the content of the

denial or supporting evidence produced in conjunction with the denial that carries a doubt-

inducing quality.'" *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 281–82 (S.D.N.Y. 2013) (quoting 1

Rodney A. Smolla, Law of Defamation § 3:65.50 (2013)), *aff'd*, 807 F.3d 541 (2d Cir. 2015),

and *aff'd*, 622 F. App'x 67 (2d Cir. 2015). Absent contrary evidence in front of her, Ms. Cockson

was entitled to believe the worst things she had experienced or heard about Mr. Hopwood.

-24-

In short, Mr. Hopwood touts his public persona, but alleges nothing more than bare labels to meet the accompanying burden of pleading actual malice. He thus cannot meet his burden.

5.    **Mr. Hopwood's Claims are Untimely.**

The statute of limitations for defamation is one year. D.C. Code § 12-301(4). "Defamation occurs on publication, and the statute of limitations runs from the date of publication." *Mullin v. Washington Free Wkly., Inc.*, 785 A.2d 296, 298 (D.C. 2001). And this action was commenced on December 3, 2025. ECF No. 1. Thus, with the exception of one alleged statement in March 2025, every statement in the complaint was made prior to the limitations period and these claims are facially untimely.

Mr. Hopwood evidently seeks to avoid this bar by arguing that a discovery rule applies, claiming that he only learned of these statements in late December 2024. ECF No. 2 ¶¶ 42-43. That argument fails.

The D.C. Court of Appeals has never held that a discovery rule applies to defamation claims at all and has explicitly *rejected* one for widely-disseminated statements such as those on television shows or in newspapers or magazines. *Mullin v. Washington Free Wkly., Inc.*, 785 A.2d 296, 298 (D.C. 2001) ("Appellant tries to widen his window of opportunity by urging this court to adopt the so-called discovery rule in defamation claims. We decline to do so, at least in the case of defamatory statements published in a mass media outlet such as City Paper."); *see also Caudle v. Thomason*, 942 F. Supp. 635, 641 (D.D.C. 1996) (D.C. Court of Appeals "has not yet applied the rule to a defamation claim"). Many states, including Virginia, hold that a claim for defamation accrues on publication, not discovery. *See*, *e.g.*, *Dragulescu v. Virginia Union Univ.*, 223 F. Supp. 3d 499, 508 (E.D. Va. 2016); *see also Cannon v. Peck*, 36 F.4th 547, 576 (4th Cir. 2022) (North Carolina) *Kamdem-Ouaffo v. Pepsico, Inc.*, 160 F. Supp. 3d 553, 571 (S.D.N.Y.), *aff'd*, 657 F. App'x 949 (Fed. Cir. 2016) (New York). While courts in this District

are divided on the applicability of the discovery rule to "inherently undiscoverable" statements, *Ramos v. ADR Vantage, Inc.*, No. 18-CV-1690 (APM), 2021 WL 4462611, at *7 (D.D.C. Sept. 29, 2021) (assuming without deciding that rule would apply), *aff'd*, No. 21-7124, 2022 WL 17726704 (D.C. Cir. Dec. 16, 2022), public social media posts and comments on websites are not inherently undiscoverable. Multiple courts have held that searchable websites and social media are analogous to mass media for discovery rule purposes. *See*, *e.g.*, Davalos *v. Bay Watch, Inc.*, 494 Mass. 548, 555–56, 240 N.E.3d 753, 760 (2024); *Stein v. City of Philadelphia*, No. CIV.A. 13-4644, 2013 WL 6408384, at *7 (E.D. Pa. Dec. 5, 2013); *Tu Nguyen v. Duy Tu Hoang*, 318 F. Supp. 3d 983, 1013 (S.D. Tex. 2018). Just as the discovery rule would not apply if Ms. Cockson had made these statements in newspaper classifieds or a letter to the editor, it does not apply to the modern equivalent. Or, at any rate, Mr. Hopwood's allegation that the posts are on public websites establishes that they could have been discovered with the exercise of due diligence, and thus that the discovery rule does not apply. *Ramos*, 2021 WL 4462611, at *7 (knowledge that someone had disparaged plaintiff sufficient to trigger accrual under discovery rule, even if plaintiff did not know of specific statement).

6.    **Mr. Hopwood's Allegations "On Information and Belief" of Unspecified Communications on Unspecified Dates to a Long List of Possible Recipients Do Not State A Claim.**

Additionally, Count I fails to state a claim because it fails to satisfy basic pleading standards under Rule 8. Mr. Hopwood alleges based on unspecified "information and belief" that Ms. Cockson communicated either "via email, text, phone call, or social media application" with a judge, a court, Georgetown University Law Center, and the D.C. Bar Association on unspecified dates. Those allegations of communications on unspecified dates by four means listed in the alternative do not meet the requirement that "[a] plaintiff should plead the time, place, content, speaker, and listener of the alleged defamatory matter." *Wiggins v. Philip Morris*,

*Inc.*, 853 F. Supp. 458, 465 (D.D.C. 1994); *accord Mattiaccio v. DHA Grp., Inc.*, 908 F. Supp. 2d 136, 138 (D.D.C. 2012); *Stovell v. James*, 810 F. Supp. 2d 237, 248 (D.D.C. 2011); 5A Fed. Prac. & Proc. Civ. § 1309 (4th ed.) ("[I]n libel and slander suits courts require the time and place of the publication of the alleged defamatory matter to be specifically stated in the complaint."). These allegations are far too vague to establish a reasonable inference of any element of defamation.

### 7.    Reports to Bar Disciplinary Authorities Are Absolutely Privileged.

Furthermore, Mr. Hopwood appears to contend that Ms. Cockson defamed him by contacting the D.C. Bar and D.C. Circuit to attempt to get him "disciplined or disbarred." ECF No. 2 ¶ 61. That theory is so frivolous as a matter of law that the D.C. Court of Appeals has suspended an attorney for asserting it. In *In re Spikes*, the court observed that bar discipline complaints are "absolutely privileged" as a matter of law, a rule expressly stated in D.C. Bar Rule XI § 19(a), and repeatedly restated in numerous D.C. Court of Appeals decisions. 881 A.2d 1118, 1122-24 (D.C. 2005). *See also*, *e.g.*, *Solomon v. Supreme Ct. of Fla.*, 816 A.2d 788, 790 (D.C. 2002) ("[T]his jurisdiction generally provides immunity to all its bar disciplinary participants."); *Kruise v. Jorgensen*, No. 19-CV-49 (DLF), 2022 WL 4379036, at *4 (D.D.C. Sept. 22, 2022) (similar), *aff'd*, No. 22-7143, 2023 WL 3476628 (D.C. Cir. May 16, 2023). Suing someone for defamation for filing a disciplinary complaint was grounds enough for suspension for interfering with the disciplinary process. *Spikes*, 881 A.2d at 1127-28. Accordingly, Mr. Hopwood's claims based on contacting disciplinary authorities are frivolous.

### 8.    The False Light Claims Fail for the Same Reasons.

"[W]hen a false light claim is based upon the same factual allegations as a defamation claim, the two are analyzed identically." *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 16 (D.D.C. 2019) (cleaned up). And a defective defamation claim cannot be reframed as a different tort to

evade limits on defamation liability. *Farah v. Esquire Mag.*, 736 F.3d 528, 540 (D.C. Cir. 2013);

*Blodgett*, 930 A.2d at 222–23 ("[A] plaintiff may not avoid the strictures of the burdens of proof

associated with defamation by resorting to a claim of false light invasion"). Accordingly, Mr.

Hopwood's false light claims have no independent value.

### C.    The Intentional Infliction of Emotional Distress Claim Fails Both For The Same Reasons and the High Bar for Outrageousness.

Similar principles compel dismissal of the IIED claim. To start, an allegation of causing

emotional distress by saying something false is a defamation claim, whatever a plaintiff calls it,

and the same limits on defamation claims apply to IIED claims. *Hustler Mag., Inc. v. Falwell*,

485 U.S. 46, 56, 108 S. Ct. 876, 882, 99 L. Ed. 2d 41 (1988) (A public-figure plaintiff "may not

recover for the tort of intentional infliction of emotional distress by reason of publications such

as the one here at issue without showing in addition that the publication contains a false

statement of fact which was made with 'actual malice,' i.e., with knowledge that the statement

was false or with reckless disregard as to whether or not it was true."). Thus, dismissing the

defamation counts requires dismissal of the IIED counts too.

But at any rate, calling Mr. Hopwood unflattering things is simply not conduct "so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Johnson v. Paragon Sys., Inc.*, 195 F. Supp. 3d 96, 99 (D.D.C. 2016) (quoting *Bernstein v.

Fernandez*, 649 A.2d 1064, 1075 (D.C.1991)). "[M]ere insults, indignities, threats, annoyances,

petty oppressions, or other trivialities are not sufficient" to make out a claim for IIED.  *Langer v.

George Washington Univ.*, 498 F. Supp. 2d 196, 200 (D.D.C. 2007) (cleaned up) (quoting

*Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C.1980)); *see also Asare v. LM-DC Hotel, LLC*,

62 F. Supp. 3d 30, 36 (D.D.C. 2014). That is all that Mr. Hopwood alleges here.

### D.     The Complaint Must Be Dismissed Under Rule 11(a) Because There Is Strong Evidence That Mr. Hopwood Did Not Sign It "Personally."

Finally, and on a more technical note, the complaint is subject to dismissal under Federal Rule of Civil Procedure 11(a) because it appears to have been signed by a non-lawyer paralegal named Joshua Boyer who has been describing himself as Mr. Hopwood's "power of attorney," and lists a non-jail address to which Mr. Boyer presumably has access rather than the jail where Mr. Hopwood actually is. *See* ECF No. 2 (signature block). Mr. Boyer has also apparently described himself as Mr. Hopwood's attorney-in-fact or power of attorney in contacting witnesses, including Ms. Hopwood (through her divorce lawyer) to tell them to preserve documents. That strongly suggests that the signer was Mr. Boyer or another person outside the jail.

But Rule 11(a) is clear: "Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name—*or by a party personally if the party is unrepresented*." Fed. R. Civ. P. 11(a) (emphasis added). Courts have consistently held that *pro se* plaintiffs cannot delegate signing to another layperson. *See, e.g.*, *Williams v. Frame*, 145 F.R.D. 65, 65 (E.D. Pa. 1992) ("Since Dejesus did not sign the complaint individually and sought to have a non-lawyer 'sign' it for her, the complaint as to Dejesus is not in conformity with Rule 11."); *Valiant-Bey v. Morris*, 620 F. Supp. 903, 904 (E.D. Mo. 1985) ("The law requires that only parties themselves, or their legal counsel as permitted by court rule, may plead and conduct their litigation," striking a document signed by a 'jailhouse lawyer' rather than the inmate personally, citing *Herrera-Venegas v. Sanchez-Rivera*, 681 F.2d 41, 42 (1st Cir. 1982).). After all, Rule 11(b) provides that "signing" is one way that a party certifies that a pleading is non-frivolous and not intended for an improper purposes, and if the paper is signed by a non-lawyer, then Mr. Hopwood might later try to disclaim having authorized it.

-29-

If the signer was indeed Mr. Boyer or another non-lawyer, Mr. Hopwood must promptly cure the defect by signing the complaint personally or else it must be stricken. Fed. R. Civ. P. 11(a).

## IV.    CONCLUSION

For the foregoing reasons, this case should be dismissed in its entirety and with prejudice.


Dated: February 26, 2026                    Respectfully submitted,


                                _/s/ Joseph M. Sanderson_____
                                Michelle S. Kallen (Bar No. 1030497)
                                STEPTOE LLP
                                1330 Connecticut Avenue, NW
                                Washington, D.C.  20036-1795
                                Telephone:      202 429 3000
                                Facsimile:      202 429 3902
                                mkallen@steptoe.com

                                Joseph M. Sanderson (Bar No. NY0560)
                                STEPTOE LLP
                                1114 Avenue of the Americas
                                New York, NY  10036-7703
                                Telephone:      212 506 3900
                                Facsimile:      212 506 3950
                                josanderson@steptoe.com


                                *Attorneys for Defendant*