IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHON ROBERT HOPWOOD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Case No. 1:25-cv-4214 |
| | § | |
| | § | |
| JILL COCKSON, | § | **JURY TRIAL DEMANDED** |
| | § | |
| Defendant. | § | |

## THIRD AMENDED COMPLAINT IN A CIVIL ACTION

### INTRODUCTION

1. This action arises from a sustained, multi-year campaign of defamation, invasion of privacy, and intentional infliction of emotional distress orchestrated by Defendant Jill Cockson ('Cockson'), and from a coordinated post-service conspiracy—executed by Cockson and her agents, including a Brookland-based journalist and operative whose name is known to Plaintiff but who is pleaded here as John Doe 2 (the 'Brookland operative'), and persons presently identified as John Does 1–3—designed to silence Plaintiff Shon Robert Hopwood ("Hopwood"), undermine his access to federal court, and poison judicial authorities and federal prosecutors against him by means of fabricated accusations of criminal conduct.

2. Cockson has harbored a personal vendetta against Hopwood since he ended their high school relationship in 1991–1992. Beginning around 2011 and continuing through the date of this filing, Cockson systematically contacted Georgetown University Law Center, Bar authorities, the D.C. Circuit, Judge Janice Rogers Brown, the Washington Post, the American Bar Association, and other institutions and individuals, publishing false and defamatory statements that Hopwood was a "psychopath," "sociopath," "monster," and—most critically—

RECEIVED

MAR 3 1 2026

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

that he was under active criminal investigation for "embezzlement," a statement Cockson fabricated, repeated, and then openly admitted she knew to be false.

3.   On December 3, 2025, Hopwood filed this civil action asserting those defamation claims. Within days of service, Cockson's response was not to contest the lawsuit on its merits. Instead, she and her associates launched a coordinated retaliatory campaign designed to silence and discredit those who could give truthful testimony against her: they sent interstate threatening text messages to Hopwood's attorney-in-fact and witness Jane Doe; fabricated an email identity impersonating a named journalist; dispatched a co-conspirator to conduct in-person surveillance at Hopwood's attorney-in-fact's Alexandria, Virginia residence; and sent a mass ex parte email to the D.C. Superior Court judge presiding over Hopwood's related criminal case and to federal prosecutors, falsely accusing Hopwood and his attorney-in-fact of 'witness intimidation' and urging that Hopwood be kept incarcerated. In addition, Cockson's Brookland-based operative conducted in-person surveillance of Hopwood's attorney-in-fact at his residence and throughout the surrounding Brookland neighborhood while he was present there handling property matters on Hopwood's behalf.

4.   Cockson's pattern of conduct did not stop with the anonymous threats and ex parte emails of December 2025. The very same "witness intimidation" accusation she orchestrated and broadcast to federal courts and prosecutors has now been laundered into a federal court filing: in their motion to dismiss filed March 11, 2026, Cockson's counsel at Steptoe LLP characterized this lawsuit as "tied to Mr. Hopwood's efforts to influence witnesses in his criminal case" and as "an attempt at vengeance and coercion." Those characterizations are false, unsupported by any independent evidence, and directly traceable to the same narrative Cockson herself fabricated and transmitted to Judge Arthur on December 12, 2025. Their

repetition in a filed court paper confirms that the campaign to weaponize false criminal accusations against Hopwood—in the courts and before the prosecutors—is not only ongoing but has now escalated into the very proceedings before this Court.

5.  Through this Third Amended Complaint, Hopwood asserts: (i) defamation per se arising from Cockson's years-long campaign of false statements published to third parties; (ii) additional defamation per se counts based on Cockson's post-complaint false statements—including the December 12, 2025 ex parte "Justice for Jill" email, the interstate threatening text messages containing defamatory accusations, and the defamatory false accusations conveyed through the Brookland operative to Hopwood's attorney-in-fact's landlord—all of which are clearly within the applicable limitations period; (iii) intentional infliction of emotional distress; (iv) intentional interference with prospective economic advantage; (v) civil conspiracy under the common law of the District of Columbia; and (vi) a conspiracy to intimidate a party and witness in a federal court proceeding under 42 U.S.C. § 1985(2).

**THE PARTIES**

6.  Plaintiff Shon Robert Hopwood is domiciled in the District of Columbia and is currently incarcerated at the D.C. Central Detention Facility, 1901 D Street, S.E., Washington, D.C. 20003, pending disposition of post-verdict motions in *United States v. Hopwood*, No. 2023 DVM 001126 (D.C. Super. Ct.). Hopwood proceeds pro se in this civil action. Due to the restrictions his custody at the D.C. Central Detention Facility places on his ability to communicate with courts and counsel, Hopwood acts through Joshua Boyer, his duly designated attorney-in-fact under a District of Columbia limited power of attorney, who performs ministerial functions including basic research, typing, and filing in civil and family law matters at Hopwood's direction.

7.  Defendant Jill Cockson is, and at all relevant times was, a citizen and resident of the State of Missouri, currently residing in Kansas City, Missouri 64108. She is the sole named defendant in this action. The Brookland operative (John Doe 2), John Does 1 & 3, and others are named in this Complaint as co-conspirators and material actors whose conduct is relevant to Hopwood's claims and to the conspiracy counts; they are not named as defendants in this action at this time. The Brookland operative is a Brookland-based journalist and operative whose identity is known to Plaintiff; he is pleaded pseudonymously here because Plaintiff does not presently seek relief against him in his individual capacity.

**JURISDICTION AND VENUE**

8.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because Hopwood asserts a claim under 42 U.S.C. § 1985(2), a federal civil rights statute, and jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) (diversity of citizenship) because Hopwood is a citizen of the District of Columbia, Cockson is a citizen of Missouri, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.  This Court has supplemental jurisdiction over Hopwood's state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the § 1985(2) federal claim. The addition of the federal § 1985(2) count independently grounds federal question jurisdiction and eliminates any argument that the Court should decline supplemental jurisdiction over the state claims.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in the District of Columbia: Cockson's defamatory communications were directed at Hopwood's employer (Georgetown University Law Center), Bar authorities, the D.C. Circuit, and federal courts located in the District; the ex

parte "Justice for Jill" email was sent to D.C. Superior Court Judge Errol Arthur, the United States Attorney's Office for the District of Columbia, attorney Sara Kropf, and a lawyer with the American Bar Association; Hopwood was harmed in the District; and the civil action in which Hopwood is both a party and a prospective witness, *Hopwood v. Cockson*, is itself pending in this Court.

11. This Court has personal jurisdiction over Cockson because she directed intentional tortious conduct at Hopwood in the District of Columbia, including by contacting Georgetown University Law Center, Bar authorities, the D.C. Circuit, and a sitting D.C. Circuit judge, as well as by causing the "Justice for Jill" email to be sent to the D.C. Superior Court, federal prosecutors in Washington D.C., attorney Sara Kropf, and a lawyer with the American Bar Association. Cockson also traveled to the District of Columbia and attended Hopwood's criminal trial in June 2025, where she personally communicated with Hopwood's estranged wife. She knew that the brunt of the harm from her defamatory campaign would be felt in the District, where Hopwood lived, worked, practiced law, and litigated.

## FACTUAL BACKGROUND

### A. The Parties' Background and the End of Their High School Relationship

12. Hopwood attended David City Public High School in David City, Nebraska, from 1989 to 1993. He graduated in 1993 and thereafter attended Midland Lutheran College before enlisting in the U.S. Navy, from which he was honorably discharged in 1996.

13. Cockson and Hopwood dated briefly in 1991–1992, while both were teenagers. In 1991 or 1992, Cockson suffered a serious automobile accident that left her partially paralyzed. When Hopwood learned of the accident, he and his father drove from David City to Lincoln, Nebraska,

to visit Cockson in the hospital, and Hopwood subsequently visited her regularly during her hospitalization and rehabilitation.

14. In 1992, Hopwood ended the relationship with Cockson. He was sixteen years old at the time. Shortly thereafter, Hopwood briefly dated Cockson's best friend. Cockson was deeply angry about both the breakup and the subsequent relationship. Hopwood did not see or communicate with Cockson again from 1993 to 2025—a span of more than thirty years.

15. Despite this thirty-year absence of contact, Cockson formed and maintained a deep personal animus toward Hopwood based on the circumstances of their teenage breakup. That animus is the driving motive for every defamatory statement and every overt act of the conspiracy described in this Complaint.

B. Hopwood's Post-Incarceration Career and Public Profile

16. In 1994, Hopwood committed a series of bank robberies. In 1998, he pleaded guilty to five counts of bank robbery and one count of using a firearm during a crime of violence. He was sentenced to twelve years and three months of imprisonment and served approximately a decade at FCI Pekin in Illinois.

17. While incarcerated, Hopwood worked in the prison law library, taught himself legal research and writing, and prepared federal court filings for other inmates. He prepared two petitions for writs of certiorari that the Supreme Court of the United States granted, and he litigated successful appeals, post-conviction motions, and sentence reduction motions for others.

18. After his release, Hopwood attended law school on a Gates Scholarship at the University of Washington School of Law, graduating in 2014. He became a member of the Washington State Bar and the District of Columbia Bar. He clerked for the Honorable Janice Rogers Brown of the United States Court of Appeals for the D.C. Circuit, and he was thereafter appointed as a tenure-track professor at Georgetown University Law Center.

19. Hopwood also opened a law firm, Hopwood Singhal PLLC, through which he litigated federal criminal appeals, post-conviction matters, and clemency petitions. His story of rehabilitation was featured in a segment on 60 Minutes on CBS. He testified before Congress and state legislatures, advocated for criminal justice reform, and authored a book.

20. Hopwood married his wife, Ann Marie Hopwood ("Hopwood's estranged wife"), on August 7, 2009. They have a son and daughter together.

21. In 2023, Hopwood was charged in D.C. Superior Court with assault and related offenses. He was convicted of three counts of assault, five counts of contempt of court, and two counts of obstruction of justice in July 2025. A motion for new trial is pending before the D.C. Superior Court. Hopwood is currently incarcerated at the D.C. Central Detention Facility pending resolution of post-verdict proceedings.

C. Cockson's Personal Vendetta: 2011–2024

22. Beginning around 2011, when Hopwood was attending law school in Seattle, Cockson embarked on a systematic campaign to harm Hopwood's professional life and personal reputation, based solely on her lingering resentment over their high school breakup in 1992.

23. Between 2011 and 2025, Cockson contacted, by email, telephone, letter, or social media, the following entities and persons, publishing false and highly defamatory statements about Hopwood to each:

(a) The University of Washington School of Law;

(b) 60 Minutes (CBS);

(c) The Honorable Janice Rogers Brown, U.S. Court of Appeals for the D.C. Circuit;

(d) The United States Court of Appeals for the D.C. Circuit;

(e) Bar authorities;

(f) The Washington Post;

(g) Georgetown University Law Center; and

(h) Other employers, colleagues, and institutions connected to Hopwood within the District of Columbia.

24. In these communications, Cockson claimed, among other things, that Hopwood was "a certifiable psychopath and sociopath," that he was "cruel to animals," that he was "a monster," and that "he should not be employed, nor have the privilege of practicing law." She urged Georgetown, Bar authorities, and others to terminate his employment and discipline or disbar him from the practice of law. These statements were false. Cockson is not a licensed mental health professional and has never rendered any clinical diagnosis of Hopwood. She had not seen or communicated with Hopwood from 1993 until 2025. She fabricated these characterizations out of whole cloth. Cockson deliberately hid her campaign of defamation from Hopwood. He was not aware of the extent of her contacts with his employers, Bar authorities, and the courts until approximately December 26, 2024, when an acquaintance informed him of Cockson's semi-public Facebook posts and of her prior contacts with Georgetown and Bar authorities. He took a screenshot of one of Cockson's Facebook posts on January 1, 2025.

D. Cockson's Public Statements: 2023–2024

25. In 2023 or 2024, Cockson published a post on her semi-public/semi-private Facebook page stating: "he is facing both criminal and civil proceedings. there's also an embezzlement charge against him, as I understand. Nothing would shock me. It's just that Washington D.C. is full of lawyers who are paid to make this stuff go away for people like him." This statement was false. Hopwood was never investigated for, charged with, or convicted of embezzlement—a fact Cockson knew or recklessly disregarded.

26. In 2023 or 2024, Cockson posted publicly on Facebook: "Based on my personal encounters with him, it is my opinion that Shon Hopwood is a textbook sociopath. He endangered

my life more than once and laughed maniacally as he did so. I told everyone that I feared for Annie and the kids. I hope they are safe from him now. Shon Hopwood is a monster. I hope he finally goes back to prison, where he belongs. I am sad that Annie has had to endure his sociopathic terrorism. Shame to every publication that has given this monster positive press—DO BETTER. To the Bill and Melinda Gates Foundation which bought his sob story and paid for his law degree— Next time, find a worthy recipient who hasn't even had one chance, versus someone who pissed away several, whilst ruining lives and permanently traumatizing others." These statements were false and defamatory.

27. In or around July 2024, Cockson posted a video on her Instagram account, which was directed to and published in all fifty states and the District of Columbia. In the video, Cockson alleged that during their high school relationship, Hopwood "exhibited signs of sociopath/psychopathy," that he was "cruel to animals, cruel to his siblings, cruel to friends," and that he was "dangerous" and a "monster." She stated, in substance: "I'm afraid we'll be planning her funeral." She directly solicited true-crime podcasters and journalists to amplify these accusations: "If you are a podcaster, a real crime, a true crime person, and you have a platform, I would love for you to look into and call out the monster." And she made explicit her motivating intent: "I'll do everything I can to get that version of you out there." This video was later deleted in or around April 2025, after Hopwood threatened civil litigation—an act reflecting Cockson's consciousness that the video's contents were defamatory.

28. In 2023 or 2024, Cockson left a comment on the American Bar Association's website article about Hopwood, calling him "a psychopath" and stating that he was "cruel to animals" and "a monster." This statement was published to persons throughout the District and nationwide.

Cockson publicly posted that she had been "contacting [Hopwood's] employers and the law school that he attended in order to let them know he was a sociopath and a psychopath"—a rare but explicit admission, in Cockson's own words, of the nature and purpose of her campaign. These publicly accessible statements were made with ill will and with actual knowledge of their falsity.

### E. The March 2025 Substack Exchange and Cockson's Explicit Admission of Actual Malice

29. On March 11, 2025, Hopwood published an article on Substack discussing his legal career. On March 12, 2025, Cockson responded publicly: "I remember how you used to terrorize people, including myself. How you got off on seeing people afraid. How you put people in danger to get a reaction that gave you a jolt or thrill. You are a pathetic monster. That's a hard-wiring defect."

30. On March 12, 2025, Hopwood responded, noting that Cockson had published on Facebook the false claim that he was being investigated and charged with embezzlement, and stating: "That was false and there is a legal term for it—defamation." Hopwood warned that if she continued spreading lies, she would hear from his attorney.

31. Cockson responded on March 12, 2025, with the following: "I believe I got the embezzlement information from the online portal documenting your case. I can rephrase. I *believe* you are being investigated for embezzlement. Now it's a statement about my beliefs. Fun trick, huh?" (Emphasis added.) She added: "I'll do everything I can to get that version of you out there." This exchange is critical to the actual malice analysis. Cockson's own words establish, beyond any ambiguity, that: (a) she was told directly that the embezzlement claim was false; (b) she acknowledged she needed to "rephrase" it to escape liability; (c) she immediately re-published the same false impression under a pretext of expressing personal belief, describing this evasion as a "Fun trick"; and (d) she simultaneously announced her continuing intention to "do everything" to

harm Hopwood's reputation. This is not inadvertent publication of a mistaken belief—it is the knowing re-publication of a statement whose falsity the publisher had just been told and acknowledged, through a deliberate formulation designed to evade legal consequences. This admission constitutes textbook actual malice.

32. A few weeks after this exchange, Cockson deleted her Facebook posts about Hopwood and then deleted or deactivated her Facebook account entirely—acts that further demonstrate her consciousness of guilt and awareness that her statements were defamatory. Hopwood had preserved screenshots of those posts before their deletion.

F. Cockson Travels to the District and Meets with Hopwood's Estranged Wife (June 2025)

33. In June 2025, Cockson traveled to the District of Columbia and attended Hopwood's criminal trial in *United States v. Hopwood*. While in the District, she personally communicated with Hopwood's estranged wife. This visit demonstrates the length and scope of Cockson's personal involvement in the effort to harm Hopwood, including her willingness to insert herself directly into the criminal proceedings against him—the same proceedings she would later attempt to weaponize through the "Justice for Jill" email.

G. Service of the Complaint and Cockson's Immediate Foreknowledge

34. On December 3, 2025, Hopwood, proceeding pro se through his attorney-in-fact Joshua Boyer, filed this civil defamation action in this Court. As a matter of standard litigation practice and evidence preservation, a copy of the draft complaint was transmitted on December 3, 2025, to counsel for a third party who held relevant information, with a copy to that third party.

35. On December 5, 2025, Hopwood's attorney-in-fact, Joshua Boyer, personally served Cockson with the summons and complaint at her place of business in Kansas City, Missouri. The service was captured on video. The recording reflects that before examining the documents in the

envelope, Cockson stated that she had already read the complaint—confirming that she had obtained advance knowledge of the complaint's contents prior to formal service—and then referred to Hopwood in highly derogatory terms consistent with her prior public statements.

36. Cockson's advance knowledge of the complaint, whether obtained through the third party referenced in preceding paragraph, through the Brookland operative, or by other means, enabled her to begin planning her retaliatory campaign before the lawsuit was formally served. The sequence of events—service on December 5, 2025, and coordinated threats, fabricated emails, and ex parte court communications within five business days—demonstrates premeditation.

H. Post-Service Retaliatory Campaign: The Conspiracy to Silence Witnesses

*1. December 10, 2025: Interstate Threatening Texts to Boyer*

37. On December 10, 2025, beginning at approximately 3:31 p.m., Boyer received a series of text messages on his Virginia cell phone from telephone number (215) 576-4974. The sender initially identified themself as a process server attempting to serve legal papers for Hopwood, and demanded to know when Boyer would be home. This representation was false; no legal process has ever been served on Boyer at that address provided by the sender, and no such process has ever arrived in the weeks and months since. The "process server" claim was a pretext designed to learn Boyer's location and to make the initial contact appear legitimate before escalating to explicit threats.

38. The messages escalated rapidly and included the following statements, quoted verbatim: "I see the allegations here and you may want to run but I'll find you"; "This isn't going away . . . Ok see you when I see you"; "the lawyers said you're a junkie so you will probably evade so I'm ready for a wait. I make more that way"; "We already have pictures of you with your kids and going to get your dope and your recurring booze buys. So I'll see you when I see you"; and "Jesus this Doc Metzner doesn't like you."

39. The "Doc Metzner" reference is the single most significant forensic element linking these messages to Cockson. "Doc Metzner" is a nickname for Raymond Metzner (Hopwood's father-in-law), used exclusively within the small Nebraska community of David City, Nebraska—where Cockson and Hopwood grew up together—and familiar only to persons with intimate knowledge of that community. It is not a publicly known detail, is not on any court docket, and could not have been known to a random process server from a Pennsylvania area code. Its presence in the threatening texts demonstrates that the sender had access to highly specific, insider knowledge from Cockson's Nebraska hometown circle.

40. These messages were designed to convey to Boyer that he and his children were under physical surveillance at his home and while he was executing his attorney-in-fact duties in Brookland, that the senders possessed photographic evidence of his activities, and that he would be "found" if he continued assisting Hopwood. Boyer understood the messages as serious threats to his physical safety and the safety of his children.

41. Immediately after receiving the December 10, 2025 threats, Boyer treated them as serious criminal conduct and went to law enforcement rather than public forums. He first called the Alexandria Police Department's ("APD") non-emergency line that evening and, on December 12, 2025, appeared in person at APD to file Incident Report No. 25-103492, providing screenshots and a full narrative of the threats. In addition to that in-person report, Boyer submitted electronic reports by email to APD, and on March 13, 2026, he transmitted a detailed written referral and evidentiary package by email to the Criminal Division of the United States Department of Justice, enclosing the text messages, documentary evidence, Ring camera footage of the Brookland operative and expressly requesting a federal witness-tampering and obstruction investigation.

*2. December 9–10, 2025: Fabricated Identity and Non-Public Court Document*

42. On or about December 10, 2025, at approximately 7:07 p.m., Boyer received an email from the address "eileen.rivers.editor@gmail.com," purporting to be from USA TODAY editor Eileen Rivers. The email attached, as a PDF, a private letter Jane Doe had sent to the Honorable Sparkle L. Sooknanan in *Hopwood v. Cockson* that same day.[1] At the time the email was received, that letter, dated December 10, 2025, had not been docketed or made publicly available in any court. The email solicited Boyer's comment on the letter and characterized Hopwood in derogatory terms identical to Cockson's narrative.

43. The "Eileen Rivers" Gmail account is not the professional email of Eileen Rivers. No article, story, or publication by any journalist named Eileen Rivers concerning Hopwood, Cockson, or this litigation has ever appeared in any medium. The account and the identity were fabricated as an instrument of intimidation.

44. On information and belief, on December 10, 2025—the same day the threatening texts described below were transmitted—a confederate of Cockson's appeared at the Clerk's Office of this Court, obtained a copy of Jane Doe's letter to Judge Sooknanan before it was available electronically on the public docket, and provided it to Cockson. That letter used the identifying formulation "Joshua K. Boyer." The identical formulation appears verbatim in the threatening text messages sent to Boyer on December 10, 2025 and in the fabricated Eileen Rivers email—confirming that a single orchestrating source accessed and weaponized that non-public document across all multiple channels on the same day.

---

[1] Plaintiff identifies this witness pseudonymously as "Jane Doe" rather than by her legal name. Given the nature of the retaliatory conduct alleged in this action—including interstate threats, fabricated online identities, and in-person surveillance targeting individuals who assist Hopwood—publicly disclosing her identity in a publicly accessible pleading would needlessly expose her to further intimidation and harassment. Plaintiff will provide Jane Doe's full name to the Court and to counsel for the Defendant under appropriate protective conditions if and when it becomes necessary for discovery or motion practice.

*3. December 9, 2025: Threatening Texts to Witness Jane Doe*

45. On or about December 9, 2025, the same telephone number (215) 576-4974 that sent the threatening messages to Boyer also sent text messages to Jane Doe at her cell phone number. Jane Doe was identified in the initial complaint as a material fact witness with first-hand knowledge of Cockson's defamation campaign. The very next day—the same day Boyer received threatening texts from (215) 576-4974—additional messages to Jane Doe stated, in substance: "Omg Jill contacted gtown abt that defamation thing. Ppl in the group r flipping out about it. They already found 3 attys willing to take the case pro bono. SH doesn't get how hated he is there. Like a couple profs want an investigation into how he was hired."

46. These messages served two purposes: (a) they were designed to discourage Jane Doe from serving as a witness by conveying that Georgetown was preparing to take action against Hopwood, making her continued support of him reputationally costly; and (b) they reflect Cockson's longstanding, ongoing pattern of contacting Georgetown and other institutions about Hopwood—extending that pattern now to a named fact witness whose testimony could corroborate Hopwood's claims. The texts to Jane Doe were targeted at a "witness" within the meaning of 42 U.S.C. § 1985(2).

*4. December 12, 2025: The "Justice for Jill" Ex Parte Email*

47. On December 12, 2025, at approximately 10:42 a.m., an email with the subject line "STOP SHON HOPWOOD FROM HARMING WOMEN" was sent from the email address "justiceforjillcockson@gmail.com" to the following recipients: (a) the Honorable Errol Arthur, Associate Judge, D.C. Superior Court, presiding over *United States v. Hopwood*, No. 2023 DVM 001126; (b) multiple Assistant United States Attorneys for the District of Columbia, including AUSAs Monisha Rao and Katherine Ballou; (c) the United States Attorney for the District of Columbia; (d) a lawyer from the American Bar Association; and (e) other lawyers and recipients.

The email purported to be sent on behalf of "a group of concerned citizens" who remained anonymous because they "feared retaliation."

48. The "Justice for Jill" email made the following false and defamatory statements about Hopwood and his attorney-in-fact Boyer (quoted verbatim from the email): (a) that Hopwood "IS STILL COMMITTING CRIMES" (in all capital letters); (b) that Hopwood and Boyer were "engaged in witness intimidation"; (c) that Hopwood was "literally placing [Jane Doe] in harm's way and trying to destroy her"; (d) that "one of us has seen Josh Boyer buying alcohol in Brookland"—an allegation mirroring the December 10 threat message's "recurring booze buys" language, proving single-source orchestration; (e) that Hopwood and Boyer are "getting people on the outside to do his dirty work and threatening anyone who doesn't tell the story he wants told"; and (f) that this lawsuit is "just a Substack post to humiliate [Cockson] except he had to do it in a lawsuit because he is broke and is trying to collect money."

49. These statements were false. Hopwood was not, and is not, committing crimes. He has not engaged in witness intimidation. Pursuing a civil defamation lawsuit based on documented, publicly accessible statements by Cockson is a constitutionally protected exercise of the right of access to the courts. Cockson's characterization of protected litigation activity as "witness intimidation" and ongoing criminal conduct is itself defamatory—it falsely accuses Hopwood and Boyer of federal crimes they did not commit.

50. The email explicitly asked Judge Arthur to "get control of this defendant" and implied that Hopwood's pre-sentencing incarceration should be extended. This statement was directed at a judicial officer presiding over Hopwood's criminal case with the intent to influence Hopwood's detention status on the basis of fabricated criminal accusations—an attempt to weaponize the criminal justice system against a party in civil litigation who has sued Cockson for defamation.

51. The "Justice for Jill" email is tied to Cockson by multiple independent forensic markers: (a) the "alcohol in Brookland" language mirrors the "recurring booze buys" language in the December 10 texts, proving single-source orchestration; (b) the email's narrative—that Hopwood is a dangerous criminal, serial abuser, and obstructor of justice—is a verbatim continuation of the defamation campaign described throughout this Complaint; (c) the email was sent from a Gmail account bearing Cockson's personal name ("justiceforjillcockson"); (d) the email incorporates details from the non-public court document that Cockson's confederates procured on December 10, 2025; and (e) its timing—five days after service—is consistent with the premeditated, coordinated campaign documented in this Complaint. On information and belief, the email was authored or orchestrated by Cockson and dispatched by or through John Does 1-3.

52. On December 15, 2025, the court in *United States v. Hopwood* and counsel for both parties acknowledged on the record that the "justiceforjillcockson" email had been received. Neither the court nor the Government engaged with its allegations substantively. Cockson also separately contacted chambers and the USAO for DC to request participation in the December 15, 2025 motions hearing; a claim that was not responded to by either the judge or the prosecution . The email's arrival on the docket of Hopwood's criminal case—even without substantive engagement by the court—demonstrates the potential it had to taint the judicial environment in which Hopwood was being prosecuted.

*5. December 10–15, 2025, and January 4, 2026: The Brookland Operative's Surveillance and Harassment*

53. On information and belief, on or about December 10–15, 2025, the Brookland operative—who resides in NE, Washington, D.C. 20018, in the Brookland neighborhood—came to Boyer's residence in Alexandria, Virginia, without invitation, approached Boyer's front door,

and photographed Boyer's home from his doormat. This conduct was captured on Boyer's Ring doorbell camera.

54. The Brookland operative made no attempt to knock, leave a message, or otherwise engage in any legitimate purpose. The sole apparent purpose of these visits was to demonstrate to Boyer that he had been located, that his home was known to Cockson's associates, and that surveillance of him and his children at their residence would continue if he persisted in assisting Hopwood.

55. On multiple occasions, the Brookland operative contacted Boyer's Virginia landlord and falsely stated that he had heard that Boyer was "harassing" Hopwood's estranged wife. This statement was false. Boyer has never harassed Hopwood's estranged wife, has never visited her current residence, and does not know her current address. The Brookland operative had no reasonable factual basis for this accusation and communicated it to Boyer's landlord—a person with no connection to any of the pending legal proceedings—with the intent to destabilize Boyer's housing and demonstrate that anyone who assists Hopwood will face adverse consequences in their personal lives.

56. On information and belief, on December 10, 2025, The Brookland operative physically appeared at the D.D.C. Clerk's Office to obtain the non-public Jane Doe letter that was then weaponized in the same-day threatening texts and the fabricated Eileen Rivers email. The coordination between the Brookland operative's document procurement, the threatening texts that incorporated that document's language, and the Brookland operative's subsequent physical surveillance of Boyer's home proves that the Brookland operative's was not acting independently but in concert with Cockson.

*6. Steptoe's March 11, 2026 Motion as Continuation of the "Justice for Jill" Narrative*

57. On March 11, 2026, Defendant's counsel, Steptoe LLP, filed a motion to dismiss the Second Amended Complaint in this action. In its opening pages, the brief asserted that this lawsuit is "tied to Mr. Hopwood's efforts to influence witnesses in his criminal case," and described the Complaint as "an attempt at vengeance and coercion" and an effort to "harass his wife further." Framed as factual descriptions rather than mere legal advocacy, these statements track the same storyline previously pushed in the anonymous "Justice for Jill" email: that Hopwood is "STILL COMMITTING CRIMES" from jail and using litigation to intimidate witnesses.

58. At the time the motion was filed, Steptoe's nearly 896 pages of exhibits contained no law-enforcement report, charging document, or investigative finding that Hopwood or Boyer had engaged in witness intimidation, obstruction, or any other crime. The evidentiary record consisted entirely of unsubstantiated allegations generated or curated by Cockson and her allies. Boyer, by contrast, immediately reported threats to the police and DOJ, enclosing the threatening texts, documentary evidence, Ring footage of the Brookland operative, and landlord-harassment documentation, and expressly asking federal authorities—not private litigants—to determine who, if anyone, had violated the federal witness-tampering and obstruction statutes.

59. The motion's "witness influence," "vengeance," and "coercion" framing is therefore significant in this case not as a separate basis for liability, but as further evidence of the ongoing conspiracy and narrative inversion at the heart of Hopwood's claims: Defendant and her associates have repeatedly taken conduct that federal law affirmatively protects—filing a civil defamation suit and preserving evidence—and rebranded it as criminal "witness intimidation," first in anonymous ex parte communications to Judge Arthur and federal prosecutors, and now in Defendant's own briefing in this Court. This use of unsupported criminal accusations to pressure courts and chill participation by witnesses and lay agents is one of the ways the conspiracy has

injured Hopwood by poisoning judicial and prosecutorial perceptions of him and undermining his access to the courts.

## I. How the Conspiracy Injured Hopwood

60. The coordinated campaign described in the preceding paragraphs caused direct and proximate injury to Hopwood in the following ways: (a) *Impairment of access to the courts.* Boyer is Hopwood's attorney-in-fact for limited purposes in these proceedings, family law, and financial matters, and the conduit through whom Hopwood, an incarcerated pro se litigant, communicates with this Court, preserves evidence, and pursues his defamation claims. The threatening texts, the fabricated emails, the Brookland operative's surveillance and uninvited visit to his home, and the false accusations to Boyer's landlord were collectively designed to frighten Boyer into abandoning his role as Hopwood's attorney-in-fact, a witness in this case, and cease providing the ministerial assistance that enables Hopwood to litigate. To the extent that campaign partially succeeded in chilling Boyer's participation, Hopwood's ability to prosecute this action was directly impaired. (b) *Poisoning of the criminal proceedings.* The "Justice for Jill" ex parte email, transmitted directly to Judge Arthur and to the AUSAs prosecuting *United States v. Hopwood,* placed false criminal accusations about Hopwood before the judicial officer and prosecutors whose decisions directly affected Hopwood's detention status and criminal defense. Even though the court did not substantively engage with the email's allegations, the mere transmission of such a document to a sitting judge, active prosecutors, and others—falsely characterizing an incarcerated defendant's civil lawsuit as "witness intimidation" and urging that he be kept incarcerated—created a material risk that Hopwood's interests in the criminal proceedings would be prejudiced. (c) *Reputational harm.* The post-complaint defamatory statements—the false criminal accusations in the "Justice for Jill" email, and the defamatory statements in the threatening texts—caused Hopwood reputational harm. (d) *Emotional distress and compounded harm.* Learning that

false criminal accusations, orchestrated by the same person he sued for defamation, had been transmitted directly to the judge and prosecutors in his criminal case while he was incarcerated and unable to respond caused Hopwood severe emotional distress, deepening the harm inflicted by the underlying defamation campaign.

## CLAIMS FOR RELIEF

### COUNT ONE
### Defamation Per Se
### (Contacts with Georgetown, D.C. Circuit, Judge Brown, Bar authorities, and Washington Post, 2011–2024)

Hopwood incorporates all preceding paragraphs.

61. From 2011 to approximately 2024, Cockson contacted Georgetown University Law Center, the U.S. Court of Appeals for the D.C. Circuit, the Honorable Janice Rogers Brown, Bar authorities, and the Washington Post, and published statements that Hopwood was "a certifiable psychopath and sociopath," was "cruel to animals," and was "a monster" who should be terminated from employment and disciplined or disbarred.

62. These statements were false. They were published to third parties. They constitute defamation per se under D.C. law because they are highly likely to damage Hopwood's professional reputation as an attorney and law professor, and because they falsely impute mental illness, moral depravity, and professional unfitness.

63. Cockson fabricated claims that she made up and knew were false. She is not a psychiatrist, has not evaluated Hopwood, and has not even spoken to him since 1993. She made up those claims of mental illness because Hopwood ended their relationship and she was bitter about it. Even if Cockson heard those claims from others, those claims were and are unsupported by any facts. Cockson also made up claims that Hopwood was investigated or charged with embezzlement and that he committed witness tampering, which she knew was false because she

was the one who threatened and harassed witnesses in this civil case and in Hopwood's criminal case.

64. Cockson deliberately concealed these contacts from Hopwood. He did not learn of the full scope of her contacts with Georgetown, the D.C. Circuit, Judge Brown, and Bar authorities until approximately December 26, 2024. The concealment tolls the otherwise applicable one-year limitations period under D.C. Code § 12-301(4) because Cockson actively prevented discovery of her conduct by communicating through private channels, directing her communications at institutions rather than at Hopwood directly, and refraining from any public disclosure of these private contacts until she made public posts in 2023.

65. Cockson claimed that Hopwood had mental illness—calling him a sociopath, psychopath, and narcissist—to bolster her contention that employers should not retain him because he was inherently dangerous to anyone he came into contact with. She also wished to defame him because she was jealous of his success and the media attention given to his story. In sum, she stalked Hopwood's career and looked for any opportunity to soil his name because of their breakup in 1991 or 1992.

66. These statements by Cockson amount to claims Hopwood suffered from mental disorders, making him dangerous to employers, potential clients, and family members.

67. Hopwood suffered reputational harm, emotional distress, professional harm, and economic harm as a direct and proximate result of these publications, harms described in paragraphs 116–121 of this Complaint.

**COUNT TWO**
**Defamation Per Se**
**(Facebook Embezzlement Post, 2023–2024)**

68. Hopwood incorporates all preceding paragraphs.

69. In 2023 or 2024, Cockson published on Facebook the false statement that Hopwood was facing "an embezzlement charge" and was involved in unspecified "civil proceedings." Hopwood was never investigated for, charged with, or convicted of embezzlement. The statement was published to all fifty states and the District of Columbia via Cockson's semi-public/semi-private Facebook page.

70. This statement is defamation per se under D.C. law because it falsely accuses Hopwood of a crime. Cockson made it with actual malice. She fabricated the embezzlement claim and knew it was false; she confirmed this when, on March 12, 2025, she acknowledged she needed to "rephrase" the claim to escape liability by hedging it as a "belief," while simultaneously re-publishing the same false impression.

71. Cockson fabricated claims that she made up and knew were false. She made up those claims because Hopwood ended their relationship and she was bitter about it. Even if Cockson heard those claims from others, those claims were and are unsupported by any facts. Cockson made up claims that Hopwood was investigated or charged with embezzlement and that he committed witness tampering, which she knew was false because she was the one who threatened and harassed witnesses in this civil case and in Hopwood's criminal case.

72. Hopwood discovered this statement on approximately January 1, 2025, when he took a screenshot of the Facebook post. He was previously unaware of it because Cockson concealed her defamation campaign from him. The discovery rule, to the extent applicable in the District of Columbia, defers the limitations period to the date of discovery. *See* D.C. Code § 12-301.

73. Hopwood suffered reputational, professional, and emotional harm as a proximate result of this publication.

**COUNT THREE**
**Defamation Per Se**
**(Facebook "Psychopath/Sociopath/Monster" Posts, 2023–2024)**

74. Hopwood incorporates all preceding paragraphs.

75. In 2023 or 2024, Cockson published on Facebook the statements that Hopwood was "a textbook sociopath," that he had "endangered [her] life more than once and laughed maniacally," that she had "told everyone [she] feared for Annie and the kids," that he was "a monster," and that he engaged in "sociopathic terrorism." These statements were published to all fifty states and the District.

76. These statements are defamation per se. They falsely impute mental illness, criminal conduct (endangering life with intent to cause fear), and unfitness for professional life. Cockson made them with actual malice: she had not seen or communicated with Hopwood since 1993, was not qualified to diagnose him, and published descriptions of purported conduct—"endangered my life more than once and laughed maniacally"—that are specific factual claims (not pure opinion) that she knew she could not substantiate.

77. The "he endangered my life more than once and laughed maniacally" claim—and the accompanying assertion "I told everyone I feared for Annie and the kids"—is not rhetorical hyperbole. It is a specific factual allegation that Hopwood committed acts designed to frighten Cockson and others. The statement implies specific, verifiable events. Cockson's statement, in its totality in the context in which it was made, conveyed provably false facts—and these statements do convey provable, specific factual assertions about Hopwood's conduct toward Cockson that Cockson cannot substantiate.

78. Cockson claimed that Hopwood had mental illness—calling him a sociopath, psychopath, and narcissist—to bolster her contention that employers should not retain him because

he was inherently dangerous to anyone he came into contact with. She also wished to defame him because she was jealous of his success and the media attention given to his story. In sum, she stalked Hopwood's career and looked for any opportunity to soil his name because of their breakup in 1991 or 1992.

79. These statements by Cockson amount to claims Hopwood suffered from mental disorders, making him dangerous to employers, potential clients, and family members.

80. Cockson fabricated claims that she made up and knew were false. She is not a psychiatrist, has not evaluated Hopwood, and has not even spoken to him since 1993. She made up those claims of mental illness because Hopwood ended their     relationship and she was bitter about it. Even if Cockson heard those claims from others, those claims were and are unsupported by any facts. Cockson also made up claims that Hopwood was investigated or charged with embezzlement and that he committed witness tampering, which she knew was false because she was the one who threatened and harassed witnesses in this civil case and in Hopwood's criminal case.

81. Hopwood discovered these posts in late December 2024 and is entitled to rely on the discovery rule as set forth in Count Three above.

### COUNT FOUR
### Defamation Per Se
### (ABA Website Comment, 2023–2024)

82. Hopwood incorporates all preceding paragraphs.

83. In 2023 or 2024, Cockson published a comment on the ABA's website article about Hopwood calling him "a psychopath" and stating that he was "cruel to animals" and "a monster." This statement was published nationwide and in the District.

84. These statements are defamation per se for the reasons stated in Count Five. Cockson acted with actual malice. Hopwood suffered the harms described in paragraphs 116-121.

85. These statements by Cockson amount to claims Hopwood suffered from mental disorders, making him dangerous to employers, potential clients, and family members.

86. Cockson fabricated claims that she made up and knew were false. She is not a psychiatrist, has not evaluated Hopwood, and has not even spoken to him since 1993. She made up those claims of mental illness because Hopwood ended their relationship and she was bitter about it. Even if Cockson heard those claims from others, those claims were and are unsupported by any facts. Cockson also made up claims that Hopwood was investigated or charged with embezzlement and that he committed witness tampering, which she knew was false because she was the one who threatened and harassed witnesses in this civil case and in Hopwood's criminal case.

87. Cockson claimed that Hopwood had mental illness—calling him a sociopath, psychopath, and narcissist—to bolster her contention that employers should not retain him because he was inherently dangerous to anyone he came into contact with. She also wished to defame him because she was jealous of his success and the media attention given to his story. In sum, she stalked Hopwood's career and looked for any opportunity to soil his name because of their breakup in 1991 or 1992.

## COUNT FIVE
### Defamation Per Se
### (March 12, 2025 Substack Exchange—Embezzlement)

88. Hopwood incorporates all preceding paragraphs.

89. On March 12, 2025, Cockson published in Substack comment threads accessible to all fifty states and the District the statement: "I believe I got the embezzlement information from the

online portal documenting your case. I can rephrase. I believe you are being investigated for embezzlement. Now it's a statement about my beliefs. Fun trick, huh?" This statement was published on March 12, 2025—within the one-year limitations period for defamation under D.C. Code § 12-301(4), running from the December 3, 2025 filing of this action.

90. This publication is defamation per se. It falsely accuses Hopwood of criminal embezzlement—a charge Cockson knew was false and reformulated specifically to evade liability, as her own words demonstrate. The public-court-portal claim was also false: Hopwood's criminal docket contains no embezzlement charge and never did. This statement constitutes actual malice because Cockson knew it was false and consciously reformulated it to perpetuate the false impression while evading legal accountability.

91. These statements by Cockson amount to claims Hopwood was being investigated for unlawful criminal activity, making him dangerous to employers, potential clients, and family members.

92. Cockson fabricated claims that she made up and knew were false. She is not a psychiatrist, has not evaluated Hopwood, and has not even spoken to him since 1993. She made up those claims of mental illness because Hopwood ended their relationship and she was bitter about it. Even if Cockson heard those claims from others, those claims were and are unsupported by any facts. Cockson also made up claims that Hopwood was investigated or charged with embezzlement and that he committed witness tampering, which she knew was false because she was the one who threatened and harassed witnesses in this civil case and in Hopwood's criminal case.

93. Hopwood suffered reputational, professional, and emotional harm from this timely publication.

**COUNT SIX**
**Defamation Per Se**
**(March 12, 2025 Substack Exchange — "Psychopath/Sociopath/Monster/Hard-Wiring Defect")**

94. Hopwood incorporates all preceding paragraphs.

95. On March 12, 2025, Cockson published in the same Substack thread the statements that Hopwood was "a pathetic monster," had "a hard-wiring defect," and that "[y]our pattern of behavior is stereotypical of a narcissist and sociopath"—adding that she would "do everything I can to get that version of you out there." These statements were published within the one-year limitations period.

96. The statements are defamation per se under D.C. law. While Cockson may characterize these as personal opinion, they were published in the context of a direct exchange in which Hopwood had just warned her of a defamation lawsuit, and they were accompanied by the explicit statement of intent to continue the defamatory campaign. The March 12 statement "I'll do everything I can to get that version of you out there" is not opinion—it is an admission of the purpose and intent animating the entire campaign.

97. Cockson fabricated claims that she made up and knew were false. She is not a psychiatrist, has not evaluated Hopwood, and has not even spoken to him since 1993. She made up those claims of mental illness because Hopwood ended their relationship and she was bitter about it. Even if Cockson heard those claims from others, those claims were and are unsupported by any facts. Cockson also made up claims that Hopwood was investigated or charged with embezzlement and that he committed witness tampering, which she knew was false because she was the one who threatened and harassed witnesses in this civil case and in Hopwood's criminal case.

98. Cockson claimed that Hopwood had mental illness—calling him a sociopath, psychopath, and narcissist—to bolster her contention that employers should not retain him because he was inherently dangerous to anyone he came into contact with. She also wished to defame him because she was jealous of his success and the media attention given to his story. In sum, she stalked Hopwood's career and looked for any opportunity to soil his name because of their breakup in 1991 or 1992.

99. Cockson acted with actual malice as established in the preceding paragraphs. Hopwood suffered the harms described throughout this Complaint.

100. These statements by Cockson amount to claims Hopwood suffered from mental disorders, making him dangerous to employers, potential clients, and family members.

**COUNT SEVEN**
**Defamation Per Se**
**(Instagram Video, July 2024)**

101. Hopwood incorporates all preceding paragraphs.

102. In or around July 2024, Cockson published a video on her Instagram account, directed to and accessible in all fifty states and the District of Columbia, in which she falsely stated that Hopwood exhibited "signs of sociopath/psychopathy," was "cruel to animals, cruel to his siblings, cruel to friends," was "a monster," was "dangerous," and predicted that someone would be "planning [a] funeral" because of him. She solicited podcasters and true-crime journalists to "look into and call out the monster."

103. This video is defamation per se. The statement that Hopwood is "dangerous" and that someone will "be planning [a] funeral" because of him implies specific, verifiable conduct—that Hopwood poses a lethal threat—that goes beyond rhetorical epithet and conveys a specific false factual assertion. Cockson acted with actual malice. The video was designed to recruit third parties

to amplify the false narrative, and indeed the subsequent December 2025 campaign of harassment against Boyer and Jane Doe appears to be a foreseeable consequence of Cockson's explicit call to action in the video.

104. Hopwood learned of the video on approximately November 3, 2025. The limitations period for this count runs from November 3, 2025, and suit was filed December 3, 2025—within one year.

105. Cockson fabricated claims that she made up and knew were false. She is not a psychiatrist, has not evaluated Hopwood, and has not even spoken to him since 1993. She made up those claims of mental illness because Hopwood ended their relationship and she was bitter about it. Even if Cockson heard those claims from others, those claims were and are unsupported by any facts. Cockson also made up claims that Hopwood was investigated or charged with embezzlement and that he committed witness tampering, which she knew was false because she was the one who threatened and harassed witnesses in this civil case and in Hopwood's criminal case.

106. Cockson is a clout chaser, seeking to gain notoriety and monetary gain from Hopwood's status as a lawyer, law professor, author and public speaker.

107. Cockson claimed that Hopwood had mental illness—calling him a sociopath, psychopath, and narcissist—to bolster her contention that employers should not retain him because he was inherently dangerous to anyone he came into contact with. She also wished to defame him because she was jealous of his success and the media attention given to his story. In sum, she stalked Hopwood's career and looked for any opportunity to soil his name because of their breakup in 1991 or 1992.

108. These statements by Cockson amount to claims Hopwood suffered from mental disorders, making him dangerous to employers, potential clients, and family members.

## COUNT EIGHT
### Defamation Per Se
**(December 12, 2025: "Justice for Jill" Email to Judge Arthur and Federal Prosecutors)**

109. Hopwood incorporates all preceding paragraphs.

110. On December 12, 2025, Cockson, acting through John Doe 3, caused the "Justice for Jill" email to be sent to Judge Errol Arthur, multiple AUSAs, the U.S. Attorney for the District of Columbia, a lawyer from the ABA, Sara Kropf, and other recipients, falsely stating that Hopwood "IS STILL COMMITTING CRIMES," that Hopwood and Boyer were "engaged in witness intimidation," and related false accusations.

111. Each of these statements is false. Pursuing a civil defamation lawsuit through protected court proceedings is not a crime. Hopwood was not committing crimes. These are statements published to third parties—including a sitting judge and federal prosecutors— constituting defamation per se under D.C. law because they falsely accuse Hopwood of committing federal crimes (witness tampering/obstruction of justice) and because they are highly likely to damage his reputation in the professional and legal community.

112. This count involves a statement published on December 12, 2025—clearly within the one-year limitations period running from the December 3, 2025 filing of this action.

113. Cockson acted with actual malice. She knew Hopwood's civil lawsuit was a lawful exercise of his constitutional right of access to the courts and did not constitute witness tampering. She fabricated and transmitted the criminal accusation for the express purpose of discrediting him before judicial and prosecutorial authorities, consistent with her fourteen-year pattern of contacting authorities with false claims about Hopwood.

114. No qualified privilege protects this communication. The "Justice for Jill" email was an ex parte, anonymous communication to a judge and prosecutors containing fabricated criminal accusations that bear no legitimate relationship to the merits of Cockson's defense in this civil case or to the substance of the criminal proceedings. It was sent not to report a genuine law-enforcement concern but to weaponize the criminal justice system against a party who had sued Cockson for defamation. Communications that exceed the scope of any legitimate interest, and that are made with knowledge of their falsity, do not attract qualified privilege under D.C. law.

115. Cockson fabricated claims that she made up and knew were false. Even if Cockson heard those claims from others, those claims were and are unsupported by any facts. Cockson a made up claims that Hopwood was investigated or charged with embezzlement and that he committed witness tampering, which she knew was false because she was the one who threatened and harassed witnesses in this civil case and in Hopwood's criminal case.

## COUNT NINE
### Intentional Infliction of Emotional Distress

116. Hopwood incorporates all preceding paragraphs.

117. From 2011 through the date of this filing, Cockson engaged in extreme and outrageous conduct by: (a) systematically contacting Hopwood's employers, Bar authorities, the D.C. Circuit, and a sitting federal appellate judge with fabricated accusations designed to destroy his career; (b) publishing false and highly inflammatory statements about Hopwood to thousands of persons through Facebook, Instagram, Substack, and the ABA website; (c) after being warned of a defamation lawsuit, openly announcing that she would "do everything I can to get that version of you out there" while simultaneously admitting she had reformulated a known lie to evade liability; and (d) orchestrating a post-complaint campaign of anonymous threats, fabricated journalist

impersonation, and ex parte false criminal accusations to Judge Arthur and federal prosecutors, all designed to destroy Hopwood's access to courts while he was incarcerated and unable to respond

118. A significant portion of this conduct was carried out during the period of 2023–2025 when Cockson knew Hopwood was particularly vulnerable—facing criminal charges, alienated from colleagues at Georgetown, fighting to maintain custody of his children, and reliant on external assistance for his legal affairs due to his eventual incarceration. She callously and deliberately exploited that vulnerability to maximize harm.

119. Cockson intended to cause Hopwood severe emotional distress, or acted with reckless disregard of the near certainty that her conduct would cause such distress.

120. Cockson's conduct did cause Hopwood severe emotional distress: he lost approximately ten pounds; his blood sugar levels spiked (he has type 2 diabetes); he suffered anxiety attacks, insomnia, excessive sweating, body aches, and lethargy; he was depressed, unable to work more than a few hours per day, withdrew from family and friends, and was rendered largely unable to function professionally for extended periods. He was further distressed by the transmission of false criminal accusations directly to the judge presiding over his criminal case, creating a well-founded fear that Cockson's fabrications would color his criminal proceedings. Hopwood specifically suffered from the harms described in paragraphs 116–121 of this Complaint.

121. Hopwood is entitled to compensatory and punitive damages for these injuries.

## COUNT TEN
### Intentional Interference with Prospective Economic Advantage

122. Hopwood incorporates all preceding paragraphs.

123. Cockson knew of and intentionally targeted Hopwood's specific economic relationships: his employment at Georgetown University Law Center; his relationship with his law

partner and clients at Hopwood Singhal PLLC; his relationship with the D.C. Circuit and federal courts; and his relationship with the ABA and other professional organizations.

124. Without privilege or justification, Cockson used improper means—specifically, knowing falsehoods published to Georgetown, the D.C. Circuit, and the ABA—to disrupt these known, specific economic and professional relationships. Knowing falsehoods used to destroy specific employment and professional relationships constitute "improper means" that satisfy this cause of action.

125. Cockson's contacts with Georgetown and Judge Brown were directed at Hopwood's employment and federal court relationships—specific, known economic relationships, not merely inchoate interests. Cockson intended to destroy those relationships and acted to do so.

126. As a direct and proximate result, Hopwood suffered loss of clients, interference with his Georgetown employment, and impairment of his court relationships.

### COUNT ELEVEN
### Civil Conspiracy
### (District of Columbia Common Law)

127. Hopwood incorporates all preceding paragraphs.

128. Under D.C. common law, civil conspiracy requires: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act by unlawful means; (3) injury caused by an unlawful overt act in furtherance of the common scheme; and (4) that the overt act was the proximate cause of injury.

129. Beginning on or before December 5, 2025, Cockson, the Brookland operative (John Doe 2), John Doe 1, John Doe 3, and additional persons whose identities are not yet known, reached an agreement or tacit understanding to injure Hopwood in his person, property, and professional standing by: (a) threatening and intimidating Boyer into abandoning his role as

Hopwood's attorney-in-fact and witness; (b) poisoning the criminal courts and federal prosecutors against Hopwood through false criminal accusations; (c) impairing Hopwood's ability to prosecute his civil defamation claims; and (d) recruiting third parties to amplify the defamatory campaign through the Instagram video and the "Justice for Jill" email's dissemination to Judge Arthur, AUSA's responsible for prosecuting Hopwood, the ABA, and private lawyer Sara Kropf.

130. The following overt acts were committed in furtherance of this conspiracy:

(a) December 10, 2025: John Doe 1 sent a series of interstate threatening text messages from (215) 576-4974 to Boyer's Virginia phone, identifying him by name and home address, insisting "this isn't going away," telling him "you may want to run but I'll find you," and stating "I can wait outside your home…" and "I'll see you when I see you." In the same exchange, John Doe 1 claimed to have photographs of Boyer with his children and of his routine movements and made defamatory, unfounded allegations suggesting Boyer was engaged in criminal activity. Taken together, these messages conveyed that Boyer and his children were under hostile surveillance and were reasonably understood as threats intended to intimidate him at his home.

(b) December 10, 2025: John Doe 3, at Cockson's direction or in coordination with her, sent the fabricated Eileen Rivers email to Boyer, attaching a non-public court document, to harass and intimidate him.

(c) December 9-10, 2025: The same phone number (215) 576-4974 sent threatening texts to witness Jane Doe, designed to discourage her continued cooperation with Hopwood's civil litigation.

(d) December 10, 2025: on information and belief, the Brookland operative appeared at the D.D.C. Clerk's Office, obtained a non-public court document, and provided it to Cockson for weaponization.

(e) December 12, 2025: John Doe 3, at Cockson's direction or in coordination with her, sent the "Justice for Jill" email to Judge Arthur and federal prosecutors, falsely accusing Hopwood and Boyer of witness intimidation and ongoing criminal conduct.

(f) January 4, 2026: the Brookland operative appeared uninvited at Boyer's Alexandria residence, again photographing the property.

(g) Later that day, the Brookland operative repeatedly contacted Boyer's Virginia landlord, invoking the same narratives and falsely asserting that Boyer was "harassing" a third party in connection with pending D.C. litigation, even though Boyer had never been to that person's residence and had no contact with her. These unsolicited communications had no legitimate purpose related to service of process or the underlying cases; they were designed to portray Boyer to his landlord as a problem tenant engaged in criminal harassment, to alienate Boyer from

his landlord, and to destabilize his housing at the very moment he was serving as Hopwood's attorney-in-fact and anticipated federal witness.

131. The conspiracy's underlying torts are Cockson's defamatory statements and IIED, all perpetrated through coordinated action with the Brookland operative and the John Does. Civil conspiracy extends joint and several liability to the Brookland operative and the John Does for all tortious acts taken in furtherance of the scheme. It also provides the predicate for punitive damages based on concerted, willful conduct.

132. The overt acts described above were the direct and proximate cause of Hopwood's injuries, including: loss of effective access to this Court through intimidation of his attorney-in-fact; reputational harm before federal and local courts; emotional distress; and harm to his interests in the pending criminal proceeding.

### COUNT TWELVE
### Violation of 42 U.S.C. § 1985(2)
### Conspiracy to Deter a Party and Witness in a Federal Court Proceeding

133. Hopwood incorporates all preceding paragraphs.

134. The first clause of 42 U.S.C. § 1985(2) provides a civil cause of action against two or more persons who "conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified." No allegation of class- or race-based discriminatory animus is required under the first clause of § 1985(2).

135. *Hopwood's Standing as Party and Witness.* Hopwood has standing to assert this claim in two distinct capacities. He is a party in this federal civil action, *Hopwood v. Cockson*, No. 1:25-cv-04214-SLS (D.D.C.). The post-service conspiracy was designed to injure Hopwood in his "person or property on account of his" filing and prosecuting this federal civil action, and was

designed to poison the judicial and prosecutorial environment in which his criminal case was pending.

136. *No Animus Requirement.* The first clause of § 1985(2) requires no allegation of racial or class-based discriminatory animus. Cockson is not acting on the basis of race or protected class status; she is retaliating against a party to a federal lawsuit that threatens her with civil liability. That is precisely the scenario the first clause was designed to address: private retaliation against a party or witness to suppress or corrupt federal litigation.

137. *Elements Satisfied.* Each element of a § 1985(2) Clause 1 claim is satisfied:

(a) Two or more persons: Cockson, the Brookland operative (John Doe 2), John Doe 1, John Doe and John Doe 3 each participated in the conspiracy as alleged throughout this Complaint.

(b) Conspiracy to deter a party or witness in a federal court by force, intimidation, or threat: The threatening texts, fabricated emails, ex parte communications to courts and prosecutors, physical surveillance and trespass at Boyer's residence, and false accusations to Boyer's landlord were all designed to frighten Boyer into abandoning his role as Hopwood's attorney-in-fact in this matter— thereby depriving Hopwood of his means of communicating with this Court—and to poison the court and prosecutors against Hopwood in both the federal civil case and the related criminal case.

(c) Federal court nexus. *Hopwood v. Cockson*, No. 1:25-cv-04214-SLS (D.D.C.), is a pending federal civil action in which Hopwood alleges an ongoing campaign to intimidate him and dissuade witnesses from assisting his suit. The "Justice for Jill" email was sent after service of that complaint and was calculated to influence how federal judicial and prosecutorial officers would view Hopwood and his attorney-in-fact, Joshua Boyer, by recasting their protected civil-litigation activity as "witness intimidation" and "still committing crimes," thereby undermining Hopwood's ability to prosecute the D.D.C. case and secure truthful testimony. Although the message was transmitted to the presiding judge and prosecutors in *United States v. Hopwood*, its thrust was to poison those same federal decisionmakers against Hopwood and Boyer across both the criminal and civil matters, and to chill participation in the federal civil proceeding that § 1985(2) is designed to protect

(d) Injury to party or witness: Hopwood was injured by the conspiracy's impairment of Boyer's ability to function as his attorney-in-fact, by the false accusations transmitted to Judge Arthur and AUSAs that poisoned his criminal proceedings, by the reputational harm described throughout this

Complaint, and by the compounded distress caused by learning that false criminal accusations had been delivered to the courts responsible for his liberty.

138. *Nexus to Boyer as Witness*. Boyer is a named, identified witness in this federal civil action and was a defense witness in *United States v. Hopwood*. The conspiracy targeted Boyer because of his roles as attorney-in-fact and anticipated witness. Third-party interference causing economic or dignitary harm to a witness states a cognizable injury for purposes of § 1985(2). The conspiracy injured Hopwood by injuring Boyer—his only means of communicating with this Court and a key witness whose credibility the conspiracy was designed to destroy.

139. *Statute of Limitations*. The limitations period for § 1985(2) is borrowed from the most analogous state personal-injury limitations period—three years in the District of Columbia. See D.C. Code § 12-301(8). All overt acts described in this Complaint occurred within three years of the filing of this action.

140. As a direct and proximate result of this conspiracy, Hopwood suffered the injuries described in paragraphs 116–121. He is entitled to compensatory damages, punitive damages, and attorney's fees under 42 U.S.C. § 1988 as the prevailing party in a federal civil rights action.

## DAMAGES AND RELIEF

141. As a result of Cockson's statements, conduct, and the conspiracy described throughout this Complaint, Hopwood has suffered the following categories of harm:

(a) *Physical symptoms*: Loss of approximately ten pounds; elevated blood sugar levels and pancreatic complications (Hopwood has type 2 diabetes); anxiety attacks; insomnia; excessive sweating; body aches; fever; stiffness of joints; low testosterone levels; and lethargy;

(b) *Mental and emotional harm*: Clinical depression; inability to work more than a few hours per day; withdrawal from family and friends; extended periods of isolation in his place of confinement; inability to exercise; and pervasive feelings of defeat and helplessness exacerbated by his inability to respond to the defamation campaign while incarcerated;

(c) *Reputational harm*: Colleagues at Georgetown University Law Center, former and current students, current and potential clients, fellow lawyers, Bar authorities, and federal courts read false

and vile statements from Cockson that diminished their professional and personal opinions of Hopwood; Cockson's direct contacts with Georgetown and Bar authorities created a material risk of employment termination and professional discipline that Hopwood was required to monitor and address during the most vulnerable period of his professional life;

(d) *Livelihood*: Hopwood's law practice suffered economic losses directly attributable to Cockson's contacts with Georgetown, Bar authorities, and potential clients; Hopwood's Georgetown Law Center salary and partnership income were placed at direct risk;

(e) *Familial harm*: Hopwood's mother, siblings, and other family members read Cockson's false and vile public statements, causing them distress and compounding Hopwood's emotional injury by creating family conflict for which he felt responsible despite having no control over Cockson's conduct; and

(f) *Legal harm*: The transmission of false criminal accusations to the presiding judge and prosecutors in *United States v. Hopwood* created a concrete risk of prejudice to Hopwood's criminal proceedings and impaired his ability to pursue this civil action through his attorney-in-fact, compounding all other harms.

142. Hopwood seeks:

(a) Compensatory damages in an amount to be proven at trial, but no less than $350,000, subject to increase upon discovery;

(b) Punitive damages in an amount to be proven at trial, but no less than $650,000, reflecting the deliberate, malicious, and sustained nature of Cockson's campaign, subject to increase upon discovery;

(c) Attorneys' fees and paralegal fees under 42 U.S.C. § 1988 and otherwise as allowed by law;

(d) A permanent injunction prohibiting Cockson from making further defamatory statements about Hopwood, including calling him a psychopath, sociopath, narcissist, or monster, accusing him of embezzlement or other criminal conduct, or disparaging Hopwood before his wife, children, current or former employer, or professional regulators;

(e) Costs of suit, including filing fees and other litigation-related costs;

(f) Nominal damages and declaratory relief as appropriate; and

(g) Such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Shon Robert Hopwood respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff and against Defendant Jill Cockson on all counts;

B. Award compensatory damages in the amount of at least $350,000.00, or such greater amount as may be proven at trial;

C. Award punitive damages in the amount of at least $650,000.00, or such greater amount as may be proven at trial, based on Defendant's deliberate, malicious, premeditated, and sustained campaign of defamation, intimidation, and conspiracy;

D. Grant a permanent injunction prohibiting Defendant from making further false and defamatory statements of fact about Plaintiff to any third party; this injunction shall be limited to false statements of fact and shall not be construed to restrict constitutionally protected expressions of opinion;

E. Award attorney's fees and costs pursuant to 42 U.S.C. § 1988 as the prevailing party on the § 1985(2) federal civil-rights claim; Plaintiff expressly pleads that this fee entitlement is tied to success on the federal § 1985(2) count and remains available even if the Court declines supplemental jurisdiction over or otherwise trims any state-law tort count;

F. Award nominal damages and declaratory relief as appropriate, including a declaration that Defendant's conduct as described herein violated 42 U.S.C. § 1985(2) and constituted defamation per se under the common law of the District of Columbia; and

G. Grant such other and further relief as the Court deems just and proper

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

March 31, 2026

Respectfully submitted,

Shon Robert Hopwoood
D.C. Department of Corrections
1901 D Street, SE
D.C. Central Detention Facility
Washington, D.C. 20003

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2026, I caused a copy of Plaintiff's Third Amended

Complaint to be served on Defendant via mail by sending notice of such filing to counsel of record:

Michelle S. Kallen
Steptoe LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
mkallen@steptoe.com

Respectfully submitted,

_____
Shon Robert Hopwood