**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SHON ROBERT HOPWOOD,           )
                                   )
       Plaintiff,              )
                                   )
v.                            )      Civil Action No. 1:25-cv-4214-SLS
                                   )
JILL COCKSON               )
                                   )
       Defendant.         )

**PLAINTIFF'S MOTION FOR SANCTIONS AND EXPEDITED DISCOVERY**

Comes now Plaintiff Shon Robert Hopwood, proceeding pro se, and respectfully moves this Court to impose sanctions and order expedited discovery against Defendant Jill Cockson. Cockson intimidated witnesses in this case by sending anonymous threatening and harassing text messages and emails, then falsely accused Hopwood of witness intimidation before this Court.

In Cockson's most recent motion to dismiss, her lawyers argued that there is a "strong indication that this suit is tied to Mr. Hopwood's efforts to influence witnesses in his criminal case." R. 12 at 1. That accusation has no evidentiary support. Hopwood's criminal case and this civil case have nothing to do with each other.[1] The accusation simply repackages claims Cockson had already made anonymously and then explicitly to the D.C. Superior Court. It is the latest entry in a growing record: Cockson told this Court, the D.C. Superior Court, and even her own lawyers that Hopwood intimidated witnesses when, in truth, she was the one sending anonymous threatening and harassing messages to potential witnesses in these proceedings.

---

[1] Cockson has not spoken to Plaintiff Hopwood since 1993 and was not a witness—nor a part of—Hopwood's criminal case in D.C. Superior Court. *See* Decl. of Shon Hopwood (Ex. 1). Cockson's post-service conduct is separately pleaded in Hopwood's Third Amended Complaint, filed April 7, 2026, which alleges—among other claims—a conspiracy to deter parties and witnesses in a federal court proceeding, in violation of 42 U.S.C. § 1985(2). *See* R. 19, Third Am. Compl. at 1–5.

RECEIVED

MAY 19 2026

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

In this motion, Hopwood shows that Cockson, using the same anonymous phone number and related accounts, sent threatening and harassing communications to the two witnesses identified in the original complaint—Ms. Bozelko and Joshua Boyer. Boyer is both a fact witness and Hopwood's power of attorney and primary conduit to this Court. Third Am. Compl. at 1-3. Astonishingly, Cockson's scheme included anonymous texts to Boyer threatening surveillance of Boyer and his children—a threat Boyer took seriously enough to report to the Alexandria, Virginia Police Department and DOJ's Criminal Division. *See* Decl. of Joshua Boyer (Ex. 2); DOJ Criminal Division Referral (Ex. 3); *see also* 18 U.S.C. §§ 1512(b)(1), (b)(2)(A), (c)(2), (d)(4) (criminalizing intimidation, threats, corrupt persuasion, and other obstructive conduct aimed at influencing witness testimony, court proceedings, and the reporting of offenses).

Attached to this motion is ample evidence—clear and convincing—that Cockson intimidated potential witnesses in this case and then falsely accused Hopwood of doing so, all in bad faith. Once proven, Cockson will have committed a fraud on this Court and upon Hopwood. *See Ty Inc. v. Softbelly's Inc.*, 517 F.3d 494, 498 (7th Cir. 2008) ("Trying to improperly influence a witness is fraud on the court and the opposing party.").

This Court has the inherent power to sanction party misconduct.[2] *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991); *see also Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469, 1475 (D.C. Cir. 1995). The Court may impose default judgment and substantial monetary sanctions when a party commits bad-faith misconduct proved by clear and convincing evidence. *Shepherd*, 62 F.3d at 1478–79. Federal Rule of Civil Procedure 11 separately authorizes sanctions for factual

---

[2] Plaintiff Hopwood is not seeking sanctions against Defendant Cockson's attorneys, as he does not currently possess evidentiary support that counsel were aware of Cockson's intimidation of witnesses. To some extent, Cockson's attorneys are also victims of Cockson's fraud upon the Court, as explained below.

contentions made without evidentiary support. *See Lucas v. Duncan*, 574 F.3d 772, 774 (D.C. Cir. 2009). And because witness tampering is among "the most grave abuses of the judicial process," it "warrants a substantive sanction." *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 782 (7th Cir. 2016).

Cockson's misconduct reaches the core of the judicial function. It makes potential witnesses apprehensive about participating in this case. It forces Hopwood—incarcerated and proceeding pro se—to divert scarce resources to investigate, coordinate with law enforcement, and file this motion, all while depending on his power of attorney as his only conduit to this Court. Cockson exploited Hopwood's custodial status to accuse him of crimes she herself was committing. Misconduct that brazen deserves no leniency.

Plaintiff Hopwood therefore requests:

a. Default judgment on the three counts most directly affected by Defendant's witness intimidation: the defamation per se and intentional infliction of emotional distress claims that turn on testimony from Boyer and Ms. Bozelko;[3]

b. A monetary sanction of $10,000.00, payable to Hopwood;

c. An adverse jury instruction on witness tampering; and

---

[3] In the Third Amended Complaint, these are Counts Seven (defamation per se–Instagram video), Eight (defamation per se–post-complaint "Justice for Jill" email and related accusations), and Nine (intentional infliction of emotional distress). Count Seven is the successor to the Instagram-video defamation-per-se claim originally pleaded as Count 11 of the initial complaint; Count Nine is the successor to the IIED claim originally pleaded as Count 12; and Count Eight re-pleads one of the social-media defamation-per-se theories from the original complaint (Counts 7, 9, and 10) that accused Hopwood of serious criminal conduct and became the immediate focus of Defendant's post-service intimidation campaign.

d.  A protective order precluding Defendant from communicating with Ms. Bozelko, Joshua Boyer, Kyle Singhal, and Ann Marie Hopwood, and any additional witnesses identified in future pleadings.

Without severe sanctions, Hopwood will struggle to convince witnesses to participate. Only serious consequences can punish and deter Defendant from further frauds upon this Court.

Hopwood also requests expedited discovery under Federal Rule of Civil Procedure 26(d)(1). He seeks Rule 45 subpoenas for phone records associated with the anonymous number used in the intimidation campaign, and non-content records associated with the anonymous email accounts used in the scheme. These records will show that Defendant used anonymous texts and emails to intimidate witnesses and will provide further proof of a conspiracy to commit witness tampering, as alleged in the Third Amended Complaint. *See* 42 U.S.C. § 1985(2).

Without sanctions and expedited discovery, witnesses may withdraw, critical electronic evidence may be lost, and Defendant's intimidation and deception will stand unrebutted.

## ARGUMENT

This motion rests on three interrelated grounds that all point in the same direction: immediate relief. First, the Court's inherent authority to address fraud on the court and witness tampering, together with the clear-and-convincing standard that governs severe sanctions under *Shepherd*, squarely applies to Cockson's conduct. Second, the elements of a civil conspiracy under 42 U.S.C. § 1985(2) independently capture Cockson's post-service misconduct and confirm that it is actionable. Third, the good-cause and proportionality requirements for expedited discovery under Rule 26(d)(1) are satisfied considering the risk that critical third-party records will soon be lost or destroyed.

The legal standard is clear and unforgiving: a party who, in bad faith, intimidates witnesses and then weaponizes that misconduct by falsely accusing the opposing side to influence courts and prosecutors has crossed the line that justifies the most serious sanctions, including default judgment, substantial monetary penalties, adverse jury instructions, protective orders, and targeted expedited discovery.

## I.    THE COURT'S INHERENT AUTHORITY PERMITS DEFAULT JUDGMENT AND MONETARY SANCTIONS UPON CLEAR AND CONVINCING PROOF OF BAD-FAITH WITNESS TAMPERING AND FRAUD ON THE COURT.

Federal courts possess inherent authority, independent of the Federal Rules of Civil Procedure, to impose severe sanctions—including default judgment and substantial monetary penalties—when a party engages in bad-faith misconduct that abuses the judicial process. *Chambers*, 501 U.S. at 44–46; *Shepherd*, 62 F.3d at 1474–75. Courts must be able to protect their institutional integrity "with contempt citations, fines, awards of attorneys' fees, and such other orders and sanctions as they find necessary, including even dismissals and default judgments." *Shepherd*, 62 F.3d at 1474.

Under D.C. Circuit precedent, the Court may impose terminating sanctions or serious monetary penalties only upon clear and convincing evidence of bad faith; a preponderance does not suffice. *Id.* at 1479. Before entering default, the Court must also give a "specific, reasoned explanation" for rejecting lesser sanctions, such as fines, attorneys' fees, or adverse evidentiary rulings. *Id.* at 1478. Issue-related sanctions may be imposed based on a preponderance alone. *Id.*

Bad faith exists where "a fraud has been practiced upon" the Court. *Chambers*, 501 U.S. at 44. Improperly influencing witnesses is fraud on both the court and the opposing party. *Ty Inc.*, 517 F.3d at 498. Witness tampering is among the most serious forms of litigation misconduct, and federal courts have inherent authority "to take reasonable steps to avoid intimidation or coercion of witnesses." *United States v. Vasilakos*, 508 F.3d 401, 411 (6th Cir. 2007). District courts



routinely invoke their inherent power to sanction parties who engage in bad-faith tactics such as harassment and intimidation of opposing parties, their counsel, or witnesses. *See Pullen v. Brown*, 2020 U.S. Dist. LEXIS 196452 (M.D. Fla.) (collecting cases).

The record already shows the chilling effect Defendant's misconduct has caused. Ms. Bozelko, one of the two fact witnesses identified in the original complaint, appeared to Samantha Hopwood to be afraid and under stress when she described the anonymous texts, the related surveillance-like details, and the unsolicited packages sent to her elderly mother's home. Decl. of Samantha Hopwood (Ex. 4) ¶¶ 9–12. Ms. Bozelko told Samantha Hopwood she suspected the texts came from Defendant or someone acting for her and that she believed Defendant was working with a reporter affiliated with a tabloid-style media outlet in connection with the intimidation campaign. *Id.* ¶¶ 8–9. That fear is not speculative. It is the direct result of Defendant's use of anonymous channels to threaten witnesses, surveil their movements, and then launder false accusations into mass communications with courts and prosecutors. A witness who is frightened into silence cannot testify "freely, fully, and truthfully"—the very harm § 1985(2) was designed to prevent.

Courts have not hesitated to impose dismissal or default judgment—the most severe sanctions—when parties intimidate witnesses. *See Young v. Office of the U.S. Senate Sergeant at Arms*, 217 F.R.D. 61, 70–71 (D.D.C. 2003) (imposing dismissal for witness tampering and holding that, where gross fraudulent misconduct is present, monetary sanctions alone are "inherently inadequate" and issue sanctions are "not appropriate"); *Torres v. Wells Fargo Bank, N.A.*, 2019 U.S. Dist. LEXIS 227913, at 3 (C.D. Cal.) (dismissing where the plaintiff sent threatening text messages to a defense witness); *Synergetics, Inc. v. Hurst*, 2007 U.S. Dist. LEXIS 68736, at *2 (W.D.N.Y.) (threats directed at opposing party and witness warranted dismissal).

6

Under that framework, two questions matter here: (1) whether the record contains clear and convincing evidence that Defendant, acting in bad faith, intimidated witnesses and committed fraud on this Court; and (2) whether default judgment, monetary sanctions, adverse jury instructions, a protective order, and expedited discovery are appropriate and proportional remedies. The answer to both is yes.

## II.    THE RECORD CLEARLY AND CONVINCINGLY SHOWS THAT COCKSON INTIMIDATED WITNESSES AND THEN FALSELY ACCUSED HOPWOOD OF DOING THE SAME.

"Clear and convincing" evidence produces in the factfinder a firm belief or conviction that the allegations are true. *Shepherd*, 62 F.3d at 1477–79. Here, four independent strands converge:

a.  The content and timing of anonymous texts and emails aimed at the only two witnesses named in the original complaint;

b.  Defendant's unique, non-public knowledge of details in those communications—details only she would know;

c.  Law-enforcement review and forensic analysis confirming that the communications came from the same author; and

d.  Defendant's laundering of the false "witness intimidation" narrative into courts, prosecutors' offices, and finally her own motion to dismiss.

Taken together, the evidence does more than meet the clear-and-convincing standard; it establishes a civil conspiracy under 42 U.S.C. § 1985(2), which imposes liability on persons who conspire "by force, intimidation, or threat" to deter any party or witness in federal court from attending or testifying freely, fully, and truthfully.

A. Elements of Witness Tampering and § 1985(2)

7

Witness tampering under 18 U.S.C. § 1512(b)(1) occurs when a person "knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to influence, delay, or prevent the testimony of any person in an official proceeding." A corrupt influence "motivated by an improper purpose" satisfies the statute. *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996).

Section 1985(2) provides a civil remedy against persons who conspire, "by force, intimidation, or threat," to deter any party or witness in any federal court from attending or testifying freely, fully, and truthfully, or who injure such party or witness on account of having done so. The first clause of § 1985(2) requires no allegation of racial or class-based discriminatory animus. *Kush v. Rutledge*, 460 U.S. 719, 724–26 (1983). The Supreme Court has recognized that the essence of the wrong § 1985(2) addresses is intimidation or retaliation against witnesses in federal proceedings. *Haddle v. Garrison*, 525 U.S. 121, 125 (1998).

Cockson's conduct fits these standards precisely.

B. The Content and Timing of the Anonymous Communications Reveal a Coordinated Campaign Targeting the Only Two Named Witnesses.

On December 3, 2025, Hopwood filed this action against Cockson, asserting defamation per se, false light, and intentional infliction of emotional distress. The complaint identified two potential fact witnesses: Ms. Bozelko and Joshua Boyer, who also serves as Hopwood's power of attorney. R. 1 at 6, 23. Cockson has never met, spoken to, or addressed Boyer before the events at issue. Ex. 2 (Decl. of Boyer).

On December 10, 2025, Ms. Bozelko filed a letter with this Court stating that some passages of the complaint were inaccurate and requesting corrections. Ex. 5. She addressed the letter to Judge Sooknanan and cc'd "Joshua K. Boyer," labeling him "attorney-in-fact" for

Hopwood. *Id.* Boyer does not normally use his middle initial in professional life. Ex. 2. Upon information and belief, a confederate of Defendant's—pleaded as the Brookland operative in the Third Amended Complaint—appeared at the Clerk's Office on December 10, 2025, obtained a copy of the not-yet-docketed Ms. Bozelko letter, and transmitted it to Defendant. Third Am. Compl. at 14. Hours later, Boyer received a series of anonymous texts from phone number (215) 576-4974.[4] Ex. 2. The first asked, "Is this Joshua K. Boyer?"—mirroring exactly the rare "Joshua K." formulation from the letter. Ex. 2-A. That precise middle-initial usage is no coincidence; it came straight from the letter Defendant's operative had just obtained.

The texter claimed, "I'm a process server. I need to serve you for Shon Hopwood," and demanded to know when Boyer would be home in Alexandria. Ex. 2-A. No process was ever served there; none has appeared since. The "process server" claim was a pretext to draw Boyer out and cloak the initial contact in apparent legitimacy.

When Boyer questioned who was texting him and what was being "served," the tone turned sharp. The anonymous sender wrote, "I see allegations here and you may want to run but I'll find you," and "This isn't going away." Ex. 2-A. The texter then claimed, "I have a right and duty to serve you. I believe you understand this." *Id.* At the time, Defendant knew Boyer was Hopwood's power of attorney and that Boyer had arranged for service of the complaint on her—explaining why the texter assumed Boyer "understood" service.

---

[4] Subsequent carrier-lookup searches confirm that phone number (215) 576-4974 is assigned at the wholesale level to Bandwidth.com CLEC, LLC ("Bandwidth"), a competitive local exchange carrier and VoIP provider that supplies telephone numbers and messaging connectivity to downstream users. Bandwidth publicly represents that it produces subscriber information and non-content usage records for such numbers only in response to valid subpoenas, court orders, or warrants issued by courts in the United States or Canada. *See* Bandwidth Inc., *Law Enforcement Guide*, BANDWIDTH, https://www.bandwidth.com/legal/law-enforcement-guide/ (last visited May 13, 2026).

The messages escalated into claimed surveillance of Boyer and his family: "We have pictures of you with your kids and going to get your dope and your recurring booze buys." *Id.* That sentence combines three separate threats: to Boyer's children, to his reputation, and to future exposure. Boyer reasonably understood this as a threat against his children and told their mother. Ex. 2.

The texter later added, "Jesus this Doc Metzner doesn't like you." Ex. 2-A. "Doc" is the local nickname for Hopwood's father-in-law, Raymond Metzner, in David City, Nebraska. It appears nowhere in public filings or coverage. Only someone from that small community would use "Doc" as shorthand for Metzner. Defendant grew up in David City and knows the Metzner family. *See* R. 19 at 13-16 ("The 'Doc Metzner' reference is the single most significant forensic element linking these messages to Cockson.").

Taken together, these texts left Boyer convinced that the sender had surveilled his home and family, knew where he lived, was prepared to "wait outside" his house, and would "find" him if he continued to assist Hopwood. Ex. 2. The texts made Boyer, reasonably, apprehensive about remaining involved in this case. *Id.* Disturbed by the threats—especially the threat to his children—Boyer contacted the Alexandria Police Department on December 10, 2025, and then made an in-person report on December 12, 2025, assigned No. 25-103492. Ex. 2.

The same day, Boyer received an email from "eileen.rivers.editor@gmail.com," purporting to be from USA Today editor Eileen Rivers. Ex. 2-B. Attached was a PDF copy of the Ms. Bozelko letter that Defendant's confederate had just obtained at the Clerk's Office. The email asked whether it seemed "a little crazy that a professor would file something like this. Especially one who was convicted of beating his wife, thoughts?" *Id.* That address is not Rivers's professional email, and to date no story by any journalist named Eileen Rivers about Hopwood or Defendant has appeared

in any outlet. Third Am. Compl. at 14. The sender impersonated Rivers as part of a witness-intimidation scheme. The purpose of the eileenrivers email was clear: to scare Boyer that his name would be tied to Hopwood's in a USA Today–style story, to paint Hopwood as a criminally active inmate, and to drive a wedge between Hopwood and his only conduit to this Court.

Around December 9–10, 2025, the same (215) 576-4974 number also sent threatening and harassing texts to Ms. Bozelko. *See* Decl. of Samantha Hopwood (Ex. 4) (authenticating screenshot from Ms. Bozelko showing texts received from (215) 576-4974); *id.* ¶¶ 7–8 (Ms. Bozelko told Samantha Hopwood she suspected the threatening texts came from Defendant Jill Cockson or someone acting for her, even though Ms. Bozelko had not spoken with Cockson). Ms. Bozelko's messages included statements that the sender was coming to Connecticut. *Id.* ¶ 7. Ms. Bozelko appeared afraid and under stress when she described the texts and related events to Samantha Hopwood in March 2026. *Id.* ¶¶ 10–12.

On December 12, 2025, an email from justiceforjillcockson@gmail.com went to D.C. Superior Court Judge Errol Arthur, United States Attorney Jannene Piro, multiple AUSAs who tried Hopwood's criminal case, an ABA lawyer, attorney Sara Kropf, and others. Ex. 6. Styled as coming from "concerned citizens" fearful of "retaliation," the email claimed that Hopwood was "STILL COMMITTING CRIMES" from the D.C. Jail and accused Hopwood and Boyer of witness intimidation. *Id.* It said "one of us" had seen Boyer "buying alcohol in Brookland"—echoing the "recurring booze buys" phrase from the anonymous texts. Ex. 2; Ex. 2-A. It also claimed that Ms. Bozelko had "received threatening texts from anonymous numbers recently," though Ms. Bozelko had never disclosed that to Defendant or anyone tied to her. Ex. 4; Ex. 6. The sender urged Judge

Arthur to "get control of this defendant," to impose "controls" on Hopwood at the jail, and to "address" his alleged "crimes behind bars." Ex. 6.

On December 15, 2025, Judge Arthur held a hearing in Hopwood's criminal case to address his medical care at the jail. Before the hearing, Cockson emailed Judge Arthur and the AUSA, asking that the court repurpose the hearing to address Hopwood's alleged "crimes" at the jail or, failing that, that she be permitted to watch the hearing anonymously. At the hearing, Judge Arthur and the prosecutor acknowledged her emails and said they would not respond—presumably because Defendant has nothing to do with the criminal case.

On March 11, 2026, Steptoe LLP, as Defendant's pro bono counsel, filed a motion to dismiss that repeated the justiceforjill theme: "Even setting aside the strong indication that this suit is tied to Mr. Hopwood's efforts to influence witnesses in his criminal case." Mot. to Dismiss at 1. But Cockson was not a witness in that case. Their counsel accusation thus rests on the same unfounded narrative Cockson seeded through anonymous emails and texts. Third Am. Compl. at 19.

On March 15, 2026, Hopwood learned from Boyer that the same number had texted both Boyer and Ms. Bozelko. Ex. A. Hopwood then filed his Third Amended Complaint and began drafting this motion. *Id.* When Boyer realized that Ms. Bozelko had received similar texts from the same number, he forwarded that information to the DOJ's Criminal Division and requested an investigation into potential federal witness tampering and obstruction. Ex. 2; Ex. 3.

Upon information and belief, Cockson's intimidation campaign did not end with Boyer and Ms. Bozelko. On January 4, 2026, Boyer's landlord told him that John Doe 2 had accused Boyer of harassing the victim in Mr. Hopwood's criminal case (Mrs. Hopwood). Ex. 2. Given the same false theme and timing, and the overlapping use of anonymous channels, the only plausible source

of that accusation is Cockson. Upon information and belief, Cockson sent harassing text messages to Mrs. Hopwood while impersonating Boyer or someone acting for him—likely using the same anonymous phone number that targeted Boyer and Ms. Bozelko—and then funneled the resulting false rumor to Boyer's landlord. She did so to destabilize Boyer's housing and to signal that any continued assistance to Hopwood would come at a personal cost. Third Am. Compl. at 18.

That is a lot of misconduct in less than five months of litigation.

C. Circumstantial Markers Tie the Anonymous Texts and Emails Exclusively to Defendant.

The circumstantial evidence of Defendant's authorship is overwhelming:

a.  The "Joshua K. Boyer" salutation in the first anonymous text came only hours after she obtained the Ms. Bozelko letter that used the same rare formulation. Ex. 2; Ex. 2-A; Third Am. Compl. at 14.

b.  The "Doc Metzner" reference taps a small-town nickname unknown outside David City, Nebraska, absent from any public document, and familiar to Defendant alone among the actors here. Ex. 1; Third Am. Compl. at 3, 13.

c.  The "recurring booze buys" phrase in the texts reappears as "buying alcohol in Brookland" in the justiceforjill email. Ex. 2; Ex. 6; Third Am. Compl. at 17.

d.  The justiceforjill email recounts that Ms. Bozelko recently received threatening anonymous texts, a fact only the sender of those texts would know, because Ms. Bozelko never told Defendant or anyone tied to her. Ex. 4; Ex. 7.

e.  Defendant knew that Boyer was Hopwood's power of attorney and that he had arranged service on Defendant, which explains the anonymous texter's assertions about a "right and duty to serve" him, and the assumption that Boyer understood the service process. Ex. 2-A; Third Am. Compl. at 3.

13

The author and originator of every one of these communications—the anonymous texts, the bogus Rivers email, the justiceforjill email, the emails to Judge Arthur, and the witness-intimidation narrative in the motion to dismiss—is Defendant Jill Cockson.

### D. Law-Enforcement Review and Forensic Analysis Confirm Single Authorship.

Boyer met with an Alexandria police officer, who reviewed the anonymous texts, the fake Rivers email, and the justiceforjill email and concluded that the similarities in language, style, and subject matter strongly suggested they were authored by the same person. Ex. 2. Boyer then ran a forensic language analysis with artificial intelligence, which independently concluded that the communications were likely written by the same author. *Id.*

Boyer believes, based on the content of the messages, the unique details they contained, and his knowledge of Cockson's background, that Cockson authored the threatening anonymous communications he received. Ex. 2. Samantha Hopwood likewise declares that Ms. Bozelko sent her screenshots of these text messages (Ex. 4-A) referencing this litigation from the same phone number and stated that she believed Defendant Cockson was the person behind them. Ex. 4. Those accounts, together with the overlapping content, timing, and distinctive details described above, reinforce that the anonymous messages directed at Boyer and Ms. Bozelko were part of the same coordinated course of conduct. The law-enforcement and forensic findings further confirm what the circumstantial record already makes plain: these were not multiple unrelated anonymous actors, but a single author or coordinated source.

### E. Cockson Laundered Her Own Witness Intimidation into a False Narrative Against Hopwood.

Her anonymous communications are not idle. They are witness tampering.

Cockson used anonymous texts and emails to frighten and punish Hopwood's potential witnesses for daring to participate in the case against her. She threatened Boyer with stalking and

surveillance of his home, his children, and his purported habits, threatened to "find" him, and dangled the prospect of public exposure in a major newspaper. She then targeted Ms. Bozelko with similar texts from the same phone. Her acts were knowingly used—or, at a minimum, knowingly attempted—to intimidate these witnesses and to "influence, delay, or prevent" their testimony and participation in this federal case. 18 U.S.C. § 1512(b)(1).

Her purpose was straightforward. She wanted to scare witnesses away from testifying, to brand Hopwood as a witness-tampering felon in the eyes of courts and prosecutors, and to make it as hard as possible for an incarcerated pro se plaintiff to litigate against her. She asked Judge Arthur and prosecutors to impose "controls" on Hopwood at the D.C. Jail—essentially to cut off his access to the outside world—based on "crimes" she herself had fabricated. She then used Steptoe LLP to repeat the same unfounded narrative in the motion to dismiss.

She also used these false statements to pose as a victim to secure pro bono counsel and external allies, and to extend a thirty-year campaign against Hopwood. For decades, she has made false claims about his mental health—that he is a sociopath, psychopath, or narcissist—and has accused him of new crimes, including embezzlement and now witness tampering, even though they have not spoken since 1993. *See* Third Am. Compl. at 2–4. She nurtures a personal grudge over a high-school romance and has chosen to wage it against his employers, colleagues, courts, and now his witnesses. Rather than trust the judicial process to resolve her grievances, she seeks to game the system—courts, prosecutors, bar authorities, and employers—to manufacture her own version of justice.

Plaintiff has met his burden of proving Cockson's witness intimidation and blame-shifting scheme by clear and convincing evidence—and therefore, a fortiori, by a preponderance. At a minimum, he has more than enough to warrant expedited discovery, which will yield additional

proof of Cockson's bad-faith misconduct. Defendant alone had the means and motive to send anonymous threats to the very witnesses named in the complaint.

## III.    GOOD CAUSE AND PROPORTIONALITY SUPPORT EXPEDITED DISCOVERY FOR NON-CONTENT PHONE AND EMAIL RECORDS.

If the Court finds that Hopwood has not produced clear and convincing evidence of Defendant Cockson's bad-faith misconduct, it should order expedited discovery for Hopwood to obtain additional evidentiary support.

The same record that justifies sanctions also supports expedited discovery under Rules 26(d)(1) and 26(b)(1). Hopwood has made a strong showing that Cockson used a specific phone number and email accounts to intimidate witnesses and then to frame Hopwood. The only way to tie those accounts to Cockson and to identify unknown co-conspirators is through targeted subpoenas to third-party providers.[5]

Courts in this District grant expedited discovery upon a showing of good cause, especially where a plaintiff cannot otherwise identify wrongdoers or preserve key evidence. *See Arista Records LLC v. Does 1–19*, 551 F. Supp. 2d 1, 5–6 (D.D.C. 2008) (authorizing Rule 45 subpoenas pre-Rule 26(f) conference to identify anonymous defendants). The D.C. Circuit has recognized that in cases with anonymous defendants, "the only potential avenue for discovery is a court order under Rule 26(d)(1)." *Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203, 1207 (D.C. Cir. 2020).

A. Good Cause

---

[5] Subscriber and call-detail records from Bandwidth are likely to show that the same subscriber controlled the (215) 576-4974 number during the relevant period and used it to send a cluster of messages to Joshua Boyer, Ms. Bozelko, and other case-linked recipients. Those records will either confirm or further corroborate the already compelling circumstantial case that Defendant orchestrated the anonymous communications.

Hopwood has already marshaled substantial proof tying phone number (215) 576-4974 and specific email accounts—justiceforjillcockson@gmail.com and the fabricated Rivers account—to a coordinated intimidation campaign. Third Am. Compl. at 3–5. Non-content records for that Bandwidth-assigned number are likely to show the subscriber or account holder for the line, associated contact information and billing details, and the dates, times, and destinations of text messages sent during the intimidation campaign.

Without expedited relief, these records may be lost. Providers routinely purge historical records. Once Cockson learns of this motion, the risk of alteration or deletion only grows. The stakes are high; the evidence is not easily replaceable. That is good cause.

Bandwidth and similar carriers also maintain internal retention schedules for non-content metadata. Once those periods lapse, the records may be irretrievable. Good cause for expedited discovery is particularly strong where, as here, third-party telecom records risk automatic deletion before a Rule 26(f) conference and the plaintiff has no other means to preserve them.

B. Proportionality

The requested discovery is narrow and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1).

Hopwood seeks Rule 45 subpoenas:

- To Bandwidth Inc. (d/b/a Bandwidth.com CLEC, LLC), as the wholesale carrier for (215) 576-4974, for non-content records only—specifically: subscriber name, physical and mailing addresses, associated email addresses and payment method, account-creation date, and call-detail records (including dates, times, and numbers called or texted) for the period December 9 through December 15, 2025. These are "records or other information

17

pertaining to a subscriber" under the Stored Communications Act, and the subpoena expressly excludes the content of any communications. 18 U.S.C. § 2702(c)(6);[6] and

- To Google LLC, for the justiceforjillcockson@gmail.com and "eileen.rivers.editor@gmail.com" accounts, for non-content records only—specifically: subscriber registration information (including name, account-creation date, associated email addresses, and recovery phone numbers), IP addresses and timestamps associated with log-ins and account activity, and any non-content header information (such as from/to fields and timestamps) for emails sent or received between December 4 and 18, 2025. These categories fall within "records or other information pertaining to a subscriber" under the Stored Communications Act and expressly exclude the contents of any communications. 18 U.S.C. § 2702(c)(6).

These are "records or other information pertaining to a subscriber" within the meaning of the Stored Communications Act, 18 U.S.C. § 2702(c)(6).[7] The subpoenas explicitly exclude message content. They target only a six-day window (December 9 – 15). They are directed to third parties, not to Defendant, and thus impose virtually no burden on her.

Hopwood learned the full extent of Cockson's intimidation and blame-shifting scheme only recently. Ex. 1. The requested records will aid this Court in resolving the core questions of witness tampering, sanctions, and protective relief, and will tie the anonymous communications directly to

---

[6] Bandwidth itself has advised that it responds to valid legal process from courts in the United States by producing non-content subscriber and usage records of exactly this kind, which confirms that the request imposes minimal burden and falls within standard industry practice.

[7] Federal privacy rules governing customer proprietary network information do not bar disclosure of such non-content records where the provider is presented with valid, enforceable legal process. 47 C.F.R. pt. 64, subpt. U; 47 U.S.C. § 222. Courts regularly authorize Rule 45 subpoenas seeking subscriber identity and call-detail records under 18 U.S.C. § 2702(c)(6), while excluding message content.

Cockson and her co-conspirators. They will also bear directly on the § 1985(2) conspiracy claim in the Third Amended Complaint. *See* Third Am. Compl. at 36–38, R. 19 at ¶¶ 37-56.

Subpoenas for these non-content records are the only realistic way to identify the unknown defendants named as John Does and the Brookland operative. *Strike 3 Holdings*, 964 F.3d at 1207. The time to issue them is now.

## IV.    COCKSON'S WITNESS TAMPERING AND BLAME-SHIFTING DEMAND SEVERE SANCTIONS TO PUNISH AND DETER FURTHER MISCONDUCT.

Cockson intimidated two key witnesses and then blamed Hopwood for intimidating witnesses. She did so to paint herself as a victim and Hopwood as a criminal, to recruit pro bono counsel, and ultimately to persuade this Court to dismiss the claims against her.

These actions fit a familiar pattern. For thirty years, she has pursued a vendetta—stalking Hopwood's personal and professional life and making repetitive false statements about his mental health (calling him a sociopath, psychopath, or narcissist) and alleging that he is committing new crimes (embezzlement, witness tampering) even though they have not spoken since 1993. She holds a grudge over a high-school romance and now channels it through courts, employers, and the media. Third Am. Compl. at 2–4.

That is not a legitimate reason to drag two witnesses through anonymous threats and then to perpetrate a fraud on this Court. Her attacks on witnesses, standing alone, justify the most serious sanctions this Court can impose, even apart from the harm to Hopwood and the Court itself. They also satisfy § 1985(2), which punishes conspiracies that deter parties and witnesses in federal court from testifying freely and fully.

### A. Default Judgment Is Warranted.

Dismissal or default judgment is a severe sanction, but it is sometimes the only appropriate one. *Webb v. Dist. of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998). Default judgment is justified

where a party has been so prejudiced by the opponent's misconduct that continuing would be unfair, or where sanctions are needed to respond to conduct that is disrespectful to the court and to deter similar misconduct in the future. *Id.* Before imposing default, the Court must find lesser sanctions inadequate. *Shepherd*, 62 F.3d at 1478–79.

Here, both *Webb* criteria are satisfied, and *Shepherd*'s requirements are met.

Boyer and Ms. Bozelko received threatening texts that plainly distressed them. Ex. 2; Ex. 4; Ex. 6; Ex. 7. Whether they will now testify is uncertain. That uncertainty directly harms Hopwood's ability to pursue at least three counts: the defamation per se and intentional infliction of emotional distress claims about Cockson's contacts with his employers—including Georgetown University Law Center—and the count tied to a social-media video in which Cockson attacked Hopwood. Third Am. Compl. at 2–3. Boyer's testimony is vital because he can describe Hopwood's mitigation efforts and the emotional and physical toll of Cockson's lies. Ex. 2. Ms. Bozelko could testify about the defamatory video.

Allowing Cockson to profit from witness intimidation would invert justice. *Young* recognizes that where "gross fraudulent misconduct" is present, monetary sanctions alone are "inherently inadequate to remedy the harm" and deter "future misconduct," and issue sanctions are "not appropriate in light of gross witness tampering." 217 F.R.D. at 70–71. Cockson's scheme is exactly that: a gross, multi-front effort to intimidate witnesses, to distort another court's criminal proceedings, and to mislead this Court.

Lesser sanctions will not suffice. Issue preclusion or evidentiary rulings cannot restore lost testimony or erase the chilling effect on witnesses. A fine alone would undersell the gravity of the misconduct and invite repetition. Given the nature, scope, and persistence of Cockson's campaign—including her enlistment of pro bono counsel based on false victimhood—default

20

judgment on the three most affected counts is the only sanction commensurate with the harm and adequate to deter.

### B. A Monetary Sanction Is Needed to Punish and Deter.

The Court should not sanction in a vacuum. This lawsuit arises directly from Cockson's thirty-year vendetta and pattern of misconduct against Hopwood, which has continued unabated for the five months of this case. In addition to default judgment, a $10,000.00 sanction is appropriate to punish and deter her from tampering with witnesses—an offense that "strikes at the heart of the litigation process" and "threatens the integrity of the justice system." *Synergetics*, 2007 U.S. Dist. LEXIS 68736, at *2.

Cockson's actions forced Hopwood to expend significant time and resources from jail—preparing this motion, coordinating with Boyer, conferring with law enforcement, and documenting the pattern. Exs. 1-2. Had he not done so, he might have been left with no witnesses and with "controls" imposed at the jail that would effectively cripple his ability to litigate this case.

Courts impose substantial monetary penalties to punish and deter "recalcitrant misconduct." *Am. Hosp. Ass'n v. Sullivan*, 938 F.2d 216, 219–20 (D.C. Cir. 1993); *see also 3E Mobile v. Global Cellular*, 222 F. Supp. 3d 50, 56 (D.D.C. 2016). So should this Court. That said, a monetary sanction alone would be inadequate for the reasons *Young* explains: it cannot restore witness confidence nor fully address the fraud on the Court.

### C. An Adverse Jury Instruction and a Protective Order Are Also Appropriate.

Because Hopwood has already proved Cockson's witness tampering, he should not have to re-litigate that question at trial. Courts have imposed adverse-instruction sanctions that allow juries to infer a party's involvement in witness tampering. *See Riley v. City of New York*, 2015 U.S. Dist. LEXIS 16025, at *35–36 (E.D.N.Y.). An instruction allowing the jury to infer that Defendant

21

authored the anonymous texts and emails and used them to intimidate Hopwood's witnesses would ensure she does not benefit from ambiguity of her own making.

The Court should also enter a protective order barring Cockson from communicating in any way with potential witnesses Boyer, Ms. Bozelko, Singhal, and Mrs. Hopwood. Singhal and Mrs. Hopwood are partners in Hopwood & Singhal PLLC and can testify that the monthly withdrawal of earned fees from their shared trust account was authorized and routine—not embezzlement, as Defendant has implied. Mot. To Dismiss, at 9,14; Third Am. Compl. at 2–3. As potential witnesses, they should not be left exposed to the same tactics that worked on Boyer and Ms. Bozelko. And if future pleadings identify additional witnesses, Hopwood should be permitted to seek to extend the protective order to cover them.

## CONCLUSION

Cockson's actions are serious, fraudulent, and in bad faith. She has intimidated witnesses, tried to weaponize a criminal case in another court, and then foisted her own misconduct onto an incarcerated pro se plaintiff—asking courts and prosecutors to treat him as the witness-tamperer she has become. Those actions create a fraud on this Court.

Plaintiff respectfully asks that the Court:

a. Enter default judgment on the three counts most directly affected by Cockson's witness intimidation;

b. Impose a monetary sanction of $10,000.00, payable to Hopwood;

c. Issue an adverse jury instruction permitting the jury to infer that Cockson engaged in witness tampering;

22

d.  Enter a protective order barring Cockson from contacting potential witnesses Boyer, Ms. Bozelko, Singhal, and Mrs. Hopwood and any additional witnesses identified in future pleadings; and

e.  Authorize expedited discovery under Rule 26(d)(1) via narrowly tailored Rule 45 subpoenas to (a) the carrier for (215) 576-4974 and (b) Google LLC, for non-content records only, to confirm the origins of the anonymous communications and identify Cockson's co-conspirators.

Anything less would reward a campaign of intimidation and deceit that strikes at the very heart of the judicial process.[8]

---

[8]  To be clear, Plaintiff respectfully submits that the record already before the Court satisfies the D.C. Circuit's clear-and-convincing standard for severe sanctions, including default, because it shows that Cockson orchestrated an anonymous witness-intimidation campaign and then weaponized that misconduct by falsely accusing Plaintiff of the very crimes she was committing. That is the paradigm of bad-faith fraud on the Court warranting terminating sanctions under *Chambers* and *Shepherd*. But even if the Court is not yet prepared to enter default judgment, the remedy cannot be "no consequence." At a minimum, the Court should (1) grant expedited discovery under Rule 26(d)(1) so that carrier and platform records can confirm the origins of the anonymous texts and emails; (2) enter a protective order barring Cockson from further direct contact with identified and future witnesses; and (3) impose issue-related sanctions and an adverse jury instruction deeming it established, for purposes of Counts Seven through Nine, that Cockson engaged in witness intimidation using the anonymous number and accounts at issue. Those steps would preserve critical evidence, protect witnesses in real time, and ensure that Cockson does not obtain any litigation advantage from the ambiguity her own misconduct has created, even as the Court defers decision on default until after an evidentiary hearing.

Under *Shepherd*, the D.C. Circuit draws a distinction between terminating sanctions and issue-related sanctions: while default judgment and severe monetary penalties require clear and convincing evidence of bad faith, "issue-related sanctions, such as deeming certain facts established," may be imposed on a preponderance standard. *Shepherd*, 62 F.3d at 1478–79. Even if the Court were to conclude that the present record warrants issue-related relief but does not yet justify terminating sanctions, that distinction provides a clear doctrinal path to grant powerful, targeted sanctions now. On the preponderance of the evidence already before the Court—including the pattern of anonymous threats to identified witnesses, contemporaneous reports to law enforcement, and the mirroring of those threats in Cockson's later "witness intimidation" narrative—the Court can and should deem it established that Defendant orchestrated the anonymous communications and used them to intimidate Plaintiff's witnesses, and instruct the jury accordingly on Counts Seven through Nine, while reserving the question of default pending any further evidentiary development.

May 18, 2026

Respectfully submitted,

/s/ Shon Robert Hopwood
Shon Robert Hopwood
DC Department of Corrections
1901 D Street, SE
D.C. Central Detention Facility
Washington, D.C. 20003

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2026, I caused a true and correct copy of the

foregoing Plaintiff's Motion for Sanctions and Expedited Discovery and all accompanying

exhibits to be served on Defendant's counsel of record by first class mail.

Michelle Kallen
Steptoe LLC
1330 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone: 202 429 3000
Facsimile: 202 429 3902
mkallen@steptoe.com

Joseph M. Sanderson (Bar No. NY0560)
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036-7703
Telephone: 212 506 3900
Facsimile: 212 506 3950
josanderson@steptoe.com

/s/ Shon Robert Hopwood
Shon Robert Hopwood
DC Department of Corrections
1901 D Street, SE
D.C. Central Detention Facility
Washington, D.C. 20003

24