**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHON ROBERT HOPWOOD<br>DCDC#: 374088<br>Central Detention Facility<br>1901 D Street, S.E.<br>Washington, DC  20003,<br><br>        Plaintiff,<br><br>   v.<br><br>JILL COCKSON<br>1519 Cherry Street<br>Kansas City, MO  64108,<br><br>        Defendant. | Civil Action No. 1:25-cv-04214-SLS |

## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT

Defendant Jill Cockson respectfully moves this Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiff's Third Amended Complaint, ECF No. 15 (the "Third Amended Complaint" or "TAC").[1] The statements upon which Mr. Hopwood bases his defamation and intentional infliction of emotional distress claims are that Ms. Cockson called Mr. Hopwood—a convicted bank robber, domestic abuser, contemnor, and obstructor of justice—epithets like "psychopath," "sociopath," and "monster." These epithets are classic non-actionable statements of opinion. Mr. Hopwood's extensive and varied criminal record, moreover, means that even if there were any factual implications, they are substantially true. It also means that Ms. Cockson's statements could not possibly have diminished a reputation

---

[1] Although such relief appears foreclosed by binding precedent, *see Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 238 (D.C. Cir. 2021), Ms. Cockson preserves for possible future proceedings the argument that the District of Columbia's anti-SLAPP statute applies. *See* D.C. Code §§ 16-5501–5505 (D.C. Anti-SLAPP Act of 2010).

already consigned to the gutter by Mr. Hopwood's criminal convictions. Additionally, Mr. Hopwood—by his own admission, a published author featured in *60 Minutes* for his proclaimed rehabilitation, witness before Congress, law professor, and prominent criminal justice reform advocate—is a public figure, and saying that Ms. Cockson dislikes him is not enough to plead actual malice. His complaint is also untimely on its face as to all but the March 12, 2025, comment under D.C.'s one-year statute of limitations for defamation.

Mr. Hopwood's new claims—that a non-lawyer, Joshua Boyer, who describes himself as Mr. Hopwood's "attorney-in-fact," has apparently received messages he considers hostile from unnamed third-parties—likewise fail to state a claim. Mr. Hopwood fails to explain why he has standing to assert claims on Mr. Boyer's behalf; while Mr. Hopwood has now belatedly signed a document purporting to ratify Mr. Boyer's actions, it has become plain that Mr. Boyer has repeatedly signed documents in Mr. Hopwood's name and appears to be the person directing the litigation of this case. He fails to explain why these statements are not protected speech. And the complaint is entirely devoid of anything more than conclusory allegations that Ms. Cockson is secretly behind third parties' conduct.

A supporting memorandum of law is attached hereto.

-3-

Dated: May 28, 2026                              Respectfully submitted,


                                                  /s/ Joseph M. Sanderson
                                                 Michelle S. Kallen (Bar No. 1030497)
                                                 STEPTOE LLP
                                                 1330 Connecticut Avenue, NW
                                                 Washington, D.C. 20036-1795
                                                 Telephone:      202 429 3000
                                                 Facsimile:      202 429 3902
                                                 mkallen@steptoe.com

                                                 Joseph M. Sanderson (Bar No. NY0560)
                                                 STEPTOE LLP
                                                 1114 Avenue of the Americas
                                                 New York, NY  10036-7703
                                                 Telephone:      212 506 3900
                                                 Facsimile:      212 506 3950
                                                 josanderson@steptoe.com


                                                 *Attorneys for Defendant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SHON ROBERT HOPWOOD
DCDC#: 374088
Central Detention Facility
1901 D Street, S.E.
Washington, DC  20003,

        Plaintiff,

   v.

JILL COCKSON
1519 Cherry Street
Kansas City, MO  64108,

        Defendant.

Civil Action No. 1:25-cv-04214-SLS

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S THIRD AMENDED COMPLAINT**

## **TABLE OF CONTENTS**

I.    Preliminary Statement.................................................................................................... 1

II.   Background. ................................................................................................................... 5

   A.   Mr. Hopwood Robs Five Banks, Gets Caught, And Spends More Than a Decade in Prison. ...................................................................................................................... 5

   B.   Mr. Hopwood Spins His Work as a Jailhouse Lawyer into Celebrity, Appearing on *60 Minutes*, Testifying Before Congress, Attending Bill Signings at the White House, and Clerking at the D.C. Circuit. ................................................................................... 5

   C.   Mr. Hopwood Violently Assaults His Wife and Tries to Coerce Her Not to Testify Against Him. ........................................................................................................... 6

   D.   Mr. Hopwood Sues His High School Ex-Girlfriend for Calling Him a Psychopath and a Monster. ................................................................................................................... 9

   E.   Mr. Hopwood Amends to Allege Unknown Persons are Sending Hostile Messages to Mr. Boyer. ............................................................................................................... 10

III.  Argument .................................................................................................................... 12

   A.   Standard of Review. ............................................................................................... 12

   B.   The Defamation and False Light Counts Should Be Dismissed for Numerous Independent Reasons. ................................................................................................................. 13

      1.   Ms. Cockson's Statements Could Not Harm Mr. Hopwood's Reputation More Than The Judicially-Established or Admitted Truth. ...................................................... 14

      2.   Ms. Cockson's Vague Statements Do Not Convey Any Verifiable Facts About Mr. Hopwood. ........................................................................................................... 19

      3.   Mr. Hopwood Is, At Minimum, A Limited-Purpose Public Figure............................ 22

      4.   Vague Allegations of a "Vendetta" Do Not Equal Knowledge of Falsity.................... 25

      5.   Mr. Hopwood's Claims are Untimely........................................................................ 28

      6.   Mr. Hopwood's Allegations "On Information and Belief" of Unspecified Communications on Unspecified Dates to a Long List of Possible Recipients Do Not State A Claim................................................................................................................... 30

      7.   Reports to Bar Disciplinary Authorities Are Absolutely Privileged. ........................... 30

   C.   The Intentional Infliction of Emotional Distress Claim Fails Both For The Same Reasons and the High Bar for Outrageousness. ....................................................................... 31

   D.   Mr. Hopwood's Claim For Intentional Interference With Prospective Economic Advantage Must Likewise Be Dismissed. ............................................................... 32

   E.   Mr. Hopwood's Claims that Ms. Cockson Participated in a Conspiracy Against His "Attorney-in-Fact" Are Baseless and Fail to State a Claim....................................... 35

      1.   Mr. Hopwood's Allegations that Ms. Cockson is Secretly Directing The Activities of Three Unnamed Third Parties Are Conclusory. .................................................... 36

-iii-

2.    Mr. Hopwood Fails to Allege an Agreement to Commit Unlawful Acts. ..................... 39

3.    Mr. Hopwood Cannot Sue for Harm to Mr. Boyer and Fails to Allege Cognizable Injury to Himself Beyond the Defective Defamation Claims. ............................................... 40

4.    Mr. Hopwood Fails to Allege an Underlying Tort for the Common Law Conspiracy Claim. ...................................................................................................................................... 41

5.    Mr. Hopwood's Witness Intimidation Conspiracy Claims Likewise Fail for Numerous Reasons. .................................................................................................................................. 42

F.    The Third Amended Complaint Should Be Dismissed With Prejudice. ......................... 44

IV.    Conclusion ...................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*5-Star Mgmt., Inc. v. Rogers*,
  940 F. Supp. 512 (E.D.N.Y. 1996) .......................................................................................18

*Acosta Orellana v. CropLife Intern.*,
  711 F. Supp. 2d 81 (D.D.C. 2010) ........................................................................................36

*Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*,
  374 A.2d 284 (D.C. 1977) .....................................................................................................26

*Arpaio v. Zucker*,
  414 F. Supp. 3d 84 (D.D.C. 2019) ........................................................................................25

*Arroyo-Torres v. Ponce Fed. Bank, F.B.S.*,
  918 F.2d 276 (1st Cir. 1990) .................................................................................................44

*Asare v. LM-DC Hotel, LLC*,
  62 F. Supp. 3d 30 (D.D.C. 2014) ..........................................................................................32

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................................................12

*Barber v. D.C. Gov't*,
  394 F. Supp. 3d 49 (D.D.C. 2019) ........................................................................................37

*Barrett v. Atl. Monthly Grp. LLC*,
  No. CV 22-49 (LLA), 2024 WL 4119400 (D.D.C. Sept. 9, 2024) ........................................13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................................12, 36

*Bernstein v. Fernandez*,
  649 A.2d 1064 (D.C.1991) ....................................................................................................31

*Bey v. WMATA*,
  341 F. Supp. 3d 1 (D.C. 2018)...............................................................................................41

*Biro v. Conde Nast*,
  963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015), and
  *aff'd* 622 F. App'x 67 (2d Cir. 2015).....................................................................................27

*Black Lives Matter D.C. v. Trump*,
  544 F. Supp. 3d 15 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th
  1003 (D.C. Cir. 2023) ............................................................................................................37

*Blankenship v. McDonald*,
    176 F.3d 1192 (9th Cir. 1999) ...............................................................................44

*Blodgett v. Univ. Club*,
    930 A.2d 210 (D.C. 2007) ......................................................................................26

*Booth v. Fletcher*,
    101 F.2d 676 (D.C. Cir. 1938) ...............................................................................13

*Borough of Duryea, Pa. v. Guarnieri*,
    564 U.S. 379 (2011) ...............................................................................................42

*Brawer v. Horowitz*,
    535 F.2d 830 (3d Cir. 1976) ...................................................................................44

*Braxton v. First Transit*,
    322 F. Supp. 3d 110 (D.D.C. 2018) .......................................................................12

*Bronner v. Duggan*,
    364 F. Supp. 3d 9 (D.D.C. 2019), *aff'd*, 962 F.3d 596 (D.C. Cir. 2020) ................40

*Brown & Williamson Tobacco Corp. v. Jacobson*,
    713 F.2d 262 (7th Cir. 1983) ..................................................................................33

*Brown v. Chaffee*,
    612 F.2d 497 (10th Cir. 1979) ................................................................................44

*Brown v. Shimabukuro*,
    118 F.2d 17 (D.C. Cir. 1941) ..................................................................................18

*BYD Co. Ltd. v. All. for Am. Mfg.*,
    554 F. Supp. 3d 1 (D.D.C. 2021), *aff'd*, 2022 WL 1463866 (D.C. Cir. May 10,
    2022) ................................................................................................................13, 25

*Cannon v. Peck*,
    36 F.4th 547 (4th Cir. 2022) ...................................................................................29

*Cardillo v. Doubleday & Co.*,
    518 F.2d 638 (2d Cir. 1975) ...............................................................................15, 16

*Carpenter v. King*,
    792 F. Supp. 2d 29 (D.D.C. 2011) ..........................................................................15

*Carr v. Brown*,
    395 A.2d 79 (D.C. 1978) .........................................................................................35

*Caudle v. Thomason*,
    942 F. Supp. 635 (D.D.C. 1996) .............................................................................29

*Davalos v. Bay Watch, Inc.*,
  494 Mass. 548 (2024) ..................................................................................................29

*Deripaska v. Associated Press*,
  282 F. Supp. 3d 133 (D.D.C. 2017) ..............................................................................13

*Dragulescu v. Virginia Union Univ.*,
  223 F. Supp. 3d 499 (E.D. Va. 2016) ............................................................................29

*Fairbanks v. Roller*,
  314 F. Supp. 3d 85 (D.D.C. 2018) .................................................................................13

*Farah v. Esquire Mag.*,
  736 F.3d 528 (D.C. Cir. 2013) ......................................................................................19

*In re FedEx Ground Package Sys., Inc., Emp. Pracs. Litig.*,
  No. 305-MD-527 RM, 2010 WL 1253891 (N.D. Ind. Mar. 29, 2010)..........................18

*Findlay v. CitiMortgage, Inc.*,
  813 F. Supp. 2d 108 (D.D.C. 2011) ..............................................................................42

*Flint v. Beneficial Fin. I Inc.*,
  No. 2:12-CV-01675-GEB, 2012 WL 3277109 (E.D. Cal. Aug. 9, 2012) ......................18

*Goldwater v. Ginzburg*,
  414 F.2d 324 (2d Cir. 1969)...........................................................................................21

*Gomez v. Wilson*,
  477 F.2d 411 (D.C. Cir. 1973)........................................................................................13

*Guilford Transp. Indus., Inc. v. Wilner*,
  760 A.2d 580 (D.C. 2000) ........................................................................................19, 20

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983)........................................................................................41

*Hedgepeth v. Whitman Walker Clinic*,
  22 A.3d 789 (D.C. 2011) ................................................................................................41

*Hengjun Chao v. Mount Sinai Hosp.*,
  476 F. App'x 892 (2d Cir. 2012) ...................................................................................33

*Herrera v. Scully*,
  815 F. Supp. 713 (S.D.N.Y. 1993) ...........................................................................43, 44

*Herzfeld v. Barmada*,
  2025 WL 2220010 (D.D.C. Aug. 5, 2025) .....................................................................41

*Holder v. Bobb*,
 797 F. Supp. 3d 134 (E.D.N.Y. 2025) ....................................................................26

*Howard Univ. v. Best*,
 484 A.2d 958 (D.C. 1984) ......................................................................................14

*Hustler Mag., Inc. v. Falwell*,
 485 U.S. 46 (1988)..................................................................................................31

*In re Indian Palms Assocs., Ltd.*,
 61 F.3d 197 (3d Cir. 1995).....................................................................................18

*Jankovic v. Int'l Crisis Grp.*,
 593 F.3d 22 (D.C. Cir. 2010)..................................................................................34

*Jankovic v. Int'l Crisis Grp.*,
 72 F. Supp. 3d 284 (D.D.C. 2014), *aff'd*, 822 F.3d 576 (D.C. Cir. 2016).........................22, 25

*Johnson v. Comm'n on Presidential Debates*,
 202 F. Supp. 3d 159 (D.D.C. 2016), *aff'd*, 869 F.3d 976 (D.C. Cir. 2017).............................33

*Johnson v. Paragon Sys., Inc.*,
 195 F. Supp. 3d 96 (D.D.C. 2016) .........................................................................31

*Jones v. Brooks*,
 97 A.3d 97 (D.C. 2014) .....................................................................................18, 41

*Jones v. Globe Int'l Inc.*,
 No. 3:94:CV01468 (AVC), 1995 WL 819177 (D. Conn. Sept. 26, 1995) ..............17

*Joseph v. Xerox Corp.*,
 594 F. Supp. 330 (D.D.C. 1984)............................................................................24

*Kahl v. Bureau of Nat'l Affairs, Inc.*,
 856 F.3d 106 (D.C. Cir. 2017)................................................................................13

*Kamdem-Ouaffo v. Pepsico, Inc.*,
 160 F. Supp. 3d 553 (S.D.N.Y.), *aff'd*, 657 F. App'x 949 (Fed. Cir. 2016)...........................29

*Knowlton v. United States*,
 111 F. Supp. 2d 1 (D.D.C. 1999)...........................................................................43

*Kruise v. Jorgensen*,
 No. 19-CV-49 (DLF), 2022 WL 4379036 (D.D.C. Sept. 22, 2022), *aff'd*, No.
 22-7143, 2023 WL 3476628 (D.C. Cir. May 16, 2023) .........................................31

*Lamb v. Rizzo*,
 391 F.3d 1133 (10th Cir. 2004) ..............................................................................15

*Langer v. George Washington Univ.*,
     498 F. Supp. 2d 196 (D.D.C. 2007) ................................................................................31

*Logan v. D.C.*,
     447 F. Supp. 1328 (D.D.C. 1978) ...........................................................................15, 16

*Lyles v. Micenko*,
     404 F. Supp. 2d 182 (D.D.C. 2005) ...............................................................................22

*Mar-Jac Poultry, Inc. v. Katz*,
     773 F. Supp. 2d 103 (D.D.C. 2011) .........................................................................19, 20

*Mason v. Am. Prospect, Inc.*,
     2024 WL 4345855 (D.D.C. Sept. 30, 2024) ...................................................................25

*Masson v. New Yorker Magazine, Inc.*,
     501 U.S. 496 (1991) ........................................................................................................22

*Mattiaccio v. DHA Grp., Inc.*,
     20 F. Supp. 3d 220 (D.D.C. 2014) ...........................................................................36, 37

*Mattiaccio v. DHA Grp., Inc.*,
     908 F. Supp. 2d 136 (D.D.C. 2012) ...............................................................................30

*McFarlane v. Sheridan Square Press, Inc.*,
     91 F.3d 1501 (D.C. Cir. 1996) .......................................................................................25

*Milkovich v. Lorain J. Co.*,
     497 U.S. 1 (1990) ............................................................................................................19

*Moldea v. New York Times Co.*,
     22 F.3d 310 (D.C. Cir. 1994) .......................................................................16, 17, 20, 32

*Montgomery v. Risen*,
     197 F. Supp. 3d 219 (D.D.C. 2016), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017) ...........................22

*Moss v. Stockard*,
     580 A.2d 1011 (D.C. 1990) .............................................................................................17

*Mullin v. Washington Free Wkly., Inc.*,
     785 A.2d 296 (D.C. 2001) ...............................................................................................28

*Nader v. Democratic Nat. Comm.*,
     555 F. Supp. 2d 137 (D.D.C. 2008) ................................................................................19

*New York Times v. Sullivan*,
     376 U.S. 254 (1964) ........................................................................................................25

*Nicdao v. Two Rivers Pub. Charter Sch., Inc.*,
  275 A.3d 1287 (D.C. 2022) ...................................................................................40

*Obsidian Fin. Grp., LLC v. Cox*,
  740 F.3d 1284 (9th Cir. 2014) ...............................................................................20

*Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers v. Austin*,
  418 U.S. 264 (1974).................................................................................................19

*Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*,
  829 F.3d 576 (8th Cir. 2016) .................................................................................33

*Parsi v. Daioleslam*,
  890 F. Supp. 2d 77 (D.D.C. 2012).....................................................................25, 27

*Paul v. Howard Univ.*,
  754 A.2d 297 (D.C. 2000) ......................................................................................38

*Pelkowski v. Hovermann*,
  No. 20CV1845ENVRLM, 2021 WL 9032222 (E.D.N.Y. Sept. 9, 2021) ...............................20

*Powers v. U.S. Dep't of Just.*,
  646 F. Supp. 2d 153 (D.D.C. 2009) .......................................................................45

*Powerserve Int'l, Inc. v. Lavi*,
  239 F.3d 508 (2d Cir. 2001)....................................................................................41

*Ramos v. ADR Vantage, Inc.*,
  No. 18-CV-1690 (APM), 2021 WL 4462611 (D.D.C. Sept. 29, 2021), *aff'd*,
  No. 21-7124, 2022 WL 17726704 (D.C. Cir. Dec. 16, 2022) .................................29

*Ray v. U.S. Dep't of Just.*,
  508 F. Supp. 724 (E.D. Mo. 1981), *aff'd*, 658 F.2d 608 (8th Cir. 1981)...............15

*Reading v. N. Hanover Twp., New Jersey*,
  No. 1:23-CV-1469, 2026 WL 102849 (D.N.J. Jan. 13, 2026)...........................26, 27

*Robertson v. Cartinhour*,
  867 F. Supp. 2d 37 (D.D.C. 2012), *aff'd*, 553 F. App'x 1 (D.C. Cir. 2014)............35

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
  682 F.3d 1043 (D.C. Cir. 2012) ..............................................................................36

*Rubio v. D.C.*,
  2024 WL 4957373 (D.D.C. Dec. 3, 2024), *aff'd*, 2025 WL 1189459 (D.C. Cir.
  Apr. 22, 2025) .........................................................................................................44

*Sabre Int'l Sec. v. Torres Advanced Enter. Sols., Inc.*,
   820 F. Supp. 2d 62 (D.D.C. 2011) ...............................................................................34

*Safex Found., Inc. v. Safeth, Ltd.*,
   531 F. Supp. 3d 285 (D.D.C. 2021) .............................................................................24

*Salem Media Grp., Inc. v. Awan*,
   301 A.3d 633 (D.C. 2023) ............................................................................................32

*Sandals Resorts Int'l Ltd. v. Google, Inc.*,
   86 A.D.3d 32, 925 N.Y.S.2d 407 (2011) .....................................................................20

*Sculimbrene v. Reno*,
   158 F. Supp. 2d 8 (D.D.C. 2001) .................................................................................43

*Smith v. Humane Soc'y of United States*,
   519 S.W.3d 789 (Mo. 2017) .........................................................................................19

*Solomon v. Supreme Ct. of Fla.*,
   816 A.2d 788 (D.C. 2002) ............................................................................................30

*In re Spikes*,
   881 A.2d 1118 (D.C. 2005) ...............................................................................4, 30, 31

*Stein v. City of Philadelphia*,
   No. CIV.A. 13-4644, 2013 WL 6408384 (E.D. Pa. Dec. 5, 2013) ..............................29

*Stovell v. James*,
   810 F. Supp. 2d 237 (D.D.C. 2011) .............................................................................30

*Tah v. Glob. Witness Publ'g, Inc.*,
   991 F.3d 231 (D.C. Cir. 2021) .....................................................................................13

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) ..........................................................................22, 23, 24

*Thomas v. News World Commc'ns*,
   681 F. Supp. 55 (D.D.C. 1988) ....................................................................................21

*Thompson v. Armstrong*,
   134 A.3d 305 (D.C. 2016) ............................................................................................32

*Traudt v. Lebanon Police Dep't*,
   775 F. Supp. 3d 633 (D.N.H. 2025) .............................................................................44

*Trilogy Fed., LLC v. CivitasDX LLC*,
   2025 WL 436850 (D.D.C. Feb. 9, 2025) ......................................................................34

*Tripp v. Exec. Office of the President*,
 200 F.R.D. 140 (D.D.C. 2001)...............................................................................................44

*Tu Nguyen v. Duy Tu Hoang*,
 318 F. Supp. 3d 983 (S.D. Tex. 2018) ....................................................................................29

*Vindman v. Trump*,
 No. CV 22-257 (JEB), 2022 WL 16758575 (D.D.C. Nov. 8, 2022)
 .............................................................................................................................25, 37, 39, 43

*Waldbaum v. Fairchild Publications, Inc.*,
 627 F.2d 1287,1298–99 (D.C. Cir. 1980)...............................................................................24

*Waldon v. Covington*,
 415 A.2d 1070 (D.C.1980) .....................................................................................................32

*Weber v. Garza*,
 570 F.2d 511 (5th Cir. 1978) ..................................................................................................41

*Weyrich v. New Republic, Inc.*,
 235 F.3d 617 (D.C. Cir. 2001)......................................................................................20, 21, 22

*Wheat v. United States*,
 486 U.S. 153 (1988)................................................................................................................40

*Wiggins v. Philip Morris, Inc.*,
 853 F. Supp. 458 (D.D.C. 1994)..............................................................................................30

*Williams v. United States*,
 477 F. App'x 9 (3d Cir. 2012) .................................................................................................41

*Wood v. Am. Fed'n of Gov't Emps.*,
 316 F. Supp. 3d 475 (D.D.C. 2018).........................................................................................26

*Zimmerman v. Al Jazeera Am., LLC*,
 246 F. Supp. 3d 257 (D.D.C. 2017).........................................................................................32

**Statutes**

42 U.S.C. § 1985(2) ...................................................................................................... *passim*

D.C. Code §  16-5501 *et seq.* ....................................................................................................13

D.C. Code § 12-301(4)...............................................................................................................28

**Other Authorities**

1 Rodney A. Smolla, Law of Defamation § 3:65.50 (2013).......................................................27

D.C. Bar Rule XI § 19(a) ...................................................................................................30

5A Fed. Prac. & Proc. Civ. § 1309 (4th ed.)..................................................................30

Fed. R. Civ. P. 8 ................................................................................................................30

Fed. R. Civ. P. 11(a) .........................................................................................................35

Fed. R. Civ. P. 12(b)(6)................................................................................................12, 13

U.S. Const. amend. I ............................................................................................13, 15, 19, 33

## I.    PRELIMINARY STATEMENT

Mr. Hopwood has been convicted of five counts of armed bank robbery. Last year, he was convicted of three counts of assault, five counts of contempt, and two counts of obstructing justice for a brutal attack on his wife and trying to coerce her not to testify against him. He is currently incarcerated pending sentencing.

In the years between his initial bank-robbery convictions and his recent convictions for assault, contempt, and obstruction, Mr. Hopwood became famous in the legal community. He clerked on the D.C. Circuit, became a Georgetown professor, served as a frequent panelist on criminal justice reform at universities and before Congress and courts, and published a book—all for the extraordinary sinner-turned-saint story he told of his crimes and purported redemption. That façade came tumbling down after Mr. Hopwood assaulted his wife and tried to prevent her testimony.

Now, rather than reflect on the choices that led him once again to a jail cell, Mr. Hopwood sues his high school girlfriend Jill Cockson (who knows Mr. Hopwood's assault victim and soon-to-be-ex-wife) for defamation. He claims Ms. Cockson called him epithets like a "psychopath and a liar," "sociopath," "monster," and "narcissist," damaging his reputation and causing emotional distress.

In response to Ms. Cockson's prior motions to dismiss, Mr. Hopwood amended his complaint yet again. The amendments address none of the defects that Ms. Cockson identified but rather alleges that Ms. Cockson is secretly directing the actions of anonymous third parties whom Mr. Hopwood claims are harassing Mr. Boyer and therefore interfering with Mr. Hopwood's "representation" by Mr. Boyer, who is not a lawyer. While certain of the alleged actions of those third parties are troubling, Mr. Hopwood's complaint relies on speculation and implausible leaps of logic to attribute those actions to Ms. Cockson, rather than to third parties

-1-

acting independently and without her knowledge or agreement.[2] Nor does Mr. Hopwood explain why *he* has a claim for conduct targeting third parties like Mr. Boyer.

For numerous reasons, Mr. Hopwood's third bite at the apple still fails to state a claim and should be dismissed with prejudice.

***First***, Mr. Hopwood's extensive, violent, and well-publicized criminal history means none of the purported statements Mr. Hopwood attributes to Ms. Cockson could possibly diminish Mr. Hopwood's reputation beyond the gutter in which it already lies. Mr. Hopwood's reputation, even limited to the judicially-noticeable parts, is as (i) a convicted armed robber, (ii) a convicted domestic abuse, (iii) a contemnor, and (iv) an obstructor of justice. Witnesses' testimony divulged far more specific and damaging facts about Mr. Hopwood in open court, and a jury convicted him of serious crimes. Mr. Hopwood is suspended as an attorney based on conviction of a crime of moral turpitude. Even if Ms. Cockson's words were statements of fact— they were not—they could not possibly harm Mr. Hopwood's discredited reputation.

***Second***, all the statements Mr. Hopwood challenges are vague epithets, which are classic statements of opinion. None reasonably state or imply any specific incident capable of being proven true or false. Courts have consistently held similar epithets are loose, rhetorical, and subjective, and that reasonable readers would understand them as such. The statements thus cannot be the basis of defamation claims.

***Third***, for similar reasons, even if a reader were to infer any facts about Mr. from Ms. Cockson's alleged epithets, the judicially-noticeable facts from Mr. Hopwood's convictions

---

[2] Shortly before this motion was due, Mr. Hopwood filed a motion seeking sanctions against Ms. Cockson based on his theory that she is secretly controlling third parties' actions. Ms. Cockson will respond to that motion in due course, but she absolutely denies having directed anyone to send those messages and does not know who sent them.

show they are substantially true. "Psychopath," "sociopath," "monster," and the like are terms commonly used to describe a violent criminal.

**Fourth**, Mr. Hopwood is, by his own description, a prominent public figure, but pleads nothing beyond conclusory labels to allege that Ms. Cockson knew her statements were false (or that she consciously did not care if they were true or false). Mr. Hopwood's tale of his purported rehabilitation made him a household name in the legal community and beyond; he was featured on a *60 Minutes* segment, was a witness before Congress, and more. So, he must plead and prove that Ms. Cockson acted with constitutional malice to sue her for defamation. But all he does is loosely assert that Ms. Cockson has a "vendetta" against him because of a relationship decades ago—dislike is not enough to prove a speaker knew that what she was saying was false.

**Fifth**, all but one of the statements Mr. Hopwood alleges were made more than a year before this suit was commenced on December 3, 2025, and are thus untimely under the District of Columbia's one-year statute of limitations for defamation. While Mr. Hopwood attempts to claim that a discovery rule applies, the D.C. Court of Appeals has repeatedly declined to state whether it applies to defamation cases, and the better reading is that it does not. It has, moreover, expressly rejected it for widely-disseminated statements in the media, and by the same logic it would do so for publicly-accessible social media posts too. These statements were, at any rate, discoverable with reasonable diligence.

**Sixth**, Count I, which alleges on information and belief statements made by unspecified means on unspecified dates, is inadequately pleaded. This Court has consistently held that these sorts of vague allegations are insufficient to plead a defamation claim.

**Seventh**, Mr. Hopwood's allegation of defamation by contacting bar disciplinary authorities to seek his disbarment is frivolous. The D.C. Court of Appeals has *suspended* an

-3-

attorney for filing a similar libel suit given unequivocal authority that communicating with disciplinary authorities is absolutely privileged. *In re Spikes*, 881 A.2d 1118 (D.C. 2005).

**Eighth**, the intentional infliction of emotional distress (IIED) claims fail too, both because they are repackaged defamation claims that do not meet the constitutional standards for defamation liability, and because expressing negative opinions about someone simply is not the extreme and outrageous conduct required for IIED liability.

**Ninth**, Mr. Hopwood's claim for intentional interference with prospective economic advantage fails for many of the same reasons as his IIED claims: this claim is merely a repackaged defamation claim based on constitutionally-protected speech. Moreover, it is far more likely that Mr. Hopwood's own conduct is to blame for interfering with any reasonable business expectancy he may have had, rather than anything Ms. Cockson allegedly did.

**Finally**, as for Mr. Hopwood's new conspiracy allegations that Ms. Cockson is secretly responsible for the actions of assorted unnamed third parties, they fail to state a claim for multiple independent reasons. Mr. Hopwood fails to plead sufficient factual allegations to plausibly infer that Ms. Cockson agreed with anyone else to do something unlawful rather than the obvious alternative explanation that whoever is sending inappropriate messages to Mr. Boyer is doing so on their own. He fails to explain why he—as opposed to third parties—has a tort claim for conduct directed at others. He fails to plead an underlying tort for the common law conspiracy claim. And his Section 1985(2) claims fail to plead multiple elements of the tort.

⁂

Mr. Hopwood has now had three attempts to plead an adequate complaint, including with the benefit of Ms. Cockson's prior motion to dismiss. The Third Amended Complaint should be dismissed with prejudice.

-4-

## II.    BACKGROUND

### A.    Mr. Hopwood Robs Five Banks, Gets Caught, And Spends More Than a Decade in Prison.

The Third Amended Complaint alleges that Mr. Hopwood and Ms. Cockson had a relationship as teenagers. TAC ¶¶ 13–15. Around the same time, Mr. Hopwood engaged in a series of armed bank robberies across rural Nebraska, robbing $48,000 from Petersburg State Bank, $9,980 from Saline State Bank, $16,000 from York State Bank, $25,650 from the Bank of Peru, and $115,116 from Farmer's National Bank. *Id.* ¶ 16; Sanderson Decl. Ex. A at 5–6 (Transcript of Change of Plea Hearing). Caught, he pleaded guilty to five counts of bank robbery and one count of using a firearm during a crime of violence. TAC ¶ 16; Sanderson Decl. Ex. A at 5–6; Sanderson Decl. Ex. B (6/30/25 Tr. at 148:16-151:6). Mr. Hopwood was sentenced to twelve years and three months in prison, serving more than a decade behind bars. TAC ¶ 16.

### B.    Mr. Hopwood Spins His Work as a Jailhouse Lawyer into Celebrity, Appearing on *60 Minutes*, Testifying Before Congress, Attending Bill Signings at the White House, and Clerking at the D.C. Circuit.

By his own account, Mr. Hopwood spent his time in prison working in the prison law library, eventually becoming a jailhouse lawyer who helped other inmates prepare *pro se* post-conviction motions and petitions. *Id.* ¶¶ 16–17. Among other successes, two petitions for certiorari he ghostwrote were granted. *Id.*

After release, Mr. Hopwood attended law school, became an attorney, clerked for the D.C. Circuit, taught at Georgetown University Law Center, operated a law firm, and advocated for criminal justice reform. *Id*. ¶¶ 18–21. Plaintiff attained such fame that his "story of rehabilitation was featured in a segment on 60 Minutes." *Id*. ¶ 19. He made himself a household name in the legal community. He testified before Congress and state legislatures. *Id.*; Sanderson Decl. Exs. C, D. He attended bill signings at the White House with the President, Sanderson

Decl. Ex. E; *see also* Sanderson Decl. Ex. B (6/30/25 Tr. at 19:25–27:3, 142:7–13), and received "a lot of publicity for working on criminal justice reform, especially," in Mr. Hopwood's words, "after one of the meetings [he] attended at the White House with the famous Kim Kardashian." Sanderson Decl. Ex. B (6/30/25 Tr. at 35:13–16). Mr. Hopwood was perhaps the most prominent formerly-incarcerated spokesperson for criminal justice reform; to the world and the media, he seemed a real-life Jean Valjean, rehabilitation personified.

### C. Mr. Hopwood Violently Assaults His Wife and Tries to Coerce Her Not to Testify Against Him.

Sadly, Mr. Hopwood's rehabilitation was a façade. Last year, Mr. Hopwood was convicted of three counts of assault, five counts of contempt, and two counts of obstructing justice, arising out of his abuse of his wife. TAC ¶ 21, Sanderson Decl. Ex. F (Transcript of Verdict). He currently sits in the D.C. jail awaiting disposition of post-verdict motions and sentencing. TAC ¶ 21, Sanderson Decl. Ex. G (Docket Sheet).

Mr. Hopwood's wife testified at that trial about the intensive, violent abuse and coercive control he perpetrated against her. She explained that he repeatedly called her "a stupid dumb b—h and a worthless piece of s—t." Sanderson Decl. Ex. H (6/18/25 Tr. at 12:8–9). He pushed her with two hands into the bedroom door frame, injuring her head. *Id.* at 14:1–23. He threw her phone, destroying it (along with an air conditioner and light fixture) after realizing that she was audio recording a fight. *Id.* at 19:13–25, 20:15–21:11. He shoved her down the stairs during an argument, breaking her finger and hurting her back. *Id.* at 23:9–24:19. He physically broke through a door into a locked room where she was hiding and threw her onto a bed, causing bruising all over her body. *Id.* at 25:21–27:4. He moved almost $100,000 from their law firm's account to which she had access to an LLC account that only he could access, causing them to be unable to make tax payments, and when she confronted him, he threatened to "slap the s—t out

-6-

of [her] again" and then punched and slapped her. *Id.* at 45:5–21, 47:1–9, 47:16–48:3, 52:14–20, 54:14–55:19.

Mr. Hopwood's wife testified that Mr. Hopwood threw her phone out of the car, and then drove off with their children when she exited to retrieve it. *Id.* at 87:11–88:1. He would make video recordings interviewing the children about whose "fault" arguments were. *Id.* at 90:22–24. He shoved her onto the kitchen floor as he tried to block her from escaping a room and threw her when she tried again; he threw her at least half a dozen times as she tried to escape again and again, breaking her finger. *Id.* at 91:11–95:2. Mr. Hopwood's wife showed text messages in which Mr. Hopwood admitted slapping her. *Id.* at 104:14–20.

After a stayaway order was entered against Mr. Hopwood, Mr. Hopwood's wife testified that he telephoned her to say he knew he would get acquitted, he would publicly humiliate her and destroy her, and that their children would never forgive her. *Id.* at 126:23–127:14. He texted her that she would have to answer to their kids when they were all poor because of her and they would be homeless because of her. *Id.* at 131:19–132:24. Later, Mr. Hopwood started texting his wife on their son's phone to avoid being tracked, again telling her that her cooperation would make them homeless. Sanderson Decl. Ex. I (6/23/25 A.M. Transcript at 8:20–12:6). He badgered her repeatedly about trying to get the prosecution dismissed and stated she would be to blame if their kids were forced to testify against him. *Id.* at 16:23–18:10. He sent her a draft separation agreement purporting to require her not to cooperate with prosecutors. *Id.* at 22:6–19. He blamed her for complying with a grand jury subpoena. *Id.* at 25:25–26:1. Mr. Hopwood pressured his wife to obtain burner phones to coordinate complying with his instructions to not appear at the original trial date in violation of a subpoena. *Id.* at 31:19–35:25. Mr. Hopwood's

daughter corroborated multiple incidents of violence that she had witnessed. Sanderson Decl. Ex. J (6/25/25 Tr. at 16:10–24:15, 27:6–13).

Mr. Hopwood testified in his own defense, broadly contending that actually, Ms. Hopwood hit him, but that she did not remember it because he claimed she was delusional or paranoid or psychotic. Sanderson Decl. Ex. B (6/30/25 Tr. at 40:4–5, 41:18–42:9, 46:3, 46:25–47:1, 92:25). He claimed that Ms. Hopwood was engaged in "performance art." *Id.* at 73:9. He admitted, however, that he had smacked his wife in the back of the head during an argument and again during the argument about tax payments. *Id.* at 98:24–25, 101:14–22. He admitted battering the door down, claiming that he did it to see if Ms. Hopwood was harming herself inside. *Id.* at 115:23–116:23. He admitted contacting Ms. Hopwood in violation of the restraining order, but claimed that the idea to defy the subpoena was hers. *Id.* at 136:18–141:16. He admitted breaking Ms. Hopwood's iPhone deliberately. *Id.* at 157:25–158:16. He admitted that he had offered to get brain scans because there was a voice in his head saying that Ms. Hopwood was the enemy and he was worried that it was something demonic. *Id.* at 161:22–163:14. He admitted to taking Ms. Hopwood's phone. *Id.* at 168:19–170:7. He admitted to moving $80–90,000 to an account to which he had sole access. *Id.* at 174:15–175:5.

Mr. Hopwood admitted to saying "Shut up or I'll slap the s—t out of you again." *Id.* at 177:10–178:1. He tried to explain it away by saying that he could "never imagine actually slapping" her, before admitting that he went on to slap her later that same day. Sanderson Decl. Ex. K (7/1/25 Tr. 10:25–12:17). He admitted to throwing Ms. Hopwood's phone out of the car and driving off. *Id.* at 18:10–20:9. He admitted to telling his children to lie to Child Services and say nothing happened. *Id.* at 37:16–38:5. He admitted to lying to police. *Id.* at 41:1–7, 43:2–7, 44:10–21. He admitted he knew about the order of protection, knew what it prohibited, and

knowingly violated it by communicating with her and had suggested she leave town for the original trial date. *Id.* at 58:21–82:22.

After all this, a jury convicted him. Sanderson Decl. Ex. F (Transcript of Verdict). Mr. Hopwood has also been suspended from the D.C. Bar. Sanderson Decl. Ex. L (Suspension Order). Given Mr. Hopwood's fame, the trial attracted widespread media attention. *See, e.g.*, Sanderson Decl. Exs. M, N, O.

**D.    Mr. Hopwood Sues His High School Ex-Girlfriend for Calling Him a Psychopath and a Monster.**

Mr. Hopwood's complaint alleges that he and Ms. Cockson had a brief high school relationship in the early 1990s, and because that ended on poor terms, Ms. Cockson maintains a "vendetta" against him. TAC ¶¶ 2, 22–36. Mr. Hopwood alleges that on various occasions between 2014 and 2025, Ms. Cockson contacted Judge Janice Rogers Brown, the U.S. Court of Appeals for the D.C. Circuit, the D.C. Bar Association, Georgetown University Law Center, and the Washington Post, asserting that Mr. Hopwood was a "certifiable psychopath," "sociopath," "cruel to animals," and a "monster," and urging termination or bar discipline. *Id*. ¶¶ 2, 22–24. He asserts that Ms. Cockson publicly posted on Facebook in 2023 and 2024 calling him a "textbook sociopath," a "monster," and stating he endangered her life. *Id.* ¶ 26. She allegedly also wrote that Mr. Hopwood was facing "criminal and civil proceedings." *Id.* ¶ 25 He further alleges Ms. Cockson posted a July 2024 Instagram video asserting Mr. Hopwood exhibited signs of "sociopath/psychopathy," was "cruel to animals, cruel to his siblings, [and] cruel to friends," and urging a "true crime" podcaster to feature him. *Id*. ¶¶ 27, 101–108. Mr. Hopwood also alleges Ms. Cockson left an ABA website comment calling him a "psychopath," and a "monster." *Id*. ¶¶ 82–87. He claims that Ms. Cockson posted comments on Substack calling him a "psychopath," "pathetic monster," and stating, in reference to Mr. Hopwood's admitted transfers of funds to an

account only he had access to, that she believed he had embezzled from Ms. Hopwood. *Id.* ¶¶ 22, 94–100. And he claims that after he threatened to sue her, Ms. Cockson reported it as "witness intimidation" to the judge and prosecutors in his criminal case. *Id.* ¶¶ 3, 48–49, 58–59, 109–115.

Mr. Hopwood, the convicted bank robber who admitted to slapping his wife and intentionally (and repeatedly) violating a restraining order, claims that Ms. Cockson using unfavorable epithets to describe him hurt him emotionally and damaged his reputation. *Id.* ¶¶ 60, 116–20. He claims that he has suffered at least $350,000 in harm, not because he has been convicted of abusing his wife, but rather because Ms. Cockson used unfavorable epithets to describe him, and seeks $650,000 and an injunction against Ms. Cockson describing him unfavorably in the future, too. *Id.* ¶¶ 141–42.

### E.    Mr. Hopwood Amends to Allege Unknown Persons are Sending Hostile Messages to Mr. Boyer.

After Ms. Cockson moved to dismiss Mr. Hopwood's prior complaint, Mr. Hopwood filed an amended complaint. Principally, the new allegations assert that various unnamed person have engaged in behavior that has made Mr. Boyer feel uncomfortable and asserts that Ms. Cockson is secretly pulling the strings of those third parties. TAC ¶¶ 3–4.

The allegations regarding Ms. Cockson personally are thin and utterly routine. He complains that Ms. Cockson has asserted her belief that this lawsuit is meritless and intended to harass witnesses in Mr. Hopwood's criminal trial. *Id.* ¶¶ 4, 57–58. He seems to suggest that there is something wrong about Ms. Cockson having spoken with Ms. Metzner Hopwood, her childhood friend and Mr. Hopwood's victim and soon-to-be-ex-wife, while on a visit to Washington to watch parts of Mr. Hopwood's trial—as if Mr. Hopwood has the power to forbid Ms. Metzner Hopwood from speaking to people he dislikes and isolate her from people who wish to support her. *Id.* ¶ 33. He likewise seems to imply that there is something untoward going

-10-

on because, before serving Ms. Cockson, Mr. Boyer emailed Ms. Metzner Hopwood's lawyers a copy of the complaint and told her to preserve evidence, and, as a result of that, Ms. Cockson thereby discovered that she was being sued prior to being served. *Id.* ¶¶ 34-36.

Mr. Hopwood then details conduct by *other people* targeting Mr. Boyer with unpleasant anonymous communications. He alleges that on December 10, 2025, Mr. Boyer received strange and somewhat threatening messages from a stranger purporting to be a process server that mention Ms. Metzner Hopwood's father. *Id.* ¶¶ 37-40. The same day, he received an email from a Gmail address impersonating a USA Today editor that attached a letter that a person he calls "Jane Doe"[3] had emailed to Judge Sooknanan's chambers that has not been filed to the public docket. *Id.* ¶¶ 42-43. Mr. Hopwood (or Mr. Boyer) somehow deduces from this that "a confederate of Cockson's" must have "appeared at the Clerk's Office" and obtained the PDF that way. *Id.* ¶ 44 No explanation is given as to why the Clerk's Office would have an email sent directly to a chambers email address or why the supposed "confederate" appearing at the clerk's office in person would have received a PDF in the format in which it was emailed.

Next, Mr. Hopwood alleges that an anonymous email address calling itself justiceforjillcockson@gmail.com and purporting to be from "a group of concerned citizens" emailed the judge and prosecutors in Mr. Hopwood's criminal case with assorted allegations against Mr. Hopwood and Mr. Boyer, including that Messrs. Hopwood and Boyer were threatening "Jane Doe." *Id.* ¶¶ 47–48. Mr. Hopwood (or Mr. Boyer) surmises that Ms. Cockson must somehow have been involved in the sending of this email, despite the email referring to her in the third person, because it contains language similar to the anonymous texts that Mr. Boyer

---

[3] Mr. Hopwood also alleges that "Jane Doe" claims to have received odd messages from the same number around the same time. *Id.* ¶ 45.

received and "Jane Doe's" letter to chambers, as well as expressing the view that Mr. Hopwood committed the crimes of which he was convicted and is dangerous. *Id.* ¶ 51. Mr. Hopwood also alleges that around this time a stranger took photographs of his front door and made complaints to his landlord. *Id.* ¶¶ 53–55.

Mr. Hopwood contends that he is less likely to be able to access the courts and that the criminal case against him has been "poisoned" because of these communications and that he has suffered unspecified reputational harm and distress. *Id.* ¶¶ 60, 137(d).

## III.   ARGUMENT

This suit should be dismissed because, among other things, (i) it targets vague, unfalsifiable statements; (ii) Mr. Hopwood's reputation was already thoroughly tarnished by his array of criminal convictions and other confessed misconduct; (iii) Mr. Hopwood is, by his own admission, a public figure; and (iv) the complaint pleads nothing more than that Ms. Cockson dislikes Mr. Hopwood and does not plead facts supporting a reasonable inference that Ms. Cockson knew any statement was false.

### A.   Standard of Review.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). In other words, a complaint must "raise 'more than a sheer possibility that a defendant has acted unlawfully.'" *Braxton v. First Transit*, 322 F. Supp. 3d 110, 115 (D.D.C. 2018) (quoting *Iqbal*, 556 U.S. at 678)). While the Court accepts a complaint's allegations as true, it need not "accept the truth of legal conclusions or '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Id*. (alteration in original).

On a motion to dismiss, a court can consider materials incorporated into the complaint by reference or subject to judicial notice. To assess whether a plaintiff is a public figure, courts may take judicial notice of readily-available media articles for the fact of their publication. *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140–42 (D.D.C. 2017); *Barrett v. Atl. Monthly Grp. LLC*, No. CV 22-49 (LLA), 2024 WL 4119400, at *7 (D.D.C. Sept. 9, 2024). They may also take judicial notice of "records in another but interrelated proceeding," at least for the fact that they exist in the public record and the legal effect of those records. *Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938); *accord Gomez v. Wilson*, 477 F.2d 411, 416 (D.C. Cir. 1973).[4]

**B.      The Defamation and False Light Counts Should Be Dismissed for Numerous Independent Reasons.**

Mr. Hopwood's defamation and false light claims, Counts 1–8, are meritless and should be dismissed. "The Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *BYD Co. Ltd. v. All. for Am. Mfg.*, 554 F. Supp. 3d 1, 6 (D.D.C. 2021), *aff'd*, 2022 WL 1463866 (D.C. Cir. May 10, 2022) (quoting *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017)). "Early resolution of defamation cases under Federal Rule of Civil Procedure 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Id.* (quoting *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 89 (D.D.C. 2018)).

---

[4] The District of Columbia has enacted strong statutory protections for individuals facing meritless lawsuits targeting speech on matters of public interest. *See* D.C. Code §§ 16-5501–5505 (D.C. Anti-SLAPP Act). These protections were designed to shield speakers like Ms. Cockson from precisely the kind of retaliatory litigation at issue here. Ms. Cockson recognizes, however, that the D.C. Circuit has held that these statutory safeguards do not apply in federal court when a plaintiff elects to file a SLAPP suit in the U.S. District Court for the District of Columbia. *See Tah v. Glob. Witness Publ'g, Inc.*, 991 F.2d 231, 238 (D.C. Cir. 2021) (holding D.C. Anti-SLAPP Act's special procedure cannot be invoked in federal court). Nevertheless, Ms. Cockson respectfully preserves this issue for potential review in future proceedings.

-13-

If ever there were a defamation case that is unmeritorious, it is this one. Even limiting discussions to Mr. Hopwood's admissions under oath in his prior criminal proceedings, it is impossible for the sort of statements he alleges Ms. Cockson made to lower his reputation any further—far worse and more specific statements have been made about him in a widely-publicized trial under absolute privilege by his victim, witnesses, and, indeed, by Mr. Hopwood himself. What is more, Mr. Hopwood challenges vague statements that principally convey that Ms. Cockson holds a low opinion of Mr. Hopwood—these statements do not offer any specific facts that could be proven true or false. Mr. Hopwood, moreover, admits that he was a household name in the legal world, but alleges no facts other than Ms. Cockson's dislike for him as a basis to infer she knew her statements were false.

> 1.      **Ms. Cockson's Statements Could Not Harm Mr. Hopwood's Reputation More Than The Judicially-Established or Admitted Truth.**

To start, Mr. Hopwood's claims fail categorically because his convictions and admissions under oath establish that Ms. Cockson's statements could not possibly have lowered Mr. Hopwood's reputation more than the truth. Where, as here, the truth and unchallenged statements utterly devastate a plaintiff's reputation, he cannot show that additional statements caused him harm. Either he is defamation-proof, or the gist or sting of the statements is no more damaging than the truth; either way, he cannot sue for trivial inaccuracies that cannot possibly hurt his reputation more than judicially-established facts and his own sworn admissions.

> a.      **As a Violent Criminal, Mr. Hopwood Cannot Demonstrate That Ms. Cockson's Statements Brought His Reputation Any Lower Than The Truth Does.**

To be actionable, a statement must "injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Howard Univ. v. Best*, 484 A.2d 958, 988 (D.C. 1984). Thus, where "the plaintiff cannot demonstrate that the [statements] caused

-14-

any injury to his reputation," the claim fails. *Logan v. D.C.*, 447 F. Supp. 1328, 1332 (D.D.C. 1978). Where a plaintiff has an "extensive past criminal record," then, he "will be found 'libel-proof' as a matter of law." *Id.*; *see also Ray v. U.S. Dep't of Just.*, 508 F. Supp. 724, 726 (E.D. Mo. 1981), *aff'd*, 658 F.2d 608 (8th Cir. 1981) (applying similar doctrine under Missouri law).[5] As the case that this Court quoted in *Logan* explains, this doctrine applies where a plaintiff is "so unlikely by virtue of his life as a habitual criminal to be able to recover anything other than nominal damages as to warrant dismissal of the case, involving as it does First Amendment considerations." *Cardillo v. Doubleday & Co.*, 518 F.2d 638, 639 (2d Cir. 1975). In those circumstances, even if a plaintiff "denies participation in" the "specific crimes" he is suing over, his reputation is so deep in the gutter that he could not recover anything even if he prevailed. *Id.*

In applying this doctrine, courts have held that when "[w]hen . . . an individual engages in conspicuously anti-social or even criminal behavior, which is widely reported to the public, his reputation diminishes proportionately." *Lamb v. Rizzo*, 391 F.3d 1133, 1137 (10th Cir. 2004). "Depending upon the nature of the conduct, the number of offenses, and the degree and range of publicity received, there comes a time when the individual's reputation for specific conduct, or his general reputation for honesty and fair dealing is sufficiently low in the public's estimation that he can recover only nominal damages for subsequent defamatory statements." *Id.* at 1137–38; *accord Carpenter v. King*, 792 F. Supp. 2d 29, 34 n.2 (D.D.C. 2011) (quoting *Lamb* in case under D.C. law), *aff'd,* 473 F. App'x 4 (D.C. Cir. 2012).

Thus, in *Logan*, a man with numerous convictions related to drugs and fencing who had bragged (he claimed, falsely) that he had killed someone could not sue for falsely being

---

[5] The complaint appears to contend that most of Ms. Cockson's alleged statements were made from her Missouri home but alleges that they were principally directed at the District.

identified as a *current* drug user. 447 F. Supp. at 1332. And in *Cardillo*, a mafioso convicted of multiple federal crimes involving stolen property and bail-jumping, who had publicly admitted involvement in other "minor crimes" and bookmaking, and who had been publicly implicated by a witness under absolute privilege in Congressional testimony with fixing races could not possibly have a legitimate reputation left to salvage, even if he did not commit the specific crimes that a book claimed. 518 F.2d at 639.

Here, Mr. Hopwood has a similarly illustrious criminal career and thus no legally cognizable reputation to protect, at least from allegations such as these. It is established as a matter of law that he has committed five armed bank robberies, persistently hit his wife, repeatedly violated a restraining order, and obstructed justice. Sanderson Decl. Exs. H, I, J, K. Mr. Hopwood has admitted numerous crimes under oath—indeed, he admitted some with which he was never charged, such as stealing and destroying his wife's phone and deliberately lying to Child Services and the police. The only reputation he is legally entitled to is that of a serial criminal. Nothing Ms. Cockson is accused of saying could bring Mr. Hopwood's reputation lower than what his own established or admitted actions have done.

Moreover, this case does not involve accusations of wholly unrelated wrongdoing. *Cf. Moldea v. New York Times Co.*, 22 F.3d 310, 319 (D.C. Cir. 1994) (discussing possibility that a person who committed one sort of crime might suffer damages if accused of a different sort of crime). Ms. Cockson stated her view that Mr. Hopwood was a psychopath, a sociopath, a monster, cruel—all epithets fairly within the realm of what Mr. Hopwood has been convicted of doing. Likewise, Mr. Hopwood admitted under oath to transferring money from a joint business account to an account his wife could not access, amply justifying Ms. Cockson's description of that behavior as embezzlement; he also admitted under oath to stealing his wife's phone. Ms.

Cockson expressed her view that Mr. Hopwood is what his convictions and sworn admissions establish him to be.

> **b.**        **Because The Truth—As Established by Mr. Hopwood's Convictions and Admissions—Is Devastating to His Reputation, The Gist of the Statements Is Substantially True.**

Moreover, alleged inaccuracies that are no more damaging than the true facts established by convictions and admissions cannot support a defamation claim. Courts have characterized this as a particular application of the substantial truth doctrine—that what matters for defamation liability is whether the "'gist' or 'sting'" of the charge is false, not every minutia that does not materially alter the reader's estimation of the plaintiff. *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990) (discussing Standardized Jury Instruction for defamation). For example, accusing a burglar of one burglary more than the literal truth does not cause legally cognizable harm "since the essentially derogatory implication of the statement ('he is an habitual burglar') is correct, he has not been libeled." *Moldea*, 22 F.3d at 319.

Criminal convictions and sworn admissions of related misconduct can therefore establish the substantial truth of the gist or sting of the statements. Thus, for example, a man subsequently convicted of stealing shoes to satisfy a sexual fetish was unable to sue for defamation based on additional, purportedly false, allegations of a similar sort in a previously-published article from after the arrest. *Jones v. Globe Int'l Inc.*, No. 3:94:CV01468 (AVC), 1995 WL 819177, at *10–11 (D. Conn. Sept. 26, 1995). "The true facts surrounding the plaintiff's criminal conviction along with the unchallenged statements in the articles at issue," the court held, "had a devastating impact upon the plaintiff's reputation." *Id.* Thus, even if the additional allegations were inaccurate, he could not "prove that the remaining statements caused him to suffer any further injury." *Id.*

The same is true here. If any facts at all can be divined from the vague epithets that Ms. Cockson is alleged to have used to describe Mr. Hopwood, they are well within the scope of the conduct for which Mr. Hopwood has been convicted or has admitted under oath. Even if there were enough to convey to the reader that Mr. Hopwood is violent and cruel, *that is judicially established to be true*; he has been convicted of domestic violence and armed bank robbery. If a statement were to convey that Mr. Hopwood disrespects the law, *that is judicially established to be true*; he has been convicted of contempt and obstruction of justice and suspended as an attorney. That Mr. Hopwood disrespects others' property? Even leaving aside the *five armed bank robberies*, he has admitted under oath to transferring joint funds to an account in his sole name and destroying his wife's phone.[6] As in *Jones*, the judicially-established or admitted truth devastates Mr. Hopwood's reputation.

Indeed, to the extent Mr. Hopwood claims that accusing him of "witness intimidation" in an email to the judge in his criminal case and copying prosecutors was defamatory, TAC ¶ 48, *he has been convicted of contempt and obstruction of justice*. The statement, moreover, was in an email to the D.C. Superior Court judge presiding over Mr. Hopwood's criminal trial and relevant to the issues before that court and thus absolutely privileged. *Brown v. Shimabukuro*, 118 F.2d

---

[6] While judicial notice of disputed facts in the other litigation is generally not permitted, courts can take judicial notice of a party's own sworn admissions absent a satisfactory explanation why a previously-admitted fact should now be deemed subject to dispute. *5-Star Mgmt., Inc. v. Rogers*, 940 F. Supp. 512, 519 (E.D.N.Y. 1996) (taking notice of "a critical admission in another judicial proceeding"); *In re FedEx Ground Package Sys., Inc., Emp. Pracs. Litig.*, No. 305-MD-527 RM, 2010 WL 1253891, at *4 (N.D. Ind. Mar. 29, 2010) ("Court documents from another case may be used to show that . . . admissions were made."); *Flint v. Beneficial Fin. I Inc.*, No. 2:12-CV-01675-GEB, 2012 WL 3277109, at *3 (E.D. Cal. Aug. 9, 2012) (taking judicial notice of admission in prior proceeding); *see also In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 205 (3d Cir. 1995) ("[I]t is not seriously questioned that the filing of documents in the case record provides competent evidence of certain facts—that a specific document was filed, that a party took a certain position, that certain judicial findings, allegations, or admissions were made.").

17, 18 (D.C. Cir. 1941) (Statements filed with court "are absolutely privileged if they have enough appearance of connection with the case in which they are filed so that a reasonable man might think them relevant. They need not be relevant in any strict sense.").[7]

### 2.    Ms. Cockson's Vague Statements Do Not Convey Any Verifiable Facts About Mr. Hopwood.

At any rate, none of Ms. Cockson's statements convey any actionable *fact* about Mr. Hopwood. Certainly, the alleged statements convey a low *opinion* of Mr. Hopwood. But defamation law does not police opinions, only underlying objectively verifiable facts. Defamation claims "arise[] only if, at a minimum, a defendant's statement 'reasonably implies false and defamatory facts.'" *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990)). "Where a defendant's statement 'cannot be construed as representations of fact,' there can be no defamation." *Id*. (internal citation omitted) (quoting *Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers v. Austin*, 418 U.S. 264, 284 (1974)). Thus, where "a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000). And "[t]o ensure space for 'imaginative expression' and 'rhetorical hyperbole,' a statement of opinion is actionable only if it implies an explicit or implicit factual foundation and therefore is 'objectively verifiable.'" *Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 121 (D.D.C. 2011) (quoting *Milkovich*, 497 U.S. at 20–22; *see also Smith v. Humane Soc'y of United States*, 519 S.W.3d 789, 800 (Mo. 2017) ("[T]he test to be

---

[7] "[P]etition[ing] the Government for redress of grievances," including "seeking redress in court" is also immune from liability under the Petition Clause of the First Amendment and the *Noerr-Pennington* doctrine. *Nader v. Democratic Nat. Comm.*, 555 F. Supp. 2d 137, 156 (D.D.C. 2008).

applied to an ostensible 'opinion' is whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact.").

To determine whether a reasonable reader would interpret a statement as conveying facts, context is key. *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001) ("In deciding whether a reasonable factfinder could conclude that a statement expressed or implied a verifiably false fact about appellant, the court must consider the statement in context."); *Mar-Jac*, 773 F. Supp. 2d at 122–23 (analyzing "general tenor" of broadcast and finding that "speculative" and "hyperbolic" statements "did not imply a verifiably false fact"); *Guilford*, 760 A.2d at 603 (D.C. 2000) (context as op-ed suggested subjective opinion). Thus, in *Moldea*, that the statements were in a book review would affect whether a reader would understand them as factual assertions rather than the reviewer's evaluations. 22 F.3d at 315. Here, many of the statements were made in the context of comments or posts on social media, a context where courts have repeatedly recognized that vituperative statements are likely to be expressions of subjective opinion rather than literal fact. "Use of epithets, fiery rhetoric or hyperbole on social media have been held to warrant an understanding that these statements are vigorous expressions of personal opinion, rather than the rigorous and comprehensive presentation of factual matter." *Pelkowski v. Hovermann*, No. 20CV1845ENVRLM, 2021 WL 9032222, at *5 (E.D.N.Y. Sept. 9, 2021) (cleaned up); *see also Obsidian Fin. Grp., LLC v. Cox*, 740 F.3d 1284, 1294 (9th Cir. 2014) (blog post); *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.3d 32, 43, 925 N.Y.S.2d 407, 415 (2011) (online speech is "often the repository of a wide range of casual, emotive, and imprecise speech" and readers may give "less credence" to statements in that context).

At any rate, statements like those attributed to Ms. Cockson that a person is, in essence, crazy, have consistently been held non-actionable, subjective statements. In *Weyrich v. New*

*Republic, Inc.*, for example, the D.C. Circuit upheld the dismissal of a defamation claim stemming from an article that depicted the plaintiff, a political activist, as "emotionally volatile[,] short-tempered . . . a zealoted political extremist and an easily-enraged tyrant." 235 F.3d at 620. The article further described the plaintiff as suffering from "bouts of pessimism and paranoia." *Id*. at 623. The *Weyrich* court, however, rejected the plaintiff's contention that "a reasonable reader might . . . regard the article as actually asserting that [plaintiff] suffers from, or has been diagnosed with, a psychological ailment." *Id*. at 625. Rather, the D.C. Circuit held that in context, these were clearly statements of opinion: at the time the article was published, "the definitive, clinical term 'paranoia' ha[d] taken on a less-than-definitive popular meaning, as ha[d] 'crazy' and 'nutty.'" *Id*. at 624. "Presented in such a loose manner, in such a well-understood context," the court recognized, "the article's reference to 'bouts of paranoia' is neither verifiable nor does it imply specific defamatory facts about appellant." *Id*. at 625 (internal ellipses omitted). That, the D.C. Circuit held, was quite unlike *Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969), involving a statement specifically alleging *clinically diagnosable* paranoia that "purported to be a well-researched psychiatric diagnosis." *Weyrich*, 235 F.3d at 624.

So too in *Thomas v. News World Commc'ns*, 681 F. Supp. 55 (D.D.C. 1988). There, the plaintiffs—antinuclear demonstrators who had maintained continuous protests outside the White House—brought a defamation action against a newspaper that had published various editorials describing the protestors as "pitiable lunatics," "deluded," and "insane," among other choice epithets. *Id*. at 63 (cleaned up). But in light of "the immediate, linguistic context" in which the statements appeared, "the newspaper's description of plaintiffs as 'insane' persons and as 'pitiable lunatics' reflects opinion and not fact—exaggerated epithet, not factual allegation." *Id*. at 64. Many other decisions in D.C. alone similarly recognize that calling people one dislikes

various creative synonyms for "crazy" does not imply verifiable facts but rather are "loose, rhetorical turn[s] of phrase, and [] statement[s] of . . . subjective opinion." *Montgomery v. Risen*, 197 F. Supp. 3d 219, 248 (D.D.C. 2016), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017); *Lyles v. Micenko*, 404 F. Supp. 2d 182, 187–88 (D.D.C. 2005).

So too here. Ms. Cockson, like so many others, is alleged to have expressed in colorful terms distaste for her ex. While, as noted above, Mr. Hopwood's public convictions for armed bank robbery and domestic violence and other admissions under oath certainly might lead others to reach a similar opinion, the statements themselves do not assert any facts that can be proven verifiably true or false. Mr. Hopwood does not allege that Ms. Cockson claimed to be a psychiatrist or to be delivering a formal diagnosis. "Psychopath," "sociopath," "cruel," "pathetic monster," "hard-wiring defect," "narcissist"—all of these terms are precisely the sort of epithets that *Weyrich* holds a reasonable reader would not regard as stating provable, objective facts, but rather a very low subjective opinion of the object of the statements. And, as discussed above, to the extent any residual factual implications are discernible, Mr. Hopwood's convictions and admissions under oath in open court amply justify them.

### 3.     Mr. Hopwood Is, At Minimum, A Limited-Purpose Public Figure.

When the plaintiff in a defamation case is a public figure, he must demonstrate by clear and convincing evidence that the defendant knew that the facts she was stating were false or consciously did not care whether they were true or false in the face of information suggesting that they were. *Jankovic v. Int'l Crisis Grp.*, 72 F. Supp. 3d 284, 309 (D.D.C. 2014), *aff'd*, 822 F.3d 576 (D.C. Cir. 2016) (citing *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991)). As the D.C. Circuit has noted, "[t]he Supreme Court has identified two classes of public figures in addition to government officials: general purpose and limited purpose public figures." *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987). "In some instances, an individual may

achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Id.* Alternatively, when "an individual voluntarily injects himself or is drawn into a particular public controversy," he "thereby becomes a public figure for a limited range of issues." *Id.* "The extent of the individual's participation in public affairs and assumption of the risk of adverse publicity determines the weight of the government's interest in protecting his or her reputation." *Id.*

To determine whether a plaintiff is a public figure for the purposes of the statements against them, a court conducts a three-step analysis. "First, we isolate the controversy at issue, because the scope of the controversy in which the plaintiff involves himself defines the scope of the public personality." *Tavoulareas*, 817 F.2d at 772. It "must be public both in the sense that persons actually were discussing it and that persons beyond the immediate participants in the dispute are likely to feel the impact of its resolution." *Id.* at 772–73 (cleaned up). "Second, we examine the plaintiff's role in the controversy, to be sure that it is more than 'trivial or tangential.'" *Id.* at 773. "Finally, we determine if the alleged defamation was germane to the plaintiff's participation in the controversy." *Id.*

This case is not a close call. Criminal justice, including the extent to which sentencing laws are unduly harsh and fail to recognize the possibility of rehabilitation and redemption, is an obvious and legitimate subject of public debate. Mr. Hopwood injected himself firmly into that debate by touting himself extraordinarily publicly as a shining beacon of rehabilitation, speaking in a *60 Minutes* segment, authoring and publicizing a book, testifying before Congress and state legislatures, appearing in the media in the debate over criminal justice reform, attending White house bill signings as an invited guest, and much more before his very public downfall. *See* TAC ¶ 19; Sanderson Decl. Ex. E. That is remarkably similar to what the D.C. Circuit held made the

-23-

plaintiff a public figure in *Tavoulareas*. 817 F.2d at 774 ("He made speeches, testified before Congress, published articles, and through Mobil's publicity apparatus enjoyed continuing access to the media.") (internal citations omitted). Plaintiff's noteworthy background, combined with his concededly "considerable" efforts to "inject[]" himself into the public discourse on topics related to criminal justice reform, mean that Plaintiff has inescapably played a significant role in the relevant controversy here. *Joseph v. Xerox Corp.*, 594 F. Supp. 330, 334 n.4 (D.D.C. 1984) ("Courts commonly find that writers have injected themselves into public controversies and thus have become limited-purpose public figures.") (collecting cases).[8]

Ms. Cockson's alleged statements are related to this controversy—the common theme is that Ms. Cockson expressed her belief that Mr. Hopwood's public persona built on his purported rehabilitation was a façade. "[S]tatements, including those highlighting a plaintiff's talents, education, experience, and motives, can be germane." *Safex Found., Inc. v. Safeth, Ltd.*, 531 F. Supp. 3d 285, 305 (D.D.C. 2021) (internal quotations omitted); *see also Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287,1298–99 (D.C. Cir. 1980) (Plaintiff's "talents, education, experience, and motives could have been relevant to the public's decision whether to listen to him" as a "leading advocate of certain precedent-breaking policies."). Fundamentally, Ms. Cockson expressed the view that none of Mr. Hopwood's public persona as the personification of rehabilitation was real, that Mr. Hopwood was more skilled at convincing others of his claimed redemption than actually introspecting and addressing his issues, and that he remained more or less the same man who committed five armed bank robberies. This is certainly relevant to Mr. Hopwood's "experience and ability to effectively advocate" on the relevant controversies.

---

[8] Ms. Cockson's view that the media and the Gates Foundation acted irresponsibly in providing a platform to Mr. Hopwood's sinner-to-saint tale and funding him, rather than worthier causes, is similarly a matter of legitimate public controversy. TAC ¶ 26.

*Mason v. Am. Prospect, Inc.*, 2024 WL 4345855, at *15 (D.D.C. Sept. 30, 2024). It is precisely Mr. Hopwood's claimed rehabilitation that made him worth listening to. Ms. Cockson's statements went precisely to whether Mr. Hopwood was the changed man he claimed to be when testifying before Congress, attending bill-signings related to rehabilitation, and being feted by judges and the media; the statements are therefore germane to Mr. Hopwood's role in the debate on punishment and rehabilitation.

### 4. Vague Allegations of a "Vendetta" Do Not Equal Knowledge of Falsity.

It is not enough for Mr. Hopwood to allege that each challenged statement was false; he must also "allege that the statement was published with actual malice." *Vindman v. Trump*, No. CV 22-257 (JEB), 2022 WL 16758575, at *10 (D.D.C. Nov. 8, 2022) (citing *New York Times v. Sullivan*, 376 U.S. 254 (1964)). "The actual-malice standard . . . 'is a daunting one.'" *Id.* (quoting *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996)). "[I]t is not enough to show that defendant should have known better; instead, the plaintiff must offer evidence that the defendant in fact harbored subjective doubt" about the veracity of the challenged statements. *Jankovic*, 822 F.3d at 589. Nor are allegations of a defendant's "[i]ll will . . . sufficient to demonstrate actual malice." *Vindman*, 2022 WL 16758575, at *10 (citing *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 90 (D.D.C. 2012); *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 92 (D.D.C. 2019)). Instead, "a plaintiff must plead 'nonconclusory facts alleging the defendant knew its statement was false or questioned its truth.'" *Id.* (cleaned up) (quoting *BYD*, 554 F. Supp. 3d at 9).

Mr. Hopwood's allegations never venture beyond the conclusory to any factual allegations supporting a reasonable inference that—to the extent that they had any factual content at all (which they did not)—Ms. Cockson *knew* that any of her statements were false. For

the most part, Mr. Hopwood simply asserts that Ms. Cockson "knew" her comments were false without elaboration. *See, e.g.*, TAC ¶¶ 2, 24–31. All he really says beyond this is alleging that Ms. Cockson dislikes him due to their teenage relationship, which he repeatedly dubs a "vendetta." *See, e.g.*, *id.* ¶¶ 2, 22–24.

But courts have consistently held that allegations of a "vendetta" are "inadequate to establish actual malice." *Wood v. Am. Fed'n of Gov't Emps.*, 316 F. Supp. 3d 475, 484 (D.D.C. 2018) (citing *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 290 (D.C. 1977) ("[S]peculation and innuendo" are not sufficient to show malice.)); *Blodgett v. Univ. Club*, 930 A.2d 210, 224 (D.C. 2007) (holding that actual malice was not demonstrated where plaintiff merely "assert[ed] in conclusory fashion" that defendants acted in bad faith)); *see also Holder v. Bobb*, 797 F. Supp. 3d 134, 150 (E.D.N.Y. 2025) ("vendetta" insufficient, because constitutional malice turns on knowledge of falsity, not "animosity" or "ill-will").

So, even if Ms. Cockson did hold this purported grudge, it would not be sufficient to adequately plead actual malice, as the mere "fact that [a defendant] harbored ill will toward Plaintiff generally is insufficient as a matter of law to demonstrate that he acted with actual malice" in making the challenged statements. *Wood*, 316 F. Supp. 3d at 484. *See also Reading v. N. Hanover Twp., New Jersey*, No. 1:23-CV-1469 (KMW-SAK), 2026 WL 102849, at *42 (D.N.J. Jan. 13, 2026) ("Plaintiff's theory of actual malice relies on allegations of hostility, escalation, persistence, and an alleged vendetta. But New Jersey courts have repeatedly held that such allegations, even if accepted as true, do not satisfy the subjective actual malice standard."). The Third Amended Complaint is simply devoid of any factual allegations that could show that Ms. Cockson knew that anything she was saying was wrong, rather than her honest beliefs based

on her past knowledge of Mr. Hopwood and, more recently, his highly-publicized arrest, trial, and conviction.

The same goes for Mr. Hopwood's latest conspiracy theory that conclusorily alleges that Ms. Cockson is secretly pulling the strings of various third parties who have sent disturbing messages to Mr. Boyer. Quite aside from the complete lack of any particular factual allegations connecting Ms. Cockson to the messages, none of these allegations suggests that Ms. Cockson knew that any particular statement was false when she made them. As in *Reading*, pleading personal hostility is not the same as pleading subjective knowledge of falsity.

Nor do Mr. Hopwood's denials of the criminal charges against him—unconvincing as they were to the Superior Court jury—matter. "[A] plaintiff's denial as to the veracity of a story only 'serves to buttress a case for actual malice when there is something in the content of the denial or supporting evidence produced in conjunction with the denial that carries a doubt-inducing quality.'" *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 281–82 (S.D.N.Y. 2013) (quoting 1 Rodney A. Smolla, Law of Defamation § 3:65.50 (2013)), *aff'd*, 807 F.3d 541 (2d Cir. 2015), and *aff'd*, 622 F. App'x 67 (2d Cir. 2015). So when Mr. Hopwood alleges that Ms. Cockson "rephrase[d]" her statement calling Mr. Hopwood taking money that was set aside from taxes from the law firm account "embezzlement" to be "a statement about my beliefs" in response to Mr. Hopwood threatening to sue her, TAC ¶ 31, his denials and legal threats cannot bootstrap actual malice. It does not allege that Ms. Cockson subjectively knew any asserted fact was false or entertained serious doubts about its truth at the time of publication, which is the constitutional touchstone. Ms. Cockson's description of Mr. Hopwood's conduct as "embezzlement" might amount to "sloppiness" in her use of a legal term of art, but does not evidence knowledge of falsity rising to the level of actual malice. *See Parsi*, 890 F. Supp. 2d at 88 (finding that

-27-

"sloppiness is not evidence of actual malice" where "none of the errors misrepresent the substance" of the truth or "mislead the reader"). Here, the truth of the matter is that Mr. Hopwood has admitted under oath to siphoning funds out of a business account that he shared with his wife and into one that only he could access. *See supra* at § II.C; Sanderson Decl. Ex. H at 45:5–21, 47:1–9, 47:16–48:3, 52:14–20, 54:14–55:19. Absent contrary evidence in front of her, Ms. Cockson was entitled to believe the worst things she had experienced or heard about Mr. Hopwood, and her imprecise use of a legal term of art does not somehow convert that belief into a knowingly false statement.

In short, Mr. Hopwood touts his public persona, but alleges nothing more than bare labels to meet the accompanying burden of pleading actual malice. He thus cannot meet his burden.

### 5.    Mr. Hopwood's Claims are Untimely.

The statute of limitations for defamation is one year. D.C. Code § 12-301(4). "Defamation occurs on publication, and the statute of limitations runs from the date of publication." *Mullin v. Washington Free Wkly., Inc.*, 785 A.2d 296, 298 (D.C. 2001). And this action was commenced on December 3, 2025. ECF No. 1. Thus, with the exception of one alleged statement in March 2025, every statement in the complaint was made prior to the limitations period and these claims are facially untimely.

Mr. Hopwood evidently seeks to avoid this bar by arguing that a discovery rule applies, claiming that he only learned of these statements in late December 2024. TAC ¶¶ 72, 81. That argument fails.

The D.C. Court of Appeals has never held that a discovery rule applies to defamation claims at all and has explicitly *rejected* one for widely-disseminated statements such as those on television shows or in newspapers or magazines. *Mullin*, 785 A.2d at 298 ("Appellant tries to widen his window of opportunity by urging this court to adopt the so-called discovery rule in

defamation claims. We decline to do so, at least in the case of defamatory statements published in a mass media outlet such as City Paper."); *see also Caudle v. Thomason*, 942 F. Supp. 635, 641 (D.D.C. 1996) (D.C. Court of Appeals "has not yet applied the rule to a defamation claim"). Many states, including Virginia, hold that a claim for defamation accrues on publication, not discovery. *See*, *e.g.*, *Dragulescu v. Virginia Union Univ.*, 223 F. Supp. 3d 499, 508 (E.D. Va. 2016); *see also Cannon v. Peck*, 36 F.4th 547, 576 (4th Cir. 2022) (North Carolina); *Kamdem-Ouaffo v. Pepsico, Inc.*, 160 F. Supp. 3d 553, 571 (S.D.N.Y.), *aff'd*, 657 F. App'x 949 (Fed. Cir. 2016) (New York). While courts in this District are divided on the applicability of the discovery rule to "inherently undiscoverable" statements, *Ramos v. ADR Vantage, Inc.*, No. 18-CV-1690 (APM), 2021 WL 4462611, at *7 (D.D.C. Sept. 29, 2021) (assuming without deciding that rule would apply), *aff'd*, No. 21-7124, 2022 WL 17726704 (D.C. Cir. Dec. 16, 2022), public social media posts and comments on websites are not inherently undiscoverable. Multiple courts have held that searchable websites and social media are analogous to mass media for discovery rule purposes. *See*, *e.g.*, *Davalos v. Bay Watch, Inc.*, 494 Mass. 548, 555–56 (2024); *Stein v. City of Philadelphia*, No. CIV.A. 13-4644, 2013 WL 6408384, at *7 (E.D. Pa. Dec. 5, 2013); *Tu Nguyen v. Duy Tu Hoang*, 318 F. Supp. 3d 983, 1013 (S.D. Tex. 2018). Just as the discovery rule would not apply if Ms. Cockson had made these statements in newspaper classifieds or a letter to the editor, it does not apply to the modern equivalent. Or, at any rate, Mr. Hopwood's allegation that the posts are on public websites establishes that they could have been discovered with the exercise of due diligence, and thus that the discovery rule does not apply. *Ramos*, 2021 WL 4462611, at *7 (knowledge that someone had disparaged plaintiff sufficient to trigger accrual under discovery rule, even if plaintiff did not know of specific statement).

**6.      Mr. Hopwood's Allegations "On Information and Belief" of Unspecified Communications on Unspecified Dates to a Long List of Possible Recipients Do Not State A Claim.**

Additionally, Count I fails to state a claim because it fails to satisfy basic pleading standards under Rule 8. Mr. Hopwood alleges based on unspecified "information and belief" that Ms. Cockson communicated either "via email, text, phone call, or social media application" with a judge, a court, Georgetown University Law Center, and the D.C. Bar Association on unspecified dates. Those allegations of communications on unspecified dates by four means listed in the alternative do not meet the requirement that "[a] plaintiff should plead the time, place, content, speaker, and listener of the alleged defamatory matter." *Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 458, 465 (D.D.C. 1994); *accord Mattiaccio v. DHA Grp., Inc.*, 908 F. Supp. 2d 136, 138 (D.D.C. 2012); *Stovell v. James*, 810 F. Supp. 2d 237, 248 (D.D.C. 2011); 5A Fed. Prac. & Proc. Civ. § 1309 (4th ed.) ("[I]n libel and slander suits courts require the time and place of the publication of the alleged defamatory matter to be specifically stated in the complaint."). These allegations are far too vague to establish a reasonable inference of any element of defamation.

**7.      Reports to Bar Disciplinary Authorities Are Absolutely Privileged.**

Furthermore, Mr. Hopwood appears to contend that Ms. Cockson defamed him by contacting the D.C. Bar and D.C. Circuit to attempt to get him "disciplined or disbarred." TAC ¶¶ 24, 61. That theory is so frivolous as a matter of law that the D.C. Court of Appeals has suspended an attorney for asserting it. In *In re Spikes*, the court observed that bar discipline complaints are "absolutely privileged" as a matter of law, a rule expressly stated in D.C. Bar Rule XI § 19(a), and repeatedly restated in numerous D.C. Court of Appeals decisions. 881 A.2d 1118, 1122–24 (D.C. 2005). *See also*, *e.g.*, *Solomon v. Supreme Ct. of Fla.*, 816 A.2d 788, 790 (D.C. 2002) ("[T]his jurisdiction generally provides immunity to all its bar disciplinary

-30-

participants."); *Kruise v. Jorgensen*, No. 19-CV-49 (DLF), 2022 WL 4379036, at *4 (D.D.C. Sept. 22, 2022) (similar), *aff'd*, No. 22-7143, 2023 WL 3476628 (D.C. Cir. May 16, 2023). Suing someone for defamation for filing a disciplinary complaint was grounds enough for suspension for interfering with the disciplinary process. *Spikes*, 881 A.2d at 1127–28. Accordingly, Mr. Hopwood's claims based on contacting disciplinary authorities are frivolous.

**C.      The Intentional Infliction of Emotional Distress Claim Fails Both For The Same Reasons and the High Bar for Outrageousness.**

Similar principles compel dismissal of Count 9, the IIED claim. To start, an allegation of causing emotional distress by saying something false is a defamation claim, whatever a plaintiff calls it, and the same limits on defamation claims apply to IIED claims. *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988) (a public-figure plaintiff "may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with 'actual malice,' *i.e.*, with knowledge that the statement was false or with reckless disregard as to whether or not it was true."). Thus, dismissing the defamation counts requires dismissal of the IIED counts too.

But at any rate, calling Mr. Hopwood unflattering things is simply not conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Johnson v. Paragon Sys., Inc.*, 195 F. Supp. 3d 96, 99 (D.D.C. 2016) (quoting *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C.1991)). "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are not sufficient" to make out a claim for IIED. *Langer v. George Washington Univ.*, 498 F. Supp. 2d 196, 200 (D.D.C. 2007) (cleaned up) (quoting

*Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C.1980)); *see also Asare v. LM-DC Hotel, LLC*, 62 F. Supp. 3d 30, 36 (D.D.C. 2014). That is all that Mr. Hopwood alleges here.

Mr. Hopwood's conclusory allegations regarding a "Post-Service Retaliatory Campaign" are likewise insufficient to plead a claim for IIED. *See* TAC ¶¶ 37–59. Mr. Hopwood does not credibly attribute a single one of the anonymous statements or actions making up this so-called retaliatory campaign to Ms. Cockson in anything more than a conclusory fashion. Failing to do so, these allegations fall plainly short of establishing at least one of the elements of an IIED claim—that it is the *defendant's* own conduct that gives rise to the claim. *See*, *e.g.*, *Salem Media Grp., Inc. v. Awan*, 301 A.3d 633, 656 (D.C. 2023) (listing elements of IIED claim, including that there was "extreme and outrageous conduct *on the part of the defendants*") (emphasis added). Here, even assuming that each action or statement making up the alleged retaliatory campaign actually occurred or was said, "there are no factual allegations in the complaint that . . . come anywhere close to establishing that [Ms. Cockson] had the level of responsibility . . . that would be necessary to demonstrate that" she committed the actions at issue. *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 286 (D.D.C. 2017) (dismissing defamation claim for plaintiff's failure to attribute alleged statements to defendant). Because Mr. Hopwood does not plead any non-conclusory allegations connecting Ms. Cockson to the alleged retaliatory campaign, any IIED claim based on those allegations must be dismissed.

### D.    Mr. Hopwood's Claim For Intentional Interference With Prospective Economic Advantage Must Likewise Be Dismissed.

Count 10 of the TAC, alleging intentional interference with prospective economic advantage, must similarly be dismissed. Plaintiffs cannot relabel reputational damage claims under other labels, such as tortious interference, "to avoid the constitutional requisites of a defamation claim." *Thompson v. Armstrong*, 134 A.3d 305, 311 (D.C. 2016) (quoting *Moldea*,

-32-

22 F.3d at 319–20). That is because the "First Amendment restrictions" that apply to a defamation claim likewise "apply to suits for intentional interference with contractual relations." *Id.* (collecting cases across jurisdictions). And even aside from the constitutional limits, courts have consistently held that a tortious-interference-by-defamation claim fails if the underlying defamation claim fails because a reputational harm theory fundamentally sounds in defamation. *See, e.g.*, *Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*, 829 F.3d 576, 579-80 (8th Cir. 2016) ("[W]here a tortious interference claim is based upon an alleged defamation, if a plaintiff's defamation claim fails, the tortious interference claim must also fail because the plaintiff cannot establish an absence of justification as a matter of law."); *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 274 (7th Cir. 1983) ("We doubt that the Illinois courts would allow this end run around their rules on defamation."); *Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (where "causes of action seek damages only for injury to reputation, [or] where the entire injury complained of by plaintiff flows from the effect on his reputation," then claim is for defamation regardless of the label given to them).

Under D.C. law, to state a claim for intentional interference with prospective economic damage, a plaintiff must allege "(1) the existence of a valid business relationship or other expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference causing termination of the relationship or expectancy or causing a failure of performance by one of the parties; and (4) resultant damage." *Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159, 176 (D.D.C. 2016), *aff'd*, 869 F.3d 976 (D.C. Cir. 2017). Mr. Hopwood's conclusory allegations regarding unspecified business expectancies *with unspecified people* he claims to have lost, and the total absence of any allegation linking Ms. Cockson's purported conduct to the loss of those business expectancies *or her knowledge of any*

*particular expectancy*, fall woefully short of adequately stating a claim for intentional interference with prospective economic advantage. This claim, too, must be dismissed.

First, a claim for intentional interference with prospective economic advantage must be based on a business expectancy that is "commercially reasonable to expect." *Sabre Int'l Sec. v. Torres Advanced Enter. Sols., Inc.*, 820 F. Supp. 2d 62, 77 (D.D.C. 2011). This element requires the plaintiff to plead "rather specific business opportunities" as opposed to "the generic opportunities of any successful enterprise." *Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22, 29 (D.C. Cir. 2010). Thus, courts have required "relatively specific anticipated transactions," such as specifically contemplated deals, and it is not sufficient for a plaintiff to merely plead that he has "suffered a loss of current growth and business opportunities, a loss of future growth and business opportunities, and a loss of access to markets that otherwise would have been available." *Id*. Thus, Mr. Hopwood's allegation of expectancies of business with unnamed prospective clients or members of the D.C. legal community plainly flunk this test. TAC ¶ 25. If Mr. Hopwood cannot name them, then they are not the requisite *specific* business opportunities, let alone specific opportunities *that Ms. Cockson knew of*.

As for Mr. Hopwood's employment with Georgetown, Mr. Hopwood's allegations face fundamental causation problems. Mr. Hopwood must allege that Ms. Cockson's alleged "interference *caused* a breach or termination of the expectancy,"—that is, that "*but for* [Ms. Cockson's] interference," Mr. Hopwood's alleged business expectancies would not have been lost. *Trilogy Fed., LLC v. CivitasDX LLC*, 2025 WL 436850, at *8–9 (D.D.C. Feb. 9, 2025) (emphasis added). Setting aside inadequately pleaded and untimely allegations of unspecified communications by Ms. Cockson to various entities by various means, TAC ¶¶ 22–23, the first specific "defamatory" statement that Mr. Hopwood alleges was in 2023. *Id*. ¶ 25. By that time,

-34-

Mr. Hopwood had already been arrested for battering his wife, charged with assault, crimes for which he was subsequently convicted, and stopped teaching after his arrest. *See* Sanderson Decl. Ex. G. Hopwood offers only conclusory allegations that obscure internet comments, rather than his well-publicized arrest and conviction, caused termination of his relationship with Georgetown. *See*, *e.g.*, *Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 60 (D.D.C. 2012), *aff'd*, 553 F. App'x 1 (D.C. Cir. 2014). Moreover, Mr. Hopwood's criminal charges present the sort of contingencies that courts in D.C. have found render a business expectancy "too remote" to support a claim for intentional interference with prospective economic advantage. *Carr v. Brown*, 395 A.2d 79 (D.C. 1978) (finding expectations of profit contingent on decisions of governmental bodies "simply too remote"). Mr. Hopwood's claim must fail on these grounds alone.

### E.    Mr. Hopwood's Claims that Ms. Cockson Participated in a Conspiracy Against His "Attorney-in-Fact" Are Baseless and Fail to State a Claim.

Mr. Hopwood's Third Amended Complaint principally adds two claims for Civil Conspiracy and 42 U.S.C. § 1985(2) civil rights conspiracy, each alleging that Ms. Cockson is secretly behind the acts of three unnamed individuals who have sent disturbing messages to Mr. Boyer, a non-lawyer who says that he is Mr. Hopwood's "attorney-in-fact" and has apparently been signing Mr. Hopwood's name to most of the filings in this case in violation of Rule 11(a) of the Federal Rules of Civil Procedure, which requires Mr. Hopwood to sign personally.[9] While the messages that Mr. Boyer allegedly received (which he subsequently filed with the Court) are

---

[9] Mr. Hopwood has subsequently filed a supplement in which he signs the Third Amended Complaint personally. Doc. 20. Nevertheless, Mr. Boyer's repeated efforts to "represent" Mr. Hopwood are improper because Mr. Boyer is not a lawyer. Because Mr. Boyer has repeatedly signed Mr. Hopwood's name to documents, it is difficult to tell which actions are authorized by Mr. Hopwood and which are Mr. Boyer acting alone, raising the risk that Mr. Hopwood may later try to disclaim documents submitted under his signature.

disturbing and inappropriate, Mr. Hopwood does not plead any cognizable cause of action against Ms. Cockson for a number of reasons. The allegations that Ms. Cockson is secretly directing the actions of three third parties are entirely conclusory. Mr. Hopwood fails to allege harm to him, as opposed to harm to Mr. Boyer. And numerous defects exist in each claim, including (among others) the lack of an underlying tort for civil conspiracy and the underlying acts including lawful (if unpleasant) acts and protected speech.

### 1.    Mr. Hopwood's Allegations that Ms. Cockson is Secretly Directing The Activities of Three Unnamed Third Parties Are Conclusory.

To start, Mr. Hopwood's conspiracy allegations fail to plausibly plead Ms. Cockson's participation in a conspiracy. *Twombly* was a conspiracy case, albeit in the antitrust context, and holds that stating a conspiracy claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." 550 U.S. at 556. There must be "plausible grounds to infer an agreement," not merely "parallel conduct and a bare assertion of conspiracy." *Id.* So, to successfully plead a conspiracy, allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action" *Id.* at 557. "[A]llegations that a defendant acted in ways consistent with a conspiratorial agreement, but also equally well explained by legitimate economic incentives, do not suffice to show illegality." *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1051–52 (D.C. Cir. 2012) (internal brackets, quotation marks, and ellipses omitted). A conspiracy claim will fail where allegations of an agreement "are 'purely conclusory and devoid of any factual support.'" *Mattiaccio v. DHA Grp., Inc.*, 20 F. Supp. 3d 220, 230 (D.D.C. 2014) (quoting *Acosta Orellana v. CropLife Intern.*, 711 F. Supp. 2d 81, 113 (D.D.C. 2010)). Therefore, a civil conspiracy claim must be dismissed where the plaintiff "provides no 'indication of when or how such an agreement was brokered' to buttress this allegation." *Id.*

(collecting cases). Such vague allegations will "not support a reasonable inference that there was an *agreement* or even a 'meeting of the minds.'" *Id.* (emphasis in original); *see also Barber v. D.C. Gov't*, 394 F. Supp. 3d 49, 66 (D.D.C. 2019) (complaint failed to plead "existence of any events, conversations, or documents indicating that there was ever an agreement or meeting of the minds").

In the conspiracy context, courts consistently reject efforts to hold parties liable for others' wrongdoing when there is an "obvious alternative explanation" other than an agreement to commit the tort. *Vindman*, 2022 WL 16758575, at *7 . "Merely alleging that" people "communicated, without alleging any details of those communications that suggest an unlawful agreement, cannot justify inferring the requisite agreement." *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 39 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023). Thus, for example, in *Vindman*, allegations that the defendants each sought to undermine the *credibility* of a witness against them did not warrant an inference of an *agreement* to *improperly intimidate* that witness. 2022 WL 16758575, at *7. Nor was the fact that some people took allegedly unlawful actions against him enough to infer that there was *agreement* to unlawfully retaliate. *Id.* at *8. And in *Black Lives Matter D.C.*, the existence of several legitimate policing justifications meant that bare allegations of a conspiracy was not enough plausibly to infer an agreement to do something illegal. 544 F. Supp. 3d at 39–40 (distinguishing cases where an agreement could be inferred because defendants "together coordinated the plaintiff's international travel" to where she was enslaved and where prison officers "worked together to keep the inmate restrained" during a beating).

The allegations in the complaint here flunk this test. The TAC spells out a number of actions by a number of "John Does" that Mr. Hopwood purports conspired with Ms. Cockson,

-37-

but leaves the Court to guess when the alleged agreement was entered into among the co-conspirators, who the co-conspirators are, the nature of the agreement among Ms. Cockson and the co-conspirators, what Ms. Cockson's relationship was to these anonymous actors, and how or when Ms. Cockson supposedly entered into this agreement. In short, while Mr. Hopwood has "made several conclusory statements in [the TAC] that [Ms. Cockson] engaged in a conspiracy against [him], [he] alleged no specific facts to support these assertions, and the record contains no actual evidence of an agreement between or among" Ms. Cockson and any other person to engaged in the conspiracy alleged. *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000).

Nor is there any effort to dispel the obvious alternative explanation: that whoever is sending the hostile messages and whoever took photographs of Mr. Boyer's door—perhaps they are the same person, perhaps not—is acting independently, without any agreement from Ms. Cockson. That *someone* is sending improper messages to Mr. Boyer pleads nothing about why Ms. Cockson would need to have reached an agreement with the sender in order for that to happen. The only allegations that seem to allege any particular facts about Ms. Cockson are that she spoke to her childhood friend several months earlier during the trial, that she learned that she had been sued before she was served, and that she views this suit as meritless and an attempt to collaterally attack Mr. Hopwood's convictions given that Mr. Boyer reached out to Mr. Hopwood's victim and told her she would be subjected to discovery in this lawsuit.

Otherwise, Mr. Hopwood engages in wild leaps of logic. How does an anonymous email address allegedly impersonating a journalist obtaining the same PDF that "Jane Doe" emailed to chambers in this case mean that Ms. Cockson must have been involved? How does someone emailing a court referring to Ms. Cockson in the third person support an inference that Ms. Cockson agreed that they would do so? How does someone apparently investigating Mr. Boyer

-38-

mean that Ms. Cockson must have agreed that they do so? Mr. Hopwood offers nothing that supports a plausible inference that Ms. Cockson entered into an agreement with anyone, rather than third parties acting in ways that were allegedly improper for their own reasons.

### 2. Mr. Hopwood Fails to Allege an Agreement to Commit Unlawful Acts.

Nor is there anything to suggest an agreement to "to participate in an unlawful act, or a lawful act in an unlawful manner." *Vindman*, 2022 WL 16758575, at *6. In *Vindman*, for example, various administration officials criticized Lt. Col. Vindman vituperatively—but what mattered was whether they had agreed to *unlawful* acts, not lawful if distasteful or even unfair acts. "It is not enough for Vindman to allege that Defendants agreed to do something inappropriate," Judge Boasberg explained. *Id.* at *5. To the contrary, "a conspiracy must involve an agreement to do something unlawful, and so an agreement to lawfully injure a person (say, by publishing their old embarrassing writings or halting donations to their campaign) cannot form the basis for one." *Id.* at *6.

Mr. Hopwood's complaint consistently fails to distinguish between lawful and unlawful acts. An agreement to criticize Mr. Boyer for assisting a convicted abuser, for example, would generally be lawful, even if Mr. Boyer or Mr. Hopwood might view it as unfair; while Mr. Boyer is not a lawyer, there is a long history of people criticizing lawyers for representing unpopular clients. Much as in *Vindman*, even if some of that criticism is vituperative or unfair, that does not mean that there is an agreement to use unlawful means. If there were an agreement to obtain a copy of pleadings before they are formally served, that would be lawful. Thus, even if Mr. Hopwood had adequately pleaded an agreement to do *something*, nothing in the complaint alleges in more than bare conclusory terms that Ms. Cockson agreed with a third party to do *something unlawful*.

As it is, Mr. Hopwood's complaint falls at both hurdles. The allegations that Ms. Cockson agreed with unnamed third parties to do *anything* are conclusory and defy logic and obvious alternate explanations; the allegations that Ms. Cockson agreed with the unnamed third parties to undertake *illegal* acts are thinner still.

> **3.     Mr. Hopwood Cannot Sue for Harm to Mr. Boyer and Fails to Allege Cognizable Injury to Himself Beyond the Defective Defamation Claims.**

The messages Mr. Boyer claims to have received from third parties are certainly disturbing, but Mr. Hopwood fails to show how they harmed him. As a matter of standing, the District of Columbia Court of Appeal "generally has required a litigant to 'assert his own legal rights and interests; he cannot rest his claim to relief on the legal rights or interests of third parties.'" *Nicdao v. Two Rivers Pub. Charter Sch., Inc.*, 275 A.3d 1287, 1291 (D.C. 2022). That is why, for example, members of a charity could not assert claims against the directors for purportedly harming the charity; the claim legally belonged to the charity, not to individual members. *Bronner v. Duggan*, 364 F. Supp. 3d 9, 19 (D.D.C. 2019), *aff'd*, 962 F.3d 596 (D.C. Cir. 2020). The rare exceptions require, among other things, "(1) an injury in fact to the litigant bringing the claim, (2) a close relationship between the litigant and the third party, and (3) some hindrance to the third party's ability to protect his or her own interests." *Nicdao*, 275 A.3d at 1292. That test plainly is not satisfied here; Mr. Boyer is plainly capable of protecting his own interests.

The Third Amended Complaint fails to identify legal rights that belong to Mr. Hopwood, as opposed to Mr. Boyer. Mr. Hopwood repeatedly contends that Mr. Boyer's work as his "power of attorney" in litigating this suit is being interfered with. But there is no right to have a layperson conduct litigation on one's behalf. *Wheat v. United States*, 486 U.S. 153, 159 (1988) ("Regardless of his persuasive powers, an advocate who is not a member of the bar may not

-40-

represent clients (other than himself) in court."). Calling a layperson one's "attorney-in-fact" or "power of attorney" does not change the fact that it is illegal for a non-lawyer to represent anyone other than themselves in court or to practice law. *Jones v. Brooks*, 97 A.3d 97, 104 (D.C. 2014) ("Although a valid power of attorney authorized Ayanna Brooks to act on her mother's behalf as the client in an attorney-client relationship, her appearing in court in a representative capacity likely violated both our rule and the Superior Court's rule prohibiting the unauthorized practice of law."); *see also Weber v. Garza*, 570 F.2d 511, 514 (5th Cir. 1978); *Powerserve Int'l, Inc. v. Lavi*, 239 F.3d 508, 514 (2d Cir. 2001); *Williams v. United States*, 477 F. App'x 9, 11 (3d Cir. 2012). And, at any rate, Mr. Boyer still appears to be "representing" Mr. Hopwood just fine despite the bizarre messages he received.

Likewise, even if Mr. Hopwood was distressed by the messages sent to his friend, a third party cannot recover damages for emotional distress if he was not in a zone of physical danger— and even then, only if he "fear[ed] for [his] own safety." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 798 (D.C. 2011). Otherwise, the only harm Mr. Hopwood seems to suggest is that he thinks he will be impaired in obtaining justice for his defamation claims but, as explained above, all of those claims fail as a matter of law anyway.

### 4. Mr. Hopwood Fails to Allege an Underlying Tort for the Common Law Conspiracy Claim.

At any rate, Mr. Hopwood's common law conspiracy claim fails because under D.C. law, a "conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort." *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983). Where none of the "'predicate' claims that could support conspiracy liability survive Defendant's motion to dismiss . . . the Court will dismiss his conspiracy claim too." *Herzfeld v. Barmada*, 2025 WL 2220010, at *10 (D.D.C. Aug. 5, 2025) (quoting *Bey v. WMATA*, 341 F.

-41-

Supp. 3d 1, 22–23 (D.C. 2018)). *See*, *e.g.*, *Findlay v. CitiMortgage, Inc.*, 813 F. Supp. 2d 108, 122 (D.D.C. 2011) ("Because the Court has already dismissed the plaintiff's negligence claim, that claim cannot serve as the 'underlying tort' for her civil conspiracy claim. . . . Accordingly, the plaintiff's civil conspiracy claim must be dismissed.").

But here, Mr. Hopwood does not identify any particular underlying tort beyond the deficient defamation claims, which Mr. Hopwood seems to concede had already occurred by the time of the third parties' conduct directed at Mr. Boyer. Because each respective underlying tort that could conceivably serve as a basis for Mr. Hopwood's civil conspiracy claim is defective, the conspiracy claim must be dismissed too.

To the extent that Mr. Hopwood instead intends to allege that the unnamed third parties were committing torts against him and that Ms. Cockson should be held jointly liable for those torts, Mr. Hopwood does not specify what torts they are. To the contrary, some of the conduct he identifies—such as emailing a court and prosecutors—is generally immune from liability under doctrines such as absolute or qualified privilege and under the First Amendment's speech and petition clauses. *See Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011) ("[T]he Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes."). And not all wrongs are privately actionable; District of Columbia law does not turn a rule that can be enforced only by the government into a private tort claim merely because of conclusory allegations that two people agreed to do it.

### 5. Mr. Hopwood's Witness Intimidation Conspiracy Claims Likewise Fail for Numerous Reasons.

Finally, to state a claim under 42 U.S.C. § 1985(2), a plaintiff must allege "(1) a conspiracy between two or more persons, (2) to deter a witness by force, intimidation or threat

from attending court or testifying freely, fully, and truthfully in any pending matter, which (3) results in injury to the plaintiff." *Knowlton v. United States*, 111 F. Supp. 2d 1, 7 (D.D.C. 1999). The "conspiracy" required for Section 1985 liability includes "all of the general elements of a civil conspiracy"—that is, "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Vindman*, 2022 WL 16758575, at *5.

The TAC here fails for numerous independent reasons.

***Unlawful Agreement*.** To start, for the reasons discussed above, Mr. Hopwood fails to allege *any* agreement, let alone one to do something illegal. Much as in *Vindman*, Mr. Hopwood fails to allege enough facts from which this Court could plausibly infer that Ms. Cockson agreed with someone else to intimidate Mr. Boyer, as opposed to the much more obvious explanation that the anonymous individual or individuals were doing so independently without Ms. Cockson's agreement.

***Injury Caused by Unlawful Overt Act*.** Likewise, as *Vindman* notes, a civil conspiracy claim under Section 1985 requires that the plaintiff "also must prove that an unlawful overt act" by a member of the conspiracy trying to further the conspiracy "produced an injury and damages." *Id.* at *9. "[L]awful acts cannot satisfy this element." *Id.* And, where Section 1985(2) liability is sought based on alleged reputational harm from speech, the usual constitutional limits on libel claims apply. *Sculimbrene v. Reno*, 158 F. Supp. 2d 8, 18 (D.D.C. 2001) (rejecting Section 1985(2) claims based on criticism of FBI agent's testimony at a trial). The required injury, moreover, requires "injury to the claimant" himself. *Herrera v. Scully*, 815 F. Supp. 713, 726 (S.D.N.Y. 1993). The alleged injury must thus be to the plaintiff bringing the claim, and not

-43-

any third party. *See Tripp v. Exec. Office of the President*, 200 F.R.D. 140, 149–50 (D.D.C. 2001) (collecting cases). So, Mr. Hopwood must plausibly plead that he was harmed by illegal acts—not merely distasteful ones—and that those acts were in furtherance of the conspiracy. But for the reasons discussed above, Mr. Hopwood fails to plead any legally cognizable damage *to himself* (rather than Mr. Boyer), let alone that any such conduct was in furtherance of the conspiracy and itself illegal.

***Testimony or Attendance.*** Section 1985(2) is limited to "direct violations of a party or witness's right to attend or testify in federal court." *Arroyo-Torres v. Ponce Fed. Bank, F.B.S.*, 918 F.2d 276, 279 (1st Cir. 1990); *see also Brown v. Chaffee*, 612 F.2d 497, 502 (10th Cir. 1979) ("[T]he statute clearly indicates that a conspiracy under the first part must be one directly affecting, in the context of this case, the act of testifying as a witness."). It does not, for example, provide a private right of action for perjury or spoliation. *Brawer v. Horowitz*, 535 F.2d 830, 840 (3d Cir. 1976); *Traudt v. Lebanon Police Dep't*, 775 F. Supp. 3d 633, 638 (D.N.H. 2025). Nor is being "hampered in being able to present an effective case" enough to trigger liability without more. *Tripp*, 200 F.R.D. at 150 (citing *Blankenship v. McDonald*, 176 F.3d 1192 (9th Cir. 1999)). And courts have consistently held that "'filing papers' does not constitute 'attending' within meaning of § 1985(2)." *Herrera*, 815 F. Supp. at 726. Much of Mr. Hopwood's claim, however, does not allege that witnesses were scared off from testifying, but rather that he is worried that Mr. Boyer will stop "representing" him in drafting and filing papers or generally that he is being retaliated against for having filed suit. Neither of those is testimony or attendance.

### F.    The Third Amended Complaint Should Be Dismissed With Prejudice.

A case may be dismissed with prejudice "where a plaintiff is given multiple opportunities to amend his complaint, yet repeatedly fails to state a claim." *Rubio v. D.C.*, 2024 WL 4957373,

-44-

at \*5 (D.D.C. Dec. 3, 2024), *aff'd*, 2025 WL 1189459 (D.C. Cir. Apr. 22, 2025). *See also Powers v. U.S. Dep't of Just.*, 646 F. Supp. 2d 153, 155 (D.D.C. 2009) (dismissing pro se complaint with prejudice after plaintiff "was given an opportunity to correct . . . deficiencies but failed to do so"). Plaintiff has now had *three* bites at the apple to adequately plead his allegations, including one after seeking Ms. Cockson's motion to dismiss. He has failed to do so at each turn, and should not be afforded a *fourth* bite.

## IV.    CONCLUSION

For the foregoing reasons, this case should be dismissed in its entirety with prejudice.

Dated: May 28, 2026                                      Respectfully submitted,


   */s/ Joseph M. Sanderson*
Michelle S. Kallen (Bar No. 1030497)
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036-1795
Telephone:        202 429 3000
Facsimile:        202 429 3902
mkallen@steptoe.com

Joseph M. Sanderson (Bar No. NY0560)
STEPTOE LLP
1114 Avenue of the Americas
New York, NY  10036-7703
Telephone:        212 506 3900
Facsimile:        212 506 3950
josanderson@steptoe.com


*Attorneys for Defendant*

-45-