**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SHON ROBERT HOPWOOD
DCDC#: 374088
Central Detention Facility
1901 D Street, S.E.
Washington, DC  20003,

        Plaintiff,

   v.

JILL COCKSON
1519 Cherry Street
Kansas City, MO  64108,

        Defendant.

Civil Action No. 1:25-cv-04214-SLS

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR SANCTIONS**

**TABLE OF CONTENTS**

I.   Introduction...........................................................................................................................1

II.  Background............................................................................................................................4

    A.   Amid Mr. Hopwood's Trial for Abusing Ms. Metzner Hopwood, Ms. Cockson Speaks Online About Her Experiences Decades Ago.........................................................4

    B.   In July 2024, Ms. Cockson Receives Messages from Columnist Chandra Bozelko But Declines to Engage Further with Ms. Bozelko................................................................5

    C.   Mr. Hopwood Sues Ms. Cockson and Ms. Metzner Hopwood Tells Ms. Cockson About It. ................................................................................................................................6

    D.   Mr. Boyer's Account of the Events of December 10, 2025...........................................6

        1.   Ms. Bozelko's Midnight Messages to Mr. Boyer. ...........................................6

        2.   Mr. Boyer Receives Disturbing Anonymous Messages. ..................................7

        3.   Mr. Boyer Claims That Ms. Bozelko Says She Also Received Texts from the Same Number. ..........................................................................................................7

        4.   Ms. Bozelko Emails A PDF to this Court's Chambers Calling Mr. Hopwood's Compliant a "Misrepresentation" of Her Actions.................................................8

        5.   Mr. Boyer Receives an Email Allegedly Impersonating a USA Today Journalist That He Says Attached Ms. Bozelko's Letter. ......................................................9

    E.   What Ms. Cockson Was Actually Doing on December 10, 2025. .................................9

    F.   An Anonymous Email Address Set to Eastern Time Emails the Judge and Prosecutors in Mr. Hopwood's Criminal Case. .......................................................................................10

    G.   The Anonymous Email Address Attempts to Guess Ms. Cockson's Email Address, Sending an Email to Two Variants of Her Name. ...........................................................11

    H.   The Anonymous Email Address Forwards Ms. Cockson Two Documents It Received from Ms. Bozelko.............................................................................................................11

    I.   A Stranger Apparently Photographs Mr. Boyer's Front Door.......................................12

    J.   Mr. Boyer, In Mr. Hopwood's Name, Submits a Third Amended Complaint and Sanctions Motion Speculating that Ms. Cockson Is Secretly Organizing All of This............12

III.  Argument .............................................................................................................................12

    A.   Because There Will Be No Witness Testimony if this Case is Dismissed on the Pleadings, This Court Should Deny or Defer Consideration of this Motion Until After It Decides the Motion to Dismiss. ......................................................................................13

    B.   Because Mr. Hopwood Facially Fails to Present Clear and Convincing Evidence that Ms. Cockson Committed Bad Faith Misconduct, This Court Should Deny the Motion. . 15

1.    Speculation and Hearsay Cannot Satisfy Mr. Hopwood's Burden to Show By Clear and Convincing Evidence that Ms. Cockson Was Behind Any of these Actions, Acted in Bad Faith, or that the Anonymous Person's Actions Actually Affected this Case................ 15

2.    Ms. Cockson Provided A Detailed Declaration Specifically Denying Mr. Hopwood's Speculation.............................................................................................................. 17

3.    Mr. Hopwood Relies on Speculation, "Information and Belief," and Ignoring Obvious Alternative Explanations That Point to Someone Else As The Anonymous Sender............ 17

4.    Independently, Mr. Hopwood Also Fails to Show Any Actual Disruption to His Ability to Prove Any Fact That Matters to the Merits of this Case. ................................................. 21

C.    Rule 11 Sanctions Are Unavailable Because There Was No Signed Paper and No Safe Harbor Notice.................................................................................................... 22

D.    While Mr. Hopwood Has Not Shown "Exceptional Circumstances" to Justify Discovery on His Motion, if the Court Decides That Framed Discovery and an Evidentiary Hearing are Necessary, Ms. Cockson Will Take Discovery Too. .......................................... 22

E.    If the Court Permits Mr. Hopwood to Take Discovery, It Should Closely Monitor It To Ensure Mr. Hopwood Does Not Use It As an Excuse to Further Harass Ms. Metzner Hopwood. ............................................................................................................... 23

F.    Mr. Hopwood Has No Authority to Demand that Ms. Cockson Not Speak to His Soon-to-be-Ex-Wife and Victim. ............................................................................... 24

G.    Mr. Hopwood and Mr. Boyer Should Explain Why Their Motion Appears to Contain Hallucinated Citations and Quotes and Provide Their Generative AI Logs. ............. 25

IV.   Conclusion ............................................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. F.B.I.*,
541 F. Supp. 2d 274, 304 (D.D.C. 2008) ................................................................................13

*Am. Hospital Ass'n v. Sullivan*,
938 F.2d 216 (D.C. Cir. 1993) ...............................................................................................26

*Bozelko v. Arnone*,
No. 3:16CV1341 (MPS), 2017 WL 2802718 (D. Conn. June 28, 2017) ..................................5

*In re Brican Am. LLC Equip. Lease Litig.*,
977 F. Supp. 2d 1287, 1296 (S.D. Fla. 2013) .........................................................................16

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) ................................................................................................................13

*Compton v. Alpha Kappa Alpha Sorority Inc.*,
938 F. Supp. 2d 103 (D.D.C. 2013) .......................................................................................14

*Indianapolis Colts v. Mayor & City Council of Baltimore*,
775 F.2d 177 (7th Cir. 1985) .................................................................................................22

*Jones v. Brooks*,
97 A.3d 97 (D.C. 2014) .........................................................................................................14

*Kalwasinski v. Ryan*,
No. 96-CV-6475, 2007 U.S. Dist. LEXIS 68736 (W.D.N.Y. Sep. 12, 2007) ........................25

*Landon v. Hunt*,
938 F.2d 450 (3d Cir. 1991) ..................................................................................................22

*Pinson v. U.S. Dep't of Just.*,
No. CV 18-486 (RC), 2023 WL 2708815 (D.D.C. Mar. 30, 2023) ...................................16, 21

*Riley v. City of New York*,
2015 U.S. Dist. LEXIS 16025 (E.D.N.Y., Feb. 10, 2015) .......................................................26

*Rivera v. Mr. Z Towing, Inc.*,
No. CV 12-3963 (SLT)(MDG), 2016 WL 6495364 (E.D.N.Y. Sept. 9, 2016) .......................16

*Saidi v. Saqr*,
No. 6:18-cv-1338-Orl-40GJK, 2019 U.S. Dist. LEXIS 227913 (M.D. Fla. Feb.
20, 2019) ...............................................................................................................................25

*Shepherd v. Am. Broadcasting Cos., Inc.*,
62 F.3d 1469 (D.C. Cir. 1995) ........................................................................................13, 16

*State v. Bozelko*,
119 Conn. App. 483, 987 A.2d 1102 (2010) ..........................................................................5

*Synergetics, Inc. v. Hurst*,
No. 4:04CV318 CDP, 2007 U.S. Dist. LEXIS 61286 (E.D. Mo. Aug. 21,
2007) ....................................................................................................................................25

*Torres v. Wells Fargo Bank, N.A.*,
2019 U.S. Dist. LEXIS 227713 (C.D. Cal., Dec. 17, 2019) ................................................25

*Ty Inc. v. Softbelly's Inc.*,
517 F.3d 494 (7th Cir. 2008). ECF No. 21 ..........................................................................26

*United States v. Vasilakos*,
508 F.3d 401 (6th Cir. 2007) ...............................................................................................26

*W. T. Grant Co. v. Haines*,
531 F.2d 671 (2d Cir. 1976).................................................................................................14

*United States ex rel. Westrick v. Second Chance Body Armor, Inc.*,
893 F. Supp. 2d 258 (D.D.C. 2012) .....................................................................................15

*Wheat v. United States*,
486 U.S. 153 (1988)..............................................................................................................14

*Young v. Office of the United States Senate Sergeant at Arms*,
217 F.R.D. 61 (D.D.C. 2003)................................................................................................26

## Other Authorities

Fed. R. Civ. P. 11...........................................................................................................................22

## I.  INTRODUCTION

Mr. Hopwood's motion seeks extraordinary sanctions based on an extraordinary theory, but he offers little evidence to support it and no plausible basis to attribute the anonymous communications at issue to Ms. Cockson, as opposed to any number of other individuals.

Ms. Cockson did not send them, nor did she ask anyone to send them. She does not know who sent the messages. The undisputed facts underscore the absence of any connection between Ms. Cockson and the alleged communications:

- Ms. Cockson has never, directly or indirectly, communicated with Mr. Boyer, told anyone else to do so, or suggested that anyone do so.

- Ms. Cockson does not know who controls the anonymous Gmail and Yahoo accounts, which first contacted Ms. Cockson after the messages Mr. Boyer received and after that anonymous email address emailed the judge in Mr. Hopwood's criminal trial.

- The anonymous email address appears to have guessed Ms. Cockson's email address because the first message was sent to multiple Gmail accounts with variants of her name.

- The anonymous email address appears based in the Eastern time zone while Ms. Cockson lives in the Central time zone.

- Ms. Cockson does not know who the individual on Mr. Boyer's Ring camera is or why he was there.

Ms. Cockson provides a detailed declaration unequivocally denying Mr. Hopwood's allegations.

Mr. Hopwood admits that his motion is based on "information and belief" and his "belief"—unsupported by actual evidence—that Ms. Cockson was secretly behind these actions. What follows is a chain of speculation, attributing anonymous conduct to Ms. Cockson without

proof and sustained only by increasingly elaborate theorizing about unnamed accomplices. The law does not permit sanctions on that basis. This motion should be denied for numerous reasons.

*First*, Mr. Hopwood's complaint—which repeats the same baseless allegations against Ms. Cockson—does not state a claim in the first place and the entire case (motion for sanctions and all) should be dismissed. Mr. Hopwood, a high-profile convicted bank robber, abuser, and obstructor of justice, does not state a claim against someone who called him a narcissist and sociopath. That is particularly true where, as here, the plaintiff is a public figure—an author who has appeared on *60 Minutes* and before Congress and at White House bill signings. A court's inherent authority powers are limited to protecting the integrity of the proceedings before it, so if there are no longer any proceedings, the messages to Mr. Boyer can be left to the appropriate authorities (whom Mr. Boyer says he has already contacted) rather than requiring this Court's intervention.

*Second*, if the Court is inclined to address the motion now, the motion must be denied. It presents no actual evidence that Ms. Cockson is behind the improper messages to Mr. Boyer— just speculation and "information and belief." That is facially insufficient to meet the high burden of clear and convincing evidence that a party committed bad-faith misconduct for sanctions pursuant to the Court's inherent authority (let alone terminating sanctions). Rule 11 applies to submissions to courts, not to other forms of misconduct, and Mr. Hopwood has not followed Rule 11's safe harbor procedure in any event.

*Third*, if the Court does not deny the motion as facially insufficient (it should), Ms. Cockson's unequivocal denials, at the very least, require an evidentiary hearing and Ms. Cockson is entitled to discovery to prepare for that hearing and disprove Mr. Hopwood's allegations against her. Ms. Cockson would seek, for example, subpoenas to attempt to unmask the

anonymous texter and email accounts, production of the original messages screenshotted in the declarations for forensic analysis, Mr. Boyer's AI logs relating to this case (including the "AI authorship analysis" he mentions), and depositions of Plaintiff's declarants, including Mr. Hopwood, Mr. Boyer, and Samantha Hopwood.

*Fourth*, as for Mr. Hopwood's request that Ms. Cockson be enjoined from speaking to his soon-to-be-ex-wife Ms. Metzner Hopwood, it is a plainly inappropriate attempt for Mr. Hopwood to use this Court's process to continue to coerce his victim. Ms. Metzner Hopwood is an autonomous human being, capable of deciding for herself whether and with whom she wishes to communicate. If she does not wish to speak to Ms. Cockson, she can decline to do so. Mr. Hopwood has already been convicted of offenses involving efforts to control and manipulate Ms. Metzner Hopwood, including stealing her phone, hitting her, and threatening child custody to scare her out of testifying at his criminal trial. This Court should not allow its process to be used to impose restrictions that echo the very conduct underlying Mr. Hopwood's convictions.

*Finally*, Ms. Cockson notes that several cases cited in Mr. Hopwood's brief either consist of the name of one case and the citation of another, do not stand for the same proposition for which they are cited, or do not contain the text Mr. Hopwood places in quotation marks. Given Mr. Boyer's statement that he has used AI, Ms. Cockson is concerned that these cases are hallucinations of a generative predictive text algorithm used to prepare Mr. Hopwood's brief and declarations. Mr. Hopwood is a trained attorney,[1] and ought to know the importance of verifying the cases he cites. Ms. Cockson respectfully requests that the Court order Mr. Hopwood and Mr. Boyer to explain how these fictitious cases came to be cited in the brief, including, if generative predictive text algorithms were used, producing copies of the prompts related to this action.

---

[1] Albeit suspended due to his convictions.

Ms. Cockson is a bar owner in Kansas City. She spoke up to warn people about her experiences with Mr. Hopwood back in high school and to support his victim. For that, Mr. Hopwood has sought to punish her with a baseless defamation lawsuit and now a baseless conspiracy theory, much as he tormented Ms. Metzner Hopwood. It is time for Mr. Hopwood's abuse of the legal system to stop.

## II.    BACKGROUND

### A.    Amid Mr. Hopwood's Trial for Abusing Ms. Metzner Hopwood, Ms. Cockson Speaks Online About Her Experiences Decades Ago.

Shon Hopwood, Ann Marie ("Annie") Metzner Hopwood, Samantha Hopwood, and Jill Cockson all come from the small farm town of David City, Nebraska. Cockson Decl. ¶ 6. When Ms. Cockson was approximately 13, she met Mr. Hopwood and dated him for about a year and a half when she was around 14 to 15 and Mr. Hopwood was around 15 to 16. *Id.* ¶ 7. Mr. Hopwood was a star basketball player and got away with a lot of bad behavior, which Ms. Cockson began to notice more as she recovered from a serious car accident. *Id.* ¶ 8. After he and Ms. Cockson broke up, Mr. Hopwood spread hurtful rumors about her at school. *Id.* ¶ 9. Mr. Hopwood later dropped out of college, joined the Navy, and sent Ms. Cockson letters apologizing for how he had treated her and claiming to have found religion. *Id.* ¶ 11. After Ms. Cockson discovered that Mr. Hopwood was sending letters to multiple women, she stopped communicating with him. *Id.* ¶ 12.

A few years later, Ms. Cockson was unexpectedly contacted by one of Mr. Hopwood's high school friends who expressed regret for the rumor campaign and for having been involved with Mr. Hopwood. *Id.* ¶ 13. The context for that outreach became clear when Mr. Hopwood and his friend were arrested for bank robberies, pleaded guilty, and were sentenced to significant prison terms. *Id.*

After Mr. Hopwood's release, he again claimed to have found religion. He became a high-profile figure in the criminal justice reform movement, clerking on the D.C. Circuit, testifying before Congress, and appearing at White House bill signings. To Ms. Cockson, the way he framed his story of having found religion and how he talked about his claimed redemption seemed eerily familiar—precisely how he had sought to manipulate her when he was in the Navy before his bank robbery spree. *Id.* ¶ 14. Ms. Cockson did not trust Mr. Hopwood's claims to be a changed man.

Mr. Hopwood was eventually arrested again and convicted—this time for abusing his wife, Ann Marie Metzner Hopwood. Though Ms. Cockson was not particularly close with Ms. Metzner Hopwood growing up, she let Ms. Metzner Hopwood know that she believed and supported Ms. Metzner Hopwood. *Id.* ¶ 18. Ms. Cockson posted on social media about her experiences with Mr. Hopwood. She also managed to take a few days off from her work to watch parts of Mr. Hopwood's criminal trial. *Id.*

### B.    In July 2024, Ms. Cockson Receives Messages from Columnist Chandra Bozelko But Declines to Engage Further with Ms. Bozelko.

In July 2024, Ms. Cockson received messages from Chandra Bozelko, who described herself as a journalist "looking into Shon." *Id.* ¶ 19 & Ex. 1.[2]

Ms. Cockson asked Ms. Bozelko who she worked for, and Ms. Bozelko said she worked for the Washington Post's local opinions desk. *Id.* She claimed that "gtown profs are rallying around" Shon and that coverage "had been too easy on him and ignored" Ms. Metzner Hopwood. *Id.* After Ms. Cockson was unwilling to say anything that she had not already said publicly and

---

[2] Ms. Bozelko rose to prominence after she wrote a column called *Prison Diaries* while incarcerated following convictions for credit card fraud, identity theft, and pleading no-contest to charges of using spoofed telephone numbers to tamper with jurors in the trial. *See Bozelko v. Arnone*, No. 3:16CV1341 (MPS), 2017 WL 2802718, at *7 (D. Conn. June 28, 2017); *State v. Bozelko*, 119 Conn. App. 483, 486, 987 A.2d 1102, 1105 (2010).

to only contact her in writing, Ms. Bozelko nonetheless asked for a call and said she would tell

Ms. Cockson what she had heard from others but "[y]ou don't have to say shit." *Id.* Ms. Bozelko

then told Ms. Cockson that "many reporters want to cover this up or take his side." *Id.* Ms.

Cockson felt pressured and found the conversation odd. *Id.*

Later, Ms. Cockson discovered that Ms. Bozelko was Facebook friends with

Mr. Hopwood and had criminal convictions for credit card fraud, identity theft, and jury

tampering, so she felt suspicious of Ms. Bozelko and did not engage further with her after that.

*Id.* ¶ 20.

### C. Mr. Hopwood Sues Ms. Cockson and Ms. Metzner Hopwood Tells Ms. Cockson About It.

In early December 2025, Mr. Hopwood filed this lawsuit. ECF No. 1. The same day, Mr.

Boyer—who calls himself Mr. Hopwood's "attorney-in-fact" but is not a lawyer and appears to

be preparing all of Mr. Hopwood's papers in this case—emailed Ms. Metzner Hopwood's

divorce attorney with a copy of the complaint, told her that Mr. Hopwood intended to use this

action to seek evidence from her, and told her to preserve her communications with Ms.

Cockson. Ms. Metzner Hopwood then told Ms. Cockson she was being sued. Cockson Decl.

¶ 21. She was served on December 5, 2025.

### D. Mr. Boyer's Account of the Events of December 10, 2025.

According to Mr. Boyer's declaration, various events—of which Ms. Cockson has no

knowledge—occurred in short succession on December 10, 2025.

#### 1. Ms. Bozelko's Midnight Messages to Mr. Boyer.

First, just after midnight, Mr. Boyer received messages from Ms. Bozelko. Ms. Bozelko

wrote at 12:06 AM Eastern Time "I'm sure you heard what happened. I blame you for this[.]"

Boyer Decl. Ex. 2C. At 12:29 AM, Ms. Bozelko followed up: "And you're such a coward you can't say shit." *Id.*

### 2.    Mr. Boyer Receives Disturbing Anonymous Messages.

Second, that afternoon, starting around 3:31 PM Eastern Time, Mr. Boyer received disturbing text messages from an anonymous phone number with a Pennsylvania area code that appears to be from a Voice-over-IP (VoIP) provider. Boyer Decl. Ex. 2A. The messages claimed to be from a process server and repeatedly asked when Mr. Boyer will be home, mentioned his address, told him "you may want to run but I'll find you," called him a junkie, and claimed to have pictures with his children and buying drugs and alcohol. *Id.* Mr. Boyer contacted the police. *Id.* One of the last messages mentions "Doc Metzner," presumably a reference to Ms. Metzner's father, a veterinarian; Ms. Cockson recalls some of Dr. Metzner's own generation in David City referring to him that way, Cockson Decl. ¶ 16, and the *Lincoln Journal Star* has referred to Dr. Metzner by that nickname, Sanderson Decl. Ex. 6.

Ms. Cockson **unequivocally denies** sending Mr. Boyer these messages, telling anyone to send these messages, or in any way suggesting that anyone send these messages. Cockson Decl. ¶ 35. She does not know who sent the messages. *Id.* Ms. Cockson has never spoken to or sent any messages to Mr. Boyer. *Id.* ¶ 3, 35.

### 3.    Mr. Boyer Claims That Ms. Bozelko Says She Also Received Texts from the Same Number.

Mr. Boyer says that he contacted Ms. Bozelko about these messages, and that she claimed to have received messages from the same number at 1:17 PM Eastern Time saying that there is a "group" of "gtown" "alum[s]" and "ex faculty" that dislike Mr. Hopwood. Boyer Decl. Ex. 4A.

Mr. Boyer and Samantha Hopwood say that they had telephone conversations with Ms. Bozelko later on in which they claim she suggested that she suspected Ms. Cockson of sending the texts, but Ms. Bozelko has not provided a declaration to that effect; Mr. Boyer's and Samantha Hopwood's declarations paraphrase some of Ms. Bozelko's supposed speculation—all hearsay—about the source of texts she claims she received.

Ms. Cockson **unequivocally denies** sending Ms. Bozelko these texts—or any texts, for that matter—or knowing who sent those texts, or, for that matter, if the screenshot of purported texts that Mr. Boyer says that Ms. Bozelko sent him is authentic. Cockson Decl. ¶¶ 3, 36.

### 4. Ms. Bozelko Emails A PDF to this Court's Chambers Calling Mr. Hopwood's Compliant a "Misrepresentation" of Her Actions.

At some point the same day, Ms. Bozelko appears to have emailed this Court's chambers email address. Boyer Decl. Ex. 5. Ms. Bozelko requested that this Court place her letter on the docket because, she said, "my name appears in a complaint filed in the above-referenced matter, and the statements made about me misrepresent my actions and involvement." *Id.* Ms. Bozelko claimed that Mr. Boyer had promised to remove references to her and then did not do so. *Id.* She wished, she said, "to clarify to the public that I do not endorse or agree with the statements attributed to me in the complaint." *Id.* The letter copied Mr. Hopwood's criminal defense attorney, Mr. Hopwood, and Mr. Boyer. *Id.* Mr. Boyer observes that both the letter and the anonymous text messages he received that same day use his middle initial, which he says is uncommon, and theorizes that the text message sender must have seen the letter before sending the text messages. Boyer Decl. ¶¶ 21-22.

Notwithstanding Ms. Bozelko's request that the letter be docketed, a review of this Court's electronic docket indicates that it does not appear to have been filed on the Court's docket for this case until it was attached to Mr. Boyer's declaration.

**5.      Mr. Boyer Receives an Email Allegedly Impersonating a USA Today Journalist That He Says Attached Ms. Bozelko's Letter.**

Next, Mr. Boyer claims that at 7:07 PM Eastern Time he received an email from a Gmail address purporting to be a USA Today editor named Eileen Rivers, with a follow-up email a few minutes later. Boyer Decl. Ex. 2B. Mr. Boyer's declaration claims that, although the version of the email he attaches does not show this, the original email in the thread attaches Ms. Bozelko's letter to this Court's Chambers. Boyer Decl. ¶¶ 42-43.

Mr. Boyer theorizes that the PDF copy of the email came not from Ms. Bozelko, Mr. Madsen, or Mr. Boyer, but rather on "information and belief" from some unknown individual working with Ms. Cockson who somehow obtained the exact PDF Ms. Bozelko sent from the Clerk of Court's Office in person—despite the email having been sent to a chambers email address rather than the Clerk of Court. Boyer Decl. ¶ 19.

Ms. Cockson **unequivocally denies** that she sent these messages or knows who the purported Eileen Rivers is. Cockson Decl. ¶ 3.

**E.      What Ms. Cockson Was Actually Doing on December 10, 2025.**

Ms. Cockson absolutely and unequivocally denies having any involvement in or contemporaneous knowledge of any of this. To the contrary, she was working a very long day— as recorded in her nightly report sheets and calendar, she was at one of her bars receiving orders from suppliers from around 10:30 AM to around 3 PM Central Time, and then went straight to one of her other bars and worked the bar until 2 AM Central Time. Cockson Decl. ¶ 24.

One unusual thing did happen that day. Ms. Cockson received an email from a friend, who runs an immigration law firm in Kansas City, at 10:38 AM Central Time forwarding a message that she received from Ms. Bozelko at 10:11 AM Central Time entitled "If possible, please pass to Jill Cockson re lawsuit by Shon Hopwood." Cockson Decl. Ex. 2. Much as Ms.

Bozelko's had done in her letter to the Court that same day, Ms. Bozelko complained about "misrepresentations about me" in the complaint and Mr. Boyer breaking his promise to her "to correct them." *Id.* Ms. Bozelko noted that Ms. Cockson had told Ms. Bozelko in July 2024 that she did not want to speak to her but said she wanted to share "the truth" that "Mr. Hopwood and/or Mr. Boyer are not telling the truth here; I don't know which one is responsible for the complaint." *Id.* "The contents of the complaint," she continued, "are putting me in professional and personal jeopardy and I will not tolerate it." *Id.* The email continued with a statement regarding Ms. Bozelko's communications with Mr. Boyer and an offer to provide an affidavit. *Id.*

### F.    An Anonymous Email Address Set to Eastern Time Emails the Judge and Prosecutors in Mr. Hopwood's Criminal Case.

At approximately 10:42 AM Eastern Time on December 12, 2025, an anonymous email address calling itself justiceforjillcockson@gmail.com sent a lengthy email to, among others, Mr. Hopwood's former and current criminal defense lawyers, the judge presiding in Mr. Hopwood's criminal case, and two prosecutors on that case. Boyer Decl. Ex. 6. The email stated that Mr. Hopwood had filed this lawsuit that mentions public information about Ms. Cockson, asserts that she has various defenses, and then says that Mr. Hopwood is targeting Ms. Bozelko. *Id.*

The email's anonymous author claims to have spoken to Ms. Bozelko and claims that she told the email's author that Mr. Hopwood "turned on her because she will not lie for him," mentions Ms. Bozelko receiving "threatening texts," and relays a summary of Ms. Bozelko's communications with Mr. Boyer that largely mirrors Ms. Bozelko's letter to this Court two days prior. *Id.* The anonymous author claims that "[t]he defendant is literally placing Ms. Bozelko in harms way." *Id.* The author then indicates that "when he wanted an affidavit about something he told her she had no problem with it because it was true" and then says that "he's still trying to

-10-

destroy her" and that he is "specifically trying to get Bozelko to lie for him in the case against Jill." *Id.*

Mr. Boyer claims to have conducted an unspecified "AI analysis" that he says suggests that all these documents were written by the same person and to have spoken to an unnamed Alexandria police officer who thought the writers were the same. Boyer Decl. ¶ 41. Mr. Boyer does not attach the analysis or explain why it is a reliable methodology.

### G.    The Anonymous Email Address Attempts to Guess Ms. Cockson's Email Address, Sending an Email to Two Variants of Her Name.

Eleven minutes later, the same email address emailed two Gmail addresses containing Ms. Cockson's name—one was her actual email address and another was not—saying "Just seeing if this email works. We are fighting for you. Can't tell you who we are yet because the court is still allowing him to harass peoole [sic]." Cockson Decl. Ex. 3. The email forwarded the email that the anonymous author had sent a few minutes earlier—listing the time of the forwarded email in Eastern Time, which indicates that the Gmail account was located in the Eastern time zone. *Id.* Ms. Cockson, however, lives in Kansas City, so her email account is set to Central Time. Cockson Decl. ¶ 28 & Ex. 3.

### H.    The Anonymous Email Address Forwards Ms. Cockson Two Documents It Received from Ms. Bozelko.

A few days later, on December 17, 2025, Ms. Cockson received another email from the anonymous email address, this time forwarding a Google Drive link to PDFs of an order suspending Mr. Hopwood from the D.C. Bar and a letter firing Mr. Hopwood from Georgetown. Cockson Decl. Ex. 4. The anonymous email address appears to have received those documents from "aprisondiary@gmail.com," an email address that appears to correspond to Ms. Bozelko given her authorship of the *Prison Diary* column after she was convicted of credit card fraud and jury tampering. *Id.*

## I.    A Stranger Apparently Photographs Mr. Boyer's Front Door.

Mr. Boyer says that on January 4, 2026, an unknown man took a photograph of his front door. Boyer Decl. ¶ 60. He says—presumably based on what his landlord told him—that someone, whom he speculates is the same person, contacted his landlord and told the landlord he had heard from yet another person that Mr. Boyer was harassing Ms. Metzner Hopwood. *Id.* ¶ 61. Mr. Boyer's landlord has not submitted a declaration. Mr. Boyer then speculates about the "apparent" purpose of this unknown individual. *Id.* at ¶ 62. He also speculates that someone is following him around the neighborhood and surveilling him buying alcohol. *Id.* ¶ 67.

Ms. Cockson **unequivocally denies** telling anyone to photograph Mr. Boyer's door and has no idea who this man is or why he was apparently photographing the door. Cockson Decl. ¶ 37. Ms. Cockson has no idea who Mr. Boyer's landlord is or how one would contact him. *Id.* ¶ 5. Nor does Ms. Cockson know if anyone is surveilling Mr. Boyer or whether Mr. Boyer has bought alcohol. *Id.* ¶¶ 2-5.

## J.    Mr. Boyer, In Mr. Hopwood's Name, Submits a Third Amended Complaint and Sanctions Motion Speculating that Ms. Cockson Is Secretly Organizing All of This.

Mr. Boyer—who repeatedly admits that he is writing and signing Mr. Hopwood's papers in this action—has now filed a Third Amended Complaint and the present motion, citing his own beliefs that Ms. Cockson is behind all of this. Mr. Hopwood (or Mr. Boyer) asserts that terminating sanctions are appropriate and also seeks to enjoin Ms. Cockson from speaking to her friend Ms. Metzner Hopwood, and also seeks leave to serve subpoenas.

Ms. Cockson has moved to dismiss the complaint; that motion remains pending.

## III.    ARGUMENT

The text messages Mr. Boyer received are improper. But Ms. Cockson did not send them. Mr. Hopwood (or Mr. Boyer in Mr. Hopwood's name) cite no evidence other than their own

speculation to tie Ms. Cockson to any of this. Ms. Cockson, meanwhile, not only provides a detailed denial under penalty of perjury but also points to documentary evidence that strongly suggests the anonymous sender is located in a different time zone and found Ms. Cockson by guessing variants of her email address. Mr. Hopwood's speculation is facially insufficient and, at any rate, there is no need for this Court to address issues regarding potential witness testimony if this case is dismissed for failure to state a claim.

> **A.    Because There Will Be No Witness Testimony if this Case is Dismissed on the Pleadings, This Court Should Deny or Defer Consideration of this Motion Until After It Decides the Motion to Dismiss.**

To start, this Court should deny the motion or defer its consideration pending Ms. Cockson's motion to dismiss because Mr. Hopwood has not stated a claim in the first place. Fundamentally, this is a meritless defamation suit in which a high-profile serial violent criminal alleges his reputation has been harmed by his high school ex-girlfriend criticizing him on the internet. Mr. Hopwood's recent amendments to add claims mirroring this motion do not allow him to bootstrap a cause of action for conduct directed at someone else. Because this case should be dismissed on the pleadings, various anonymous people's actions cannot possibly interfere with testimony in this action—the sole reason why Mr. Hopwood asserts that it is a matter for *this* Court's inherent authority and not, say, between Mr. Boyer and the Alexandria Police Department.

This Court's inherent authority exists "to protect [its] integrity and prevent abuses of the judicial process." *Shepherd v. Am. Broadcasting Cos., Inc.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)). However, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. Thus "alleged misconduct by" a party "that does not bear on the Court's processes in this case is by its nature beyond the Court's inherent authority to sanction." *Alexander v. F.B.I.*, 541

F. Supp. 2d 274, 304 (D.D.C. 2008); *see also W. T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir. 1976) ("The business of the court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice here unless the questioned behavior taints the trial of the cause before it.").

Thus, courts often deny or defer motions seeking inherent authority sanctions when it is too early to tell if the conduct will matter to the course of the litigation. In *Compton v. Alpha Kappa Alpha Sorority Inc.*, for example, Judge Collyer denied without prejudice a sanctions motion arguing that a letter sent to members of the sorority telling them that the plaintiff had been expelled, allegedly because of the lawsuit, warranted witness tampering sanctions because the case was in the pleading stages and "the Court cannot predict what course this case will take." 938 F. Supp. 2d 103, 107 (D.D.C. 2013).

The same is true here. If there is no testimony in this case, there cannot possibly be interference with witnesses' testimony. Inappropriate as the anonymous message sender's conduct may be, absent that hook, it is a matter for Mr. Boyer and police, not this Court. To the extent that Mr. Hopwood *also* alleges Mr. Boyer has been deterred from representing him, Mr. Hopwood has no right to be represented by a non-lawyer in the first place, and it is self-evident from Mr. Boyer drafting this motion and a lengthy declaration that Mr. Boyer has continued to "represent" Mr. Hopwood. *See Wheat v. United States*, 486 U.S. 153, 159 (1988); *Jones v. Brooks*, 97 A.3d 97, 104 (D.C. 2014) ("Although a valid power of attorney authorized Ayanna Brooks to act on her mother's behalf as the client in an attorney-client relationship, her appearing in court in a representative capacity likely violated both our rule and the Superior Court's rule prohibiting the unauthorized practice of law.").

-14-

That is not to say that the text messages Mr. Boyer received are acceptable. They are not. But unless there will actually be testimony in this case, there will not be interference with the Court's process. Judicial efficiency thus counsels in favor of addressing the motion to dismiss first, since granting that motion would render it unnecessary to resolve the issues in this one.

**B.      Because Mr. Hopwood Facially Fails to Present Clear and Convincing Evidence that Ms. Cockson Committed Bad Faith Misconduct, This Court Should Deny the Motion.**

If the Court does address the motion now, it should deny it because Mr. Hopwood fails to present the clear and convincing evidence required to impose inherent authority sanctions, let alone the punitive sanctions such as default judgment, fines, and adverse inferences that Mr. Hopwood seeks. Fundamentally, all Mr. Hopwood offers is *speculation* that Ms. Cockson is somehow masterminding unknown third parties' actions. Particularly where Ms. Cockson has unequivocally denied those allegations under penalty of perjury and provided evidence that strongly suggests the anonymous sender is in a different time zone, Mr. Hopwood's bare speculation is not enough to justify discovery or a hearing on the motion.

**1.      Speculation and Hearsay Cannot Satisfy Mr. Hopwood's Burden to Show By Clear and Convincing Evidence that Ms. Cockson Was Behind Any of these Actions, Acted in Bad Faith, or that the Anonymous Person's Actions Actually Affected this Case.**

"In order to sanction conduct under [inherent] authority, the court must find, by clear and convincing evidence, that a party committed sanctionable misconduct that is tantamount to bad faith." *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 893 F. Supp. 2d 258, 268 (D.D.C. 2012) (quotation omitted). Where, as here, the movant seeks punitive sanctions such as default judgment and fines, the D.C. Circuit has been unequivocal that:

> "to promote the disposition of cases on their merits, to protect parties and attorneys from the possible misuse of the inherent power, and to preserve its effectiveness, . . a district court may use its inherent power to enter a default judgment only if it finds, first, by clear and

> convincing evidence—a preponderance is not sufficient—that the abusive behavior occurred; and second, that a lesser sanction would not sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the merits.

*Shepherd*, 62 F.3d at 1472.

A movant's bare belief that its opponent is engaging in misconduct or inadmissible hearsay fails to meet this exceptionally high bar. Courts consistently hold that a party's "belief" that a party engaged in witness tampering "is not enough but must be supported by evidence in the record." *In re Brican Am. LLC Equip. Lease Litig.*, 977 F. Supp. 2d 1287, 1296 (S.D. Fla. 2013), *report and recommendation adopted*, No. 10-MD-02183-PAS, 2013 WL 12092311 (S.D. Fla. Nov. 15, 2013). And "hearsay statements submitted by [a moving party] do not meet the evidentiary standard required to trigger the imposition of sanctions." *Rivera v. Mr. Z Towing, Inc.*, No. CV 12-3963 (SLT)(MDG), 2016 WL 6495364, at *3 (E.D.N.Y. Sept. 9, 2016). For example, Judge Contreras has denied a pro se prisoner's motion for witness tampering sanctions where supporting declarations "provide little detail" about the conduct of unspecified BOP officers, "lack detail and specificity" tying specific defendants to the alleged misconduct, and fail to "show[] that the alleged conduct . . . has had any effect on this case." *Pinson v. U.S. Dep't of Just.*, No. CV 18-486 (RC), 2023 WL 2708815, at *14 (D.D.C. Mar. 30, 2023), *appeal dismissed*, No. 24-5010, 2025 WL 4054806 (D.C. Cir. Sept. 19, 2025). There, in denying sanctions without an evidentiary hearing, Judge Contreras contrasted the declarations before him with cases where a witness with first-hand knowledge of the opposing party's involvement in the alleged misconduct testified to it—such as testimony from the party's accomplice admitting that the party knew what was going on or documents that a party admitted sending. *Id.*

-16-

**2.    Ms. Cockson Provided A Detailed Declaration Specifically Denying Mr. Hopwood's Speculation.**

Here, Ms. Cockson unequivocally refutes Mr. Hopwood's Speculation, providing a detailed denial of her involvement and evidence suggesting that the anonymous author is located in a different time zone and contacted her *after* the email to the judge and prosecutors by guessing her email address. Cockson Decl. ¶¶ 2-5, 27-29, 35-38 & Ex. 3. Ms. Cockson has no idea who the anonymous sender may be. Cockson Decl. ¶ 33 & Ex. 3.

**3.    Mr. Hopwood Relies on Speculation, "Information and Belief," and Ignoring Obvious Alternative Explanations That Point to Someone Else As The Anonymous Sender.**

By contrast, the entirety of Mr. Hopwood's theory appears to boil down to what "Boyer believes." ECF No. 21 at 14. His brief—which shows strong indications of AI authorship—engages in unsupportable logical leaps and principally relies on (1) references to this lawsuit; and (2) speculation-within-hearsay recounting what Ms. Bozelko supposedly told Mr. Boyer and Samantha Hopwood about Ms. Bozelko's asserted theories. Indeed, Mr. Boyer admits that he makes allegations of Ms. Cockson's involvement based on unspecified "information and belief," an admission that he lacks evidence to substantiate his speculation. ECF No. 21 at 9, 12, 13.

For example, Mr. Hopwood's principal theory is that an unidentified individual secretly working for Ms. Cockson appeared at the clerk's office to obtain a letter that Ms. Bozelko had written before it was docketed expressing her distress at being named as a witness in the complaint for another anonymous accomplice to send exactly the same PDF that Ms. Bozelko sent to the court to Mr. Boyer later that day using the Eileen Rivers email address. *Id.* at 8-9. But the letter was not sent to the clerk's office and, presumably for that reason, was never docketed; it was emailed to chambers by Ms. Bozelko and Mr. Boyer and Mr. Hopwood's lawyer received

-17-

copies. Plainly, there are sources for the PDF other than an imaginary accomplice going to the clerk of court's office.

Second, Mr. Hopwood observes that both Ms. Bozelko's letter and the anonymous texter refer to Mr. Boyer as "Joshua K. Boyer." His theory is that, rather than any more straightforward explanation for why Ms. Bozelko and the anonymous sender might use the same formulation of Mr. Boyer's name, someone secretly obtained Ms. Bozelko's letter from the Court and within hours had provided it co-conspirators supposedly working on Ms. Cockson's behalf who decided to refer to Mr. Boyer in exactly the same way that Ms. Bozelko did. ECF No. 21 at 9.

Third, Mr. Hopwood speculates that the only explanation for the anonymous texter saying that Mr. Boyer, a paralegal, would "underst[an]d" that a process server has a "right and a duty to serve you" is because Mr. Boyer had recently arranged service on Ms. Cockson. *Id.* Again, Mr. Hopwood speculates from the idea that the sender has some concept of what a process server does to asserting Ms. Cockson must somehow have been involved.

Fourth, Mr. Hopwood speculates that the reference to "Doc Metzner" means the sender must have been from David City and therefore must have been Ms. Cockson. ECF No. 21 at 10. Again, that fails to exclude numerous other explanations—for example, that the sender had interviewed people from David City who used that nickname, read articles about Dr. Metzner from the *Lincoln Journal Star* that refer to him by that nickname, or that the sender was someone else from David City. *See* Sanderson Decl. Ex. 6 (articles referring to Dr. Metzner as "Doc"). In fact, as Ms. Cockson explains, that nickname was far more common among Dr. Metzner's own age group rather than younger generations like Ms. Cockson. Cockson Decl. ¶ 16.

Fifth, Mr. Hopwood claims unauthenticated screenshots that Mr. Boyer and Samantha Hopwood claim Ms. Bozelko sent them showing messages from the same VoIP number were

"threatening and harassing" and somehow implicate Ms. Cockson. ECF No. 21 at 11. The supposed screenshot does not match the claim that the messages are harassing; it appears to be vague statements about Mr. Hopwood having colleagues at Georgetown that dislike him. Boyer Decl. Ex. 4A. But Mr. Boyer and Samantha Hopwood cannot authenticate texts someone else received and Ms. Bozelko's out-of-court claim to have received the text messages is offered for the truth of Ms. Bozelko's statement. In other words, it is Ms. Bozelko's credibility and not Mr. Boyer's or Samantha Hopwood's that is at issue regarding these messages. At any rate, none of this points to why *Ms. Cockson* must have been involved.

Sixth, Mr. Hopwood points to the December 12, 2025 email mentioning Ms. Bozelko having received anonymous text messages as meaning that the sender of the email and the sender of the text messages must be the same person to have known about the messages. ECF No. 21 at 11. But on its face, the anonymous author claims to have spoken with Ms. Bozelko: "One of us has spoken to Ms. Bozelko about this." Boyer Decl. Ex. 6. And much of the email contains discussion of assorted communications between Ms. Bozelko and Mr. Boyer. *Id.* Ms. Bozelko also later emailed documents to the anonymous email address. Cockson Decl. Ex. 5. That provides a far more obvious explanation for why the anonymous email author knew about texts to Ms. Bozelko and, at any rate, there is no sign of Ms. Cockson being involved in any of this. To the contrary, the sender appears to have later *guessed* Ms. Cockson's email address, sending an email to two variants to try to find the right one. Cockson Decl. Ex. 5.

Seventh, Mr. Hopwood contends that because Ms. Cockson views this lawsuit as an attempt to harass her and continue Mr. Hopwood's abuse of Ms. Metzner Hopwood— particularly in light of Mr. Hopwood's threat conveyed through Mr. Boyer to use this lawsuit as a way to seek discovery from Ms. Metzner Hopwood— Ms. Cockson must have been the author

of the email. ECF No. 21 at 12. Again, that does not exactly narrow things down: it is not exactly hard to theorize why any observer might view a convicted abuser filing a lawsuit against a former romantic partner complaining about being called a psychopath and a monster as itself a form of abuse.

Eighth, Mr. Hopwood contends "upon information and belief" that an unnamed man contacted Mr. Boyer's landlord and accused Mr. Boyer of harassing Ms. Metzner Hopwood. ECF No. 21 at 12. Aside from being vague and hearsay (given the absence of any testimony from the landlord), Mr. Hopwood's only argument that this was Ms. Cockson is a conclusory statement that "only" Ms. Cockson could have done this. *Id.* at 12-13. But that theory is obviously untrue, not least because Mr. Boyer does not even allege that the unspecified statements mentioned this case and Mr. Boyer is also purporting to "represent" Mr. Hopwood against Ms. Metzner Hopwood in contested divorce negotiations.

Next, Mr. Hopwood (or Mr. Boyer) offers unspecified "AI analysis" and hearsay statements by an unnamed "Alexandria police officer" that he claims suggest all the anonymous communications are from the same person. ECF No. 21 at 14. But Mr. Hopwood fails to present any actual evidence showing that Ms. Cockson—rather than anyone else—sent the messages. Even if Mr. Hopwood could show that the same person wrote the messages, there is no evidence to overcome Ms. Cockson's detailed denials under penalty of perjury that that person is her.

Otherwise, the remainder of Mr. Hopwood's motion restates in conclusory terms his theories that Ms. Cockson is behind all of this and has a "grudge" against him but presents no evidence. Ms. Cockson, of course, is not the only person who questioned Mr. Hopwood's character; Mr. Hopwood is incarcerated following convictions for abuse and obstruction of justice and is involved in contested divorce proceedings. Ms. Bozelko has made clear her

-20-

dissatisfaction that Mr. Hopwood named her in the complaint, swore at Mr. Boyer for refusing to remove her from it, and apparently sent some emails to whoever was behind the anonymous account. None of this comes close to singling out Ms. Cockson as the only person who might have a motive to send hostile messages to Mr. Boyer.

**⁂**

If the messages Mr. Boyer received are genuine, they are disturbing. But none of what Mr. Hopwood presents comes close to being clear and convincing evidence that Ms. Cockson sent them or directed anyone to send them. Instead, he provides hearsay and "information and belief" and theories that conclusorily assert that "only" Ms. Cockson could have done things where that is manifestly not true. By contrast, Ms. Cockson provides detailed denials under penalty of perjury and also presents evidence that the anonymous author was located in the Eastern time zone and found her email address by guessing two variations of it. She does not know who the anonymous sender is; it is not her.

> **4.     Independently, Mr. Hopwood Also Fails to Show Any Actual Disruption to His Ability to Prove Any Fact That Matters to the Merits of this Case.**

Finally, Mr. Hopwood has failed to "show[] that the alleged conduct . . . has had any effect on this case." *Pinson*, 2023 WL 2708815, at *14. While Mr. Boyer asserts he was distressed by the messages, he has plainly continued to "represent" Mr. Hopwood. Much as in *Pinson*, Mr. Hopwood fails to point to any specific evidence that anyone with actual relevant information has been discouraged from testifying in the underlying defamation case or what particular element of his claims those people would supposedly provide evidence to support. And, for all the reasons Ms. Cockson has explained at length in her motion to dismiss, the complaint fails to state a claim in the first place.

-21-

### C.    Rule 11 Sanctions Are Unavailable Because There Was No Signed Paper and No Safe Harbor Notice.

As for Mr. Hopwood's request for Rule 11 sanctions, it fails on its face. Rule 11 is about three implied representations a party makes about the contents of a pleading or other paper filed with the court when the party signs it. Fed. R. Civ. P. 11(b). "Rule 11 sanctions are proper *only* in situations involving a signed pleading." *Landon v. Hunt*, 938 F.2d 450, 453 (3d Cir. 1991) (emphasis in original) (quotation omitted). Here, Mr. Hopwood does not point to any statement in a signed pleading; instead, he challenges someone's out-of-court conduct, which is not governed by Rule 11.

Moreover, Mr. Hopwood's motion plainly fails under Rule 11(c)(2) because he gave no "safe harbor" notice of his intent to move for sanctions if the paper he challenges was not withdrawn. Thus, Rule 11 sanctions are unavailable.

### D.    While Mr. Hopwood Has Not Shown "Exceptional Circumstances" to Justify Discovery on His Motion, if the Court Decides That Framed Discovery and an Evidentiary Hearing are Necessary, Ms. Cockson Will Take Discovery Too.

Mr. Hopwood has not made the showing necessary to justify discovery or an evidentiary hearing. Discovery on sanctions motions is available "only in extraordinary circumstances." *Indianapolis Colts v. Mayor & City Council of Baltimore*, 775 F.2d 177, 183 (7th Cir. 1985) ("The Advisory Committee Notes to Rule 11 urge that the court limit the scope of sanction proceedings to the record and allow discovery only in extraordinary circumstances, lest the costs of satellite litigation over sanctions outweigh the benefits intended from Rule 11."). Mr. Hopwood does not present a sufficient showing of Ms. Cockson's involvement to justify further multiplying proceedings in a meritless defamation case that fails to state a claim in the first place.

-22-

But if the Court is nonetheless minded to order discovery, Ms. Cockson must have an opportunity to discredit Mr. Hopwood's purported evidence and identify evidence that will show that someone else—presumably, someone on the Eastern time zone—sent the messages.

At a minimum, if discovery is necessary, Mr. Hopwood and Mr. Boyer should be required to produce the originals of (i) the emails and text messages of which they complain for forensic examination (which may help show the true sender) and (ii) their generative AI logs, given Mr. Boyer reliance on "AI analysis" and the fictitious cases cited in Mr. Hopwood's brief. Ms. Cockson also would seek third-party non-content data to try to identify who is using the anonymous accounts and where they are located. Additionally, Ms. Cockson is entitled to cross-examine Mr. Hopwood's three declarants—Mr. Hopwood, Mr. Boyer, and Samantha Hopwood—and a deposition may be a more efficient way to do that than "cold cross" at an evidentiary hearing.

### E.    If the Court Permits Mr. Hopwood to Take Discovery, It Should Closely Monitor It To Ensure Mr. Hopwood Does Not Use It As an Excuse to Further Harass Ms. Metzner Hopwood.

Mr. Hopwood requests discovery limited to a subpoena to Bandwidth.com and a subpoena to Google for non-content information about three anonymous accounts. While Ms. Cockson does not believe Mr. Hopwood has made enough of a showing to justify discovery, she would seek the same information if the Court concludes discovery is necessary.

That being said, Ms. Cockson has significant concerns about Mr. Hopwood's request for leave to conduct expedited discovery given his recent convictions for abusing Ms. Metzner Hopwood and obstruction of justice. There is a substantial risk that Mr. Hopwood will attempt to use discovery in this action to further victimize Ms. Metzner Hopwood or as a guise to collaterally attack his criminal convictions. That concern is especially stark given that Ms. Cockson understands that Mr. Boyer has, on Mr. Hopwood's behalf, repeatedly emailed Ms.

Metzner Hopwood's divorce attorneys to say that he intends to take discovery from her in this action and that he will sue Ms. Metzner Hopwood for breach of an interim agreement in the divorce proceedings if she provides documents or testimony in this action voluntarily.

Accordingly, if this Court permits Mr. Hopwood to take discovery on this motion, it should be limited to the non-content records from Bandwidth.com for the anonymous phone number and Google for the anonymous Gmail accounts, it should require submission of subpoenas for Court review prior to issuance to enforce this limitation, and it should require production simultaneously to Ms. Cockson's counsel given that Mr. Hopwood, as an incarcerated pro se litigant, may not be able to immediately produce any documents he receives to Ms. Cockson's counsel.

**F.     Mr. Hopwood Has No Authority to Demand that Ms. Cockson Not Speak to His Soon-to-be-Ex-Wife and Victim.**

Mr. Hopwood also seeks an order prohibiting Ms. Cockson from speaking with her friend, Ms. Metzner Hopwood—even with Ms. Metzner Hopwood's consent. He cites no authority for this request to restrict consensual communications, and it is disturbing that Mr. Hopwood, even after his conviction for abusing Ms. Metzner Hopwood, seeks to continue to control Ms. Metzner Hopwood, isolate her from her friends, and restrict whom she can speak to.

Indeed, the request is especially concerning given that Mr. Boyer has repeatedly threatened to use this action to seek discovery from Ms. Metzner Hopwood and recently threatened to sue Ms. Metzner Hopwood based on a confidentiality provision in an interim agreement in Mr. Hopwood's divorce proceedings if she voluntarily cooperates with Ms. Cockson's defense of this action. Mr. Hopwood and Mr. Boyer cannot continue to threaten Ms. Metzner Hopwood while demanding that Ms. Cockson not speak to her friend with her friend's consent.

At any rate, Mr. Hopwood has provided no evidence tying Ms. Cockson to the conduct he alleges against Mr. Boyer and she has provided unequivocal denials. Restricting her from preparing her defense to this action by speaking to witnesses—perhaps even through counsel—is wholly unwarranted.

**G.    Mr. Hopwood and Mr. Boyer Should Explain Why Their Motion Appears to Contain Hallucinated Citations and Quotes and Provide Their Generative AI Logs.**

Finally, Ms. Cockson notes that authorities cited in Mr. Hopwood's brief appear to be hallucinations that either do not exist in the form that they are cited, do not stand for the propositions Mr. Hopwood claims, or do not contain the quotes Mr. Hopwood claims.

- Mr. Hopwood twice cites "*Synergetics, Inc. v. Hurst*, 2007 U.S. Dist. LEXIS 68736 (W.D.N.Y.)," which Mr. Hopwood claims supports terminating sanctions for witness tampering. ECF No. 21 at 6, 21, does not exist at that citation. There is a real case by that name in a different district, but it *rejects* terminating sanctions where a party conditioned settlement of a separate lawsuit against a witness on that witness not testifying in a trial. *Synergetics, Inc. v. Hurst*, No. 4:04CV318 CDP, 2007 U.S. Dist. LEXIS 61286, at *3 (E.D. Mo. Aug. 21, 2007). The actual case at that citation is *Kalwasinski v. Ryan*, No. 96-CV-6475, 2007 U.S. Dist. LEXIS 68736, at *1 (W.D.N.Y. Sep. 12, 2007), a different case about sanctions when a plaintiff told his court-appointed counsel that he planned to murder corrections officers involved in the case. That is at least suggestive that Mr. Boyer may have used an AI algorithm to draft.[3]

---

[3] Additionally, Mr. Hopwood claims that "*Torres v. Wells Fargo Bank, N.A.*, 2019 U.S. Dist. LEXIS 227913 (C.D. Cal.)" supports terminating sanctions, but that citation is for an unrelated decision, *Saidi v. Saqr*, No. 6:18-cv-1338-Orl-40GJK, 2019 U.S. Dist. LEXIS 227913, at *1 (M.D. Fla. Feb. 20, 2019). Given that a *Torres* case exists with a citation of 2019 U.S. Dist.

- Mr. Hopwood claims to quote at length from *Young v. Office of the United States Senate Sergeant at Arms*, 217 F.R.D. 61 (D.D.C. 2003), to argue that witness tampering categorically requires terminating sanctions, including quoting the phrases "gross fraudulent misconduct," and "not appropriate in light of gross witness tampering." ECF No. 21 at 20. Neither quotation appears in the case. Likewise, Mr. Hopwood claims the case says that "monetary sanctions alone *are* 'inherently inadequate to remedy the harm.'" ECF No. 21 at 20 (emphasis added); *see also id.* at 6 (similarly changing "may be" to "are" before the quote). But that manipulates the quote, which says the equivocal "may be," not the categorical "are." 217 F.R.D. at 70.[4]

- Mr. Hopwood claims that *Am. Hospital Ass'n v. Sullivan*, 938 F.2d 216, 219-20 (D.C. Cir. 1993) contains the phrase "recalcitrant misconduct" as a basis for punitive monetary penalties. ECF No. 21 at 21. The quoted phrase does not appear in the opinion and the case does not deal with punitive fines but rather attorneys' fees. The invented quote and citing a case that deals with a close but not identical proposition are suggestive of AI hallucinations.

- Mr. Hopwood claims *Riley v. City of New York*, 2015 U.S. Dist. LEXIS 16025 (E.D.N.Y., Feb. 10, 2015) "imposed adverse-inference sanctions that allow juries

---

LEXIS 227713 (C.D. Cal., Dec. 17, 2019), this may be a typographical error rather than a hallucinated citation.

[4] Mr. Hopwood misquotes *United States v. Vasilakos*, 508 F.3d 401, 411 (6th Cir. 2007) from "reasonable actions," to "reasonable steps." ECF No. 21 at 5. Likewise, a few non-substantive wording differences appear in the quotation from *Ty Inc. v. Softbelly's Inc.*, 517 F.3d 494 (7th Cir. 2008). ECF No. 21 at 2. While in this instance the misquotes do not change the meaning, they provide further evidence that Mr. Hopwood (or Mr. Boyer) may be using generative AI without verifying the quotations.

to infer a party's involvement in witness tampering." ECF No. 21 at 21. But that garbles the case; the case did not say that a jury can infer that a party was involved in witness tampering based on an adverse inference, but rather the other way around—it found that the plaintiff had engaged in witness tampering and therefore granted an adverse inference instruction on the merits of the plaintiff's claims.

Given Mr. Boyer's admission that he used generative AI algorithms to litigate this matter on Mr. Hopwood's behalf, Boyer Decl. ¶ 41, it is very possible they are AI-hallucinated citations. This Court should order Messrs. Hopwood and Boyer to explain how these erroneous citations came to be cited in their briefs and provide their generative AI logs related to this action so that the Court can determine if anything else in the papers they have submitted is the product of generative predictive text algorithm hallucinations. Given that Mr. Boyer is not a lawyer, information he has shared with generative predictive text software cannot be privileged and, as Mr. Hopwood's agent by virtue of his power of attorney, he is required to preserve the messages he has shared with these algorithms.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Hopwood's motion should be denied without prejudice pending disposition of Ms. Cockson's motion to dismiss or held in abeyance. If the Court does reach the merits of the motion, it should deny it in its entirety. It should, in any event, order Messrs. Hopwood and Boyer to explain why the brief contains numerous erroneous citations or quotations that do not appear in the cited cases and direct them to produce any AI logs related to this action.

Dated: June 10, 2026

Respectfully submitted,

   */s/ Joseph M. Sanderson*
Joseph M. Sanderson (Bar No. NY0560)
STEPTOE LLP
1114 Avenue of the Americas
New York, NY  10036-7703
Telephone:       212 506 3900
Facsimile:        212 506 3950
josanderson@steptoe.com

Michelle S. Kallen (Bar No. 1030497)
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036-1795
Telephone:       202 429 3000
Facsimile:        202 429 3902
mkallen@steptoe.com

*Attorneys for Defendant*